UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| SAMUEL FIELDS, | ) | |
| | ) | |
| Petitioner, | ) | Civil No. 15-38-ART |
| | ) | |
| v. | ) | |
| | ) | |
| RANDY WHITE, *Warden*, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Respondent. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

More than twenty years ago, a woman named Bess Horton was murdered in her bed. She was eighty four. Her "throat was slashed," and a knife was jammed all the way through her skull: the knife was "buried to the hilt in her right temple" and "the point of the blade protruded from her left." *Fields v. Commonwealth*, 12 S.W.3d 275, 277 (Ky. 2000). When police officers arrived at the scene, they found Samuel Fields standing next to Ms. Horton's body, rummaging through her valuables. *Id.* at 278. Fields immediately confessed to the officers. *Id.* He had her jewelry in one pocket, knives and razor blades in the others. *Id.* An hour or so later, he confessed to an EMT as well. *Id.* at 279. A jury eventually convicted him of murder and burglary and sentenced him to death. *Id.* at 277. Over the last two decades, Fields has exhausted his available means of state-court relief, and he is currently awaiting execution on Kentucky's death row. Turning to the federal courts, he has now filed a petition for a writ of habeas corpus, in which he brings thirty claims for relief. R. 6. For the reasons explained below, none of those claims have merit. His petition is therefore denied.

# I.

This case begins on August 18, 1993.  That afternoon, Fields and several of his friends—including Minnie Burton, Elmer Pritchard, and Phyllis Berry—were driving around eastern Kentucky and "consuming large amounts of alcohol, mostly beer."  *Fields*, 12 S.W.3d at 278.  Fields, who was twenty-one years old at the time, had previously been married to Burton's niece, and he and Burton had been in a relationship "for a few days" during August of 1993.  R. 30-18 at 2607.  Pritchard, on the other hand, was one of Burton's neighbors.  *Id.* at 2610.

"The group made two separate trips to Ashland to purchase several cases of beer," stopped at Berry's brother house in Boyd County, "drank some whiskey," "ingested some 'horse tranquilizers[,]'" and "finally returned to Grayson with the intention of spending the night at a residence occupied by [Fields's] mother and brother."  *Fields*, 12 S.W.3d at 278. There the party got even rowdier.  The group "continued drinking with [Fields's] brother, John Fields, who also lived at the [residence]."  *Fields v. Commonwealth*, 274 S.W.3d 375, 390 (Ky. 2008).  Burton and Sam Fields eventually got into a fight, prompting Fields to throw "furniture, knives, and other objects" around the living room.  *Id.*  At around the same time, Fields "started crying"—Burton would later say that she thought he might have been "high[] or drunk"—and saying that "he didn't have any control over his self."  R. 30-18 at 2621.

At this point, Burton left to go home "because [Fields's] behavior scared her."  R. 32-1 at 413; R. 30-18 at 2621–22.  She thought he was "acting crazy," and of course she had good reason to think so: he had just thrown a knife "through to the living room from the

kitchen." R. 30-18 at 2622.[1]  Burton lived in Grayson as well, at a duplex owned by Ms. Horton.  The duplex was about a five-minute walk from the house where the group had been drinking.  *Id.* at 2624.  Burton had been living rent-free in the duplex for some time, a privilege she received in return for running Horton's errands and chauffeuring her around. *Fields*, 12 S.W.3d at 277; *see* R. 30-18 at 2668–89.  But the relationship between the two women had recently "turned sour" and Horton had "turned off the power and water in the duplex in an attempt to force Burton out."  *Fields*, 274 S.W.3d at 390.  "Thus, on the evening of August 18th, Burton was unable to gain entry into her apartment."  *Id.*  So she sat down on a chair on the front porch of the duplex and "smoked a cigarette or something."  R. 30-18 at 2625–26.

As Burton sat there on the porch, she heard "a lot of hooting and hollering and what sound[ed] [like] somebody hitting [street] signs real hard and hollering."  *Id.* at 2627.  It was "real foggy that night."  *Id.*  (A police officer would later describe the atmosphere, in southern-gothic fashion, as "a soupy type fog, kind of rolling thick fog, the kind that just kind of sticks on your windshield." R. 30-14 at 1980.)  And thus, Burton could not see who was doing the hooting and hollering, at least initially.  Fields then "came out of the fog."  *Id.* at 2627–28.  He had a knife in his hand.  *Id.* at 2628.  He "kindly[2] pushed [the knife] to [Burton]" and said "take this.  I've killed my brother, John."  *Id.*  (He hadn't.  *Fields*, 274 S.W.3d at 391 ("[I]n fact, [Fields] had not killed his brother."))   Shortly after this

---

[1] During Fields's trial, Burton testified that she didn't "know if he was throwing [the knife] at [her] or just throwing it."  R. 30-18 at 2622.  She said that the knife "probably hit the wall" but that she didn't "remember if it stuck in [the] wall or" not.  *Id.* at 2623.

[2] In the vernacular of eastern Kentucky, "kindly" means not only "gently" but also "kind of."  That appears to be the sense in which Burton used the word "kindly" here—*i.e.*, she was saying that Fields "kind of" pushed the knife toward her, not that he pushed the knife toward her in a gentle way.

conversation, Burton left the porch.  *Id.* at 2630.  It was now sometime after midnight, the morning of August 19th.

"Unbeknownst to either Burton or [Fields], Elmer Pritchard had heard the noise outside and had called the police."  R. 32-1 at 414.  Officer Larry Green received the call and arrived at the scene.  R. 30-13 at 1889–90.  Pritchard had reported a break-in at the duplex.  *Id.* at 1891.  Based on Green's conversation with Pritchard, Green believed that Fields was responsible for the break in, so Green began to look for Fields.  Again, "[i]t was real foggy," he would later say, "[v]isibility was about probably ten feet, but it was a—it was a rolling fog," so Green called for backup to help him conduct the search.  R. 30-18 at 103.  Sergeant Ron Lindeman responded.  R. 30-14 at 1979.  Lindeman had apparently been in bed asleep— it was, after all, around two in the morning—and thus he arrived clad in an unusual outfit: he was wearing a t-shirt, a pair of jogging shorts, flip flops, and a police hat.  *Id.*  He was carrying his service revolver.  *Id.*

The two officers searched various buildings in the area—which was difficult given the fog, as the officers would later recall over and over again—and then noticed that the garage door was up on Ms. Horton's residence.  *Id.* at 1990.  Lindeman said to Green: "There's a door open on the garage.  There may be someone there.  Stay tight where you're at."  *Id.*  Lindeman "made a wide sweep around the back of [the garage]," *id.* at 1990, and the two officers eventually went inside, R. 30-13 at 1898.  They looked inside some vehicles to "satisfy [themselves] [that] there was no one in the garage."  R. 30-14 at 1991.

The officers then went behind the house, at which point they noticed "that the lights were on in the backend section of the house."  *Id.* at 1992.  This was unusual, Lindeman thought, because he could not recall Ms. Horton's "lights ever being on that late at night."

4

*Id.* Around this time, the officers noticed a screen "tore down off the window." R. 30-13 at 1900; *see* R. 30-14 at 1993. "It looked like an L-shaped cut on the screen on the window." R. 30-14 at 1993. Upon seeing this, the officers became "real alarmed." *Id.*

Soon after, Green looked in a window and saw "Sammy Fields inside [the] room walking towards the window that [he] was looking through." R. 30-13 at 1901. Green knew Fields "by name when [he'd] see him." *Id.* Green radioed Lindeman: "Ron, come back here. He's in the house. Come back here. He's in the house." *Id.* at 1994. The two officers looked through the window at Fields. They saw "a high bed," a "dresser drawer," and "Sammy Fields on his knees in front of the window." *Id.* at 1995–96. At this point, the officers could not see Ms. Horton.

Lindeman told Green "to stay at the southeast corner [of the house] watching through the window to keep an eye on Mr. Fields." *Id.* at 1996. Lindeman himself went "to investigate the front end of the house to see if there was any other way that anyone could have gotten into the home." *Id.* On the front porch, he saw "a window up on the porch laying up against the brick pillar." *Id.* at 1997. Lindeman took his flip flips off to avoid making noise. *Id.* He saw some screws lying on the porch and noticed that "the middle section window was the one that was removed and was laying against the pillar." *Id.* at 1997.

As Lindeman entered the house—through the window—he saw "a spot of blood on a curtain" as well as on a comforter. *Id.* at 1998. So he "squatted down" into a "duck walk position" just in case "someone did see [him] and they fired a round or something or threw something at [him]." *Id.* He crept down the hallway and toward the bedroom in the back. *Id.* There, he saw "Sammy Fields in the [bedroom] going through a drawer." *Id.*

5

When Fields turned around, Lindeman told him "to put his hands on his head and not to move." R. 30-14 at 1999.  Fields responded, "Hi, Ron.  How you doing?"  *Id*.  With his service revolver still trained on Fields, Lindeman called for immediate backup—"everyone that I could get to come in there."  *Id*. at 2000.  Fields "had some spots of blood on him, and he had some blood on his shirts and some blood on his pants."  *Id*.  At this point, Lindeman noticed Ms. Horton.  She was "laying on the bed with a knife through her head."  *Id*.  Lindeman "radioed for Officer Green to come back through the front of the house, come through the window and assist [him] in the bedroom[.]"  *Id*. at 2000.  As Lindeman was waiting for Green, he asked Fields "What's going on?  What are you doing?"  *Id*. at 2001.  In response, Fields confessed to the crime: "Kill me, Ron, just kill me," he said, "I stabbed her, and I'm into it big time this time."  *Id*.  Lindeman asked Fields why he had done it.  "I don't know," he said, "I just did it.  Kill me.  I'm going to prison for the rest of my life."  *Id*.

"At that time, Officer Green finally got to [Lindeman]."  *Id*. at 2001.  When Green entered the room, he "could see Ms. Horton."  R. 30-13 at 1912.  "She was laying in the bed and there was a knife sticking out of her hea[d].  And there was a dresser with the drawers out [that] looked like [it] had been ransacked."  *Id*. at 1912.  On her hands, the medical examiner would later find defensive wounds, which the prosecutor would describe as "cuts on her hands from protecting herself from her attacker."  *Id*. at 1868–69.  When the police found her, her "hands were literally inside her throat."  *Id*. at 1869.  Her head "was nearly cut off."  *Id*. at 1868.

Green read Fields his *Miranda* rights.  Fields apparently was "quoting [the rights] right along with [Green] as [he] read them," *i.e.*, "parroting what [Green was] saying."  *Id*. at 1906; *see also* R. 30-14 at 2003 ("He was quoting them right along with us.  He said 'I know

them[,]' and he was cussing; he was very mad.").[3]  Fields said he understood his rights, R. 30-14 at 2003, then "made a statement" to the officers, R. 30-13 at 1907.  He said "Kill me.  Shoot me.  I'm into it deep.  I killed her."  *Id.*  "He was calm."  *Id.*  "His voice was loud."  *Id.*  In Green's judgment, Fields "wasn't intoxicated."  *Id.*  "He was looking straight at Sergeant Lindeman."  *Id.* at 1907.

Shortly thereafter, Lindeman "saw a bunch of knives and things sticking out of [Fields's] pocket."  *Id.* at 1908.  "There were knives, and there were razor[ ]blades still in their cases or boxes"—"[o]ld-fashioned straight razor[s]."  *Id.* at 1908–09.  One of the knives was a "butter knife or a silver knife.  The point was missing off of it."  *Id.* at 1910.  (Throughout trial, this object became known as the "twisty knife" because the tip was twisted in an unusual way.)  The officers also noticed "some other things bulging in his pants" and "some jewelry fell out of his pockets."  R. 30-14 at 2002.

The officers placed Fields under arrest, then took him to the hospital in Ashland, about thirty minutes away.  He was handcuffed by this point and "had some blood on him"— particularly on his pants.  R. 30-15 at 2109.  An EMT asked Fields "where the blood was coming from."  *Id.* at 2112.  Fields responded "in no uncertain terms," as the EMT would later put it, "that if [the EMT] had killed some lady that [the EMT] would have blood on [him] as well."  *Id.* The EMT then emptied Fields's pockets.  *Id.* at 2116.  Among other things, he found "two keys," a "safety pin," "necklaces," a "velvet bag of pearl jewelry," and "earrings."  *Id.* at 2116–17.

---

[3] *Cf. Dickerson v. United States*, 530 U.S. 428, 443 ("*Miranda* has become embedded in routine police practice to the point where the warnings have become part of our national culture.").

Fields was eventually indicted for murder and burglary, and a Rowan County jury found him guilty on both counts. *Fields*, 12 S.W.3d at 277.[4]   The jury sentenced him to death. *Id.*  Fields appealed his conviction to the Kentucky Supreme Court, which reversed and remanded the case for a new trial. *Id.* at 285.  The state court gave two reasons for its reversal: first, that the "jury was permitted to hear the recorded narrative of a staged videotape reenactment" of the crime scene investigation; and second, that "the trial judge erroneously failed to instruct the jury on manslaughter in the second degree as a lesser included offense of murder." *Id.* at 277.

Following a change of venue, Fields was retried for murder and first-degree burglary. *Fields*, 274 S.W.3d at 390.   During the second trial, the prosecution emphasized three themes.  First, that Fields "was caught in [Ms. Horton's] home by two police officers."  R. 30-13 at 1844.  Second, that given the time-line of events, "there wasn't any opportunity for anyone else to have done this."  *Id.* at 1844.[5]  And third, that the physical evidence in the case pointed to Fields—in particular that Fields's blood had been found at the crime scene and that the "twisty knife" had white paint on the end of it, as did the screws used to attach the window to the house.  *Id.* at 1844, 1865–66; R. 30-23 at 3394 ("The facts are, the Defendant's blood is found on this knife in which ultra-white paint is found.").   The prosecutor also reminded the jury repeatedly that Fields had confessed "three different times" to "murdering Ms. Horton" and "burglarizing her home."  R. 30-13 at 1845; *see also* R. 30-

---

[4] The details of what happened during this first trial are more or less irrelevant for the purposes of this habeas petition, given that the first conviction was reversed.  The Court will therefore not recite those details.  The record of the first trial can be found at R. 28.

[5] In particular, the prosecution emphasized that Fields *would* have had time to take the screws out of the window and thereby secure entry into the house.  R. 30-13 at 1845.  During opening statements, the prosecutor remained silent for thirty seconds to show the jury how "long a minute can be," then asked the jury rhetorically whether that was "enough time to take a screw, a little Phillips head screw, a little short Phillips head screw, out of a piece of wood?" *Id.*

23 at 3389–90 (making a similar argument during summations).    "Believe him," the prosecutor said during closing arguments, "[b]elieve [Fields] when he told Ron Lindeman that he did it."  R. 30-23 at 3425.

The defense's theory, on the other hand, was that "Ms. Horton was dead before Sam Fields ever entered that house."  R. 30-13 at 1874.  In support of that theory, the defense argued that the true murderer would have "had some blood on them."  *Id.*  Fields himself was bleeding, of course.  "We know that he was leaving blood," counsel said, "just about every place that he was in": "blood on [the] sidewalk," "blood on the back steps," "blood on the front screen porch handle," and so on.  *Id.* at 1879.  But none of his blood was found on Ms. Horton.  *Id.*  And none of Ms. Horton's blood was found on Fields.  *Id.*  Thus, the defense argued, he could not have committed the murder.

Defense counsel would later characterize this line of reasoning as the "where's the blood?" argument.  It was the main pillar of the defense.[6]  It was the "[f]irst thing[] out of my mouth in the opening," counsel said during closing arguments.  R. 30-23 at 3367.  The other pillar was that, given his intoxicated state, Fields would not have been able—during the timeframe in question—to break into the house, sneak up on Ms. Horton, and commit the murder.  *See, e.g.*, *id.* at 3373–80 ("No time. . . . Mr. Fields had less than an hour. . . . [N]o time to hide any evidence[,] no chance to clean up a crime scene[,] no chance to wash any blood off anything[,] your face[,] change your clothes, your hands, hide a screwdriver to remove screws from a window; no time—nothing. . . . [W]hat we have here is a man who has

---

[6] The prosecution's response to this argument was that Ms. Horton's blood was not found on many other things in her house, so it was no real surprise that the police found none of it on Fields, either.  R. 30-23 at 3392, 3397 ("She doesn't [even] have her own blood on her arms.  She has it right around the area that she's being attacked.").  As for why none of Fields's blood was found on Ms. Horton, the prosecution essentially argued that he just was not bleeding that badly by the time he got to Ms. Horton's bedroom.  *Id.* at 3396.

been a loud, obnoxious, aggravating man, banging glass, breaking windows, thumping inside apartments, waking the neighbors up, out in the street yelling.  All the sudden becomes quiet like a stealth.").  Fields's indictment, counsel argued, was the result of a police department that rushed to judgment and concluded that Fields had killed Ms. Horton—he had confessed, after all—then failed to follow up on leads that would have led them to the true murderer. *See id*. at 3373 ("Yes, it looks bad.  And that's exactly what the police thought when they walked in and saw that.  [Whoa], cut and dr[ied].  This is a cut and dr[ied] case.  But it's not. It's not at all.").

Of course, that argument has a bit more force to it if the lawyer can say who he thinks the true murderer is.  Defense counsel here chose Minnie Burton.  "Minnie Burton is not the whitewashed character that has been portrayed so far," counsel said during his opening statement, "[and t]he evidence is going to show that Minnie Burton is the individual that had the opportunity to case the home."  R. 30-13 at 1875.  Counsel pointed out that Burton was "unaccounted for for almost two hours on the night in question that Ms. Horton was murdered," *id.*, that she had given inconsistent statements to the police—"[i]t's hard to keep a story straight," counsel said, *id.* at 1876—that she had a clearer motive than Fields did, R. 30-24 at 3381, and that she had tried to conceal the fact that Ms. Horton had kicked her out of the duplex, R. 30-13 at 1878.  *See also* R. 30-23 at 3369 ("Minnie Burton was mad. Her gravy train was over.  We know that she had thought it would be an easy target to rob Ms. Horton[.]").  In the end, the defense's argument was that Fields was "acting as a scavenger, not a predator," and, although that was "nothing to be proud of," it nevertheless did not make him a murderer.  R. 30-13 at 1880.

The jury again convicted Fields and again sentenced him to death.  This time, the Kentucky Supreme Court affirmed the conviction.  *Fields*, 274 S.W.3d at 390, 420.  Fields petitioned the United States Supreme Court for a writ of certiorari, but the Court denied the petition.  *Fields v. Kentucky*, 558 U.S. 971 (2009).

A year later, Fields filed a motion for post-conviction relief in the state trial court.  *See Fields v. Commonwealth*, No. 2013-SC-000231-TG, 2014 WL 7688714, at *2 (Ky. May 14, 2015).  The court held an evidentiary hearing over the course of three days, received written evidence, and considered the parties' briefs.  *Id.*  In January 2013, the trial court denied the motion and likewise denied Fields's petition for rehearing.  *Id.* at *15.  Fields again filed a certiorari petition with the United States Supreme Court, which denied the petition earlier this year.  *Fields v. Kentucky*, 136 S. Ct. 798 (2016).  Around the same time that he was petitioning for certiorari, Fields filed this petition for a writ of habeas corpus.  R. 6.  That petition is now before this Court.

## II.

### A.    Legal standard

The Antiterrorism and Effective Death Penalty Act (AEDPA), which Congress passed in 1996, substantially limits a federal court's ability to grant a writ of habeas corpus to prisoners held in state custody.  *See* 28 U.S.C. § 2254.  "[T]he purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction."  *Greene v. Fisher*, 132 S. Ct. 38, 43–44 (2011) (internal quotation marks omitted).  But AEDPA applies only to claims that the state courts have already adjudicated "on the merits."  28 U.S.C. § 2254(d).  Otherwise, the federal court reviews the claim de novo.  *See, e.g.*, *Porter v. McCollum*, 558

U.S. 30, 39 (2009) ("Because the state court did not decide whether [the prisoner's] counsel was deficient, we review this element of [his] claim *de novo*."); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("[O]ur review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis." (discussing the standard for ineffective assistance of counsel set by *Strickland v. Washington*, 466 U.S. 668 (1984)); *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003) (holding that, if AEDPA does not require deference to the state court decision, then a court "'exercise[s] [its] independent judgment' and review[s] the claim de novo" (quoting *Hain v. Gibson*, 287 F.3d 1224, 1229 (10th Cir. 2002))); *Cox v. Miller*, 296 F.3d 89, 101 (2d Cir. 2002) (noting that habeas claims are either subject to the AEDPA standard or else reviewed de novo).  The first question in this case is therefore whether the Kentucky courts adjudicated "on the merits" the claims that Fields now raises in his habeas petition.

For the purposes of § 2254(d), a state court adjudicates a claim "on the merits" when it decides the petitioner's right to relief on the basis of the substance of the claim rather than on the basis of a procedural rule.  *See, e.g.*, *Muth v. Frank*, 412 F.3d 808, 815 (7th Cir. 2005) ("An adjudication on the merits is perhaps best understood by stating what it is not: it is not the resolution of a claim on procedural grounds."); *Neal v. Puckett*, 286 F.3d 230, 235 (5th Cir. 2002) ("[A]djudication 'on the merits' is a term of art that refers to whether a court's disposition of the case was substantive as opposed to procedural."); *see also Ballinger v. Prelesnik*, 709 F.3d 558, 561 (6th Cir. 2013); *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001).  A federal court must "presume[]" that "the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

Fields raised before the Kentucky Supreme Court on direct appeal nearly all of the claims he raises now in his habeas petition. (The only exception is his eighteenth claim, which the Court has already dismissed via a separate opinion. *See* R. 58.). The Kentucky Supreme Court rejected each of those claims either on direct appeal or on appeal from the trial court's denial of Fields's motion for post-conviction relief. *Fields*, 12 S.W.3d at 275; *Fields*, 274 S.W.3d at 375. And the state court gave no indication in either of those opinions that it was rejecting any of Fields's claims on procedural grounds. Because "[t]he state court did not say it was denying the claim for any other reason," this Court must presume that the Kentucky Supreme Court denied each of those claims "on the merits." *Harrington*, 562 U.S. at 99. AEDPA's gatekeeping requirements therefore apply to each of Fields's remaining claims. 28 U.S.C. § 2254(d).

When AEDPA applies to a claim, a federal court generally must deny habeas relief. 28 U.S.C. § 2254(d). There are only three exceptions to that rule. First, a federal court may grant habeas relief if the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id*. § 2254(d)(2). Alternatively, a federal court may grant habeas relief if the state court's adjudication "resulted in a decision that was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States[.]" *Id*. § 2254(d)(1). Finally, a federal court may grant habeas relief if the state court's adjudication "resulted in a decision" that "involved an unreasonable application of . . . clearly established Federal Law, as determined by the Supreme Court of the United States." *Id*. If a prisoner cannot show at least one of those things, however, then his habeas petition must be denied.

Here, Fields argues that he has shown all three of these things—that the state court acted "contrary to" clearly established federal law as determined by the Supreme Court of the United States, that the state court "unreasonably applied" that law, and that the state court "unreasonably determined" the facts.   Fields develops his "unreasonable application of Supreme Court law" argument with at least some detail with respect to each of his claims. But he makes his "unreasonable determination of the facts" arguments and "contrary to Supreme Court law" arguments only in boilerplate fashion.   To take a typical example, with respect to his first claim, he spends five pages explaining why the Kentucky Supreme Court, in his view, unreasonably applied clearly established federal law.   He then concludes by stating—without citation or further argument—that "the state courts' decisions on this issue are . . . contrary to United States Supreme Court precedent, and/or an unreasonable application of the facts."   R. 6 at 31.

Under Sixth Circuit law, "issues averred to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."   *Leary v. Livingston County*, 528 F.3d 438, 449 (6th Cir. 2008).   Fields sufficiently develops his arguments that the state courts "unreasonably applied" clearly established federal law.   Closely related are his arguments that the state courts acted "contrary to" such law.[7]   The Court will therefore consider those arguments.   Fields's arguments that the state courts "unreasonably determined the facts," on the other hand, are averred to only in a "perfunctory manner."   And they are accompanied by no "effort at developed argumentation."   *Leary*, 528 F.3d at 449.   Those arguments are therefore waived.   *Id.*

---

[7] After all, if a state court acted "contrary to" a holding of the United States Supreme Court, the state court's decision must be an "unreasonable application" of such holding as well.  *See Bell v. Cone*, 535 U.S. 685, 694 (2002) (discussing the "contrary to" standard); *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (same).

To obtain habeas relief, therefore, Fields must show that, when the Kentucky Supreme Court rejected his claims, its decision "involved an unreasonable application of[] clearly established federal law[] as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  In attempting to show that, Fields has a peculiarly narrow universe of law on which to draw.  He must show that the Kentucky courts unreasonably applied a Supreme Court case, rather than one from a lower court.  *See Renico v. Lett*, 559 U.S. 766, 779 (2010).  He must show that the Kentucky courts unreasonably applied a "holding[]" of the Supreme Court, "as opposed to the dicta."  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  He must show that the holding in question is about a constitutional rule applicable to the states, rather than about some other kind of rule. *Early v. Packer*, 537 U.S. 3, 10 (2002).  And it is not enough for him to show that the state court merely failed to extend such a holding to the facts of his case—even if that failure to extend was an unreasonable one.  *See White v. Woodall*, 134 S. Ct. 1697, 1706 (2014).  In sum, "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]."  *Harrington*, 562 U.S. at 101.

"If this standard is difficult to meet, that is because it was meant to be."  *Id.* at 102. Federal courts are to give decisions of state courts "the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington*, 562 U.S. at 103.  Thus, "[u]nder § 2254(d), a habeas court must determine what arguments or theories supported [or] could have supported the

state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.* at 102. Put "more simply and maybe a little more clearly: if some fairminded jurists could agree with the state court's decision . . . federal habeas relief must be denied" even though "other[] [jurists] might disagree." *Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011).

The task before the Court is therefore as follows: to examine each of Fields's remaining twenty-nine claims and determine whether a "fairminded jurist" could believe that the Kentucky Supreme Court's decision rejecting those claims was consistent with the holdings of the United States Supreme Court (concerning constitutional issues that apply to the states). If a fairminded jurist could believe that, then this Court need go no further: Fields is not entitled to habeas relief.

### B.  Discussion of claims

The Court will address Fields's claims in the order in which he presented them in his habeas petition. R. 6. This structure will lead to some repetition in parts, especially with respect to the standard of review for ineffective-assistance of counsel claims. But Fields seems to have grouped the claims in roughly this way when he filed for post-conviction relief in the Kentucky courts. *See* R. 33-1 at 163; R. 33-2 at 40009. And the Kentucky courts seem to have roughly maintained that same grouping. *See* R. 32-1 at 412; R. 33-2 at 621. It would probably be more confusing to break that grouping now—even if it would lead to a shorter opinion—so the Court will consider each claim in the order presented.

## 1.  Claim 1

Fields's first claim is based on the fact that, in his view, "the jury conducted an improper experiment to determine whether th[e twisty] knife could in fact be used to unscrew screws." R. 6 at 26.[8]  During Fields's post-conviction proceedings, two of the jurors testified by affidavit that "[d]uring the jury deliberations concerning Mr. Fields's guilt, members of the jury did an experiment with the knife that the prosecution said Mr. Fields used to unscrew [the] storm window.  This experiment consisted of using the knife to unscrew screws that were part of a wall of cabinets in the jury room." R. 33-1 at 67, 69.  The knife apparently "easily unscrewed the screws," and according to the two jurors "[t]his experiment helped prove that Mr. Fields could have committed the crime." *Id.* at 67.

"This experiment," Fields argues, "violated [his] rights to confrontation, due process, and a fair trial." R. 6 at 26.  His argument seems to run as follows: if a jury conducts an experiment with the evidence, then that experiment violates a defendant's rights under the constitution—his Fifth Amendment right to due process, his Sixth Amendment right to confrontation, or perhaps his Sixth Amendment right to a jury trial. Thus, the argument seems to go, when the state courts affirmed his conviction, they acted contrary to—or unreasonably applied—clearly established law as determined by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d)(1).

The problem with that argument is that AEDPA "requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established by United States

---

[8] Fields raised this claim in his motion for post-conviction relief in Kentucky state court. *See* R. 33-1 at 4–10.  The trial court addressed the merits of that claim, then ruled against Fields.  R. 33-2 at 369–70.  The Kentucky Supreme Court affirmed the trial court's ruling.  R. 33-2 at 623–25.  Neither state court gave any indication that they were denying his claim on procedural grounds.  Thus, for the purposes of AEDPA, the state courts adjudicated Fields's first claim "on the merits."  *See Harrington*, 562 U.S. at 99.

Supreme Court precedent at the time the conviction became final." *Williams*, 529 U.S. at 380. And the rule of law that Fields posits here—that juries must not conduct experiments in the jury room—is one that the United States Supreme Court has never recognized. The Court has never even suggested that juries should not play *12 Angry Men*, as it were, and the Court has certainly never held that a jury violates a defendant's constitutional rights if it does so.[9] Thus, Fields has failed to show that, when the Kentucky courts rejected his first claim, they acted contrary to—or unreasonably applied—any holding of the United States Supreme Court. Under AEDPA, that means this Court cannot grant him habeas relief based on that claim.

Fields makes two arguments in response. First, he cites several cases suggesting that juries should not conduct experiments in the jury room. *See* R. 6 at 27–28 (citing *United States v. McKinney*, 429 F.2d 1019, 1023 (5th Cir. 1970); *United States v. Beach*, 296 F.2d 153, 158–59 (4th Cir. 1961); *Wilson v. United States*, 116 F. 484, 484 (9th Cir. 1902)). The problem with that argument is apparent from the captions of the cases themselves: they are from the federal circuit courts of appeals. To obtain habeas relief, it is not enough for a prisoner to show that the state courts acted contrary to—or unreasonably applied—a decision of one of those courts. *Renico*, 559 U.S. at 779 ("[A circuit court decision] does not constitute 'clearly established Federal law, as determined by the Supreme Court,' . . . so any failure to apply that decision cannot independently authorize habeas relief under AEDPA." (citing 28 U.S.C. § 2254(d)(1))); *see also Bowles v. Dep't of Corrections*, 608 F.3d 1313, 1316 (11th Cir. 2010) ("Nor can anything in a federal court of appeals decision, even a holding directly on point, clearly establish federal law for § 2254(d)(1) purposes."). Instead,

---

[9] *See generally 12 Angry Men* (Orion-Nova Productions 1957).

he must show that the state courts flouted a decision of the United States Supreme Court—and that Court alone.  28 U.S.C. § 2254(d)(1).  Decisions from the lower courts, of course, do not help him show that.

Second, Fields cites four Supreme Court cases—*Parker*, *Skilling*, *Irvin*, and *Turner*—that in his view the Kentucky courts acted contrary to (or perhaps unreasonably applied).  R. 6 at 27, 27, 83; *see Irvin v. Dowd*, 366 U.S. 717 (1961); *Turner v. Louisiana*, 379 U.S. 466 (1965); *Parker v. Gladden*, 385 U.S. 363 (1966); *United States v. Skilling*, 561 U.S. 358 (2010).  The holding in *Irvin* was that a defendant may not be constitutionally sentenced to death by a jury "in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in [the defendant's] guilt."  *Irvin*, 366 U.S. at 728.  The holding in *Parker* is that a defendant's due-process rights are violated when a bailiff tells the jury that the defendant is "wicked," that the defendant is "guilty[,]" and that "[i]f there is anything wrong (in finding petitioner guilty) the Supreme Court will correct it."  *Parker*, 385 U.S. at 363–64.  The holding in *Turner* is that a defendant's due process rights are violated when the jury is left in the care of two sheriff deputies who just so happen to be the prosecution's star witnesses.  *Turner*, 379 U.S. at 473 ("[I]t would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution.").  And there are many holdings in *Skilling*, and Fields does not explain which one he is relying upon.  In any event, the conclusion in *Skilling* was that in spite of any error, Skilling received a fair trial.  561 U.S. at 399.  As these summaries make clear, the holdings of these cases are narrow and fact bound, and the facts there look nothing like the ones here.  Nowhere in those cases did the Supreme Court come anywhere close to suggesting that the Constitution forbids a jury to perform an

experiment in the jury room.  Thus, the Kentucky courts did not act contrary to—or unreasonably apply—any of those holdings when they rejected Fields's claim that the jurors' experiment violated his constitutional rights.

Perhaps recognizing this problem, Fields falls back on some broad language that the Supreme Court employed in these cases.  The gist of that language is that jurors must "decide guilt or innocence based on the evidence presented in court."  *Skilling*, 561 U.S. at 438 (Sotomayor, J., concurring in part and dissenting in part) (internal quotation marks omitted); *see also Parker*, 385 U.S. at 364–65 ("[T]he evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." (internal quotation marks omitted)); *Irvin*, 366 U.S. at 729 ("[T]he State has the burden of establishing guilt solely on the basis of evidence produced in court and under circumstances assuring an accused all the safeguards of a fair procedure.") (Frankfurter, J., concurring); *Turner*, 379 U.S. at 472 ("[A juror's] verdict must be based upon the evidence developed at the trial.").  But that "rule"—to the extent it can be called that—is stated at an exceptionally high level of generality.  And "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Davis v. Carpenter*, 798 F.3d 468, 473–74 (6th Cir. 2015) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  It is, of course, true that jurors should decide guilt or innocence based on the evidence presented.  The Supreme Court has made that point quite clear.  What the Court has not made clear, however, is whether jurors in fact decide guilt based on something other than "the evidence presented" when they conduct an experiment using the evidence presented.

Admittedly, one might argue that the answer should be "yes."  After all, Fields did not have the chance to subject these "experimenters" to cross examination in open court.  And thus one might say that the jury relied on something other than "the evidence" in reaching their verdict.  But one might also argue that the answer should be "no."  After all, the jurors did in some sense rely on "the evidence presented"—they simply examined the twisty knife, which was in fact in evidence.  And thus one might say that the jurors simply *examined* the evidence—albeit in an unusual way—but ultimately "based" their verdict on the evidence itself.  Meanwhile, we actively encourage juries to use their "common sense" and we at least tolerate them using their own "life experiences"—both of which are not formally admitted as evidentiary exhibits during the course of a trial.  Finally, once we start quibbling with the reasoning process that jurors use during deliberation, it is hard to know where to stop.  May a juror tell his peers "in my experience, I don't think it could have happened that way?"  May a juror say "he seemed like the kind of liars I've met in my life?"  Were the jurors in *12 Angry Men* really violating the Constitution when they tried to recreate the crime?

Thankfully, this Court need not address those questions; it is enough to say that the Supreme Court has not answered them yet, either.  The Court has "not yet taken [the next] step" of saying that a jury experiment violates a defendant's constitutional rights, "and there are reasonable arguments on both sides—which is all Kentucky needs to prevail in this AEDPA case."  *Woodall*, 134 S. Ct. at 1707.  "The appropriate time to consider the question as a matter of first impression would be on direct review, not in a habeas case governed by § 2254(d)(1)."  *Id*.  Fields is therefore not entitled to habeas relief on the basis of his first claim.

## 2.  Claim 2

In Fields's second claim, he argues that he is entitled to habeas relief because the trial court forbade a witness to testify about how long it would take to remove the storm window. R. 6 at 31.  During trial, Fields called Murrie O'Brien to testify for the defense.  R. 30-21 at 3122.  O'Brien was a carpenter who had some experience with storm windows and dealing with the kinds of screws used to hold such windows in place.  *Id.* at 3123–24.  The trial court allowed O'Brien to give rather extensive testimony about the screws.  After this general testimony, defense counsel zeroed in on a few specifics, asking O'Brien "[h]ow long does it generally take you to remove screws from a large storm window[,]" "[h]ave you ever tried to remove any Phillips Head screws with something like [the twisty knife,]" and a few questions about the markings that a tool would leave on the screws.  *Id.* at 3128–30.  A juror also asked a question of his own: "[h]ow long does it usually take to install a large storm window?"  R. 6 at 32; R. 30-21 at 3149.  The trial court forbade O'Brien to answer any of these questions.  R. 30-21 at 3149.  In Fields's view, these rulings deprived him of his right to present a complete defense and thus violated the Constitution's Due Process Clause.

Fields made this same argument in his direct appeal, and the Kentucky Supreme Court flatly rejected it.  R. 32-1 at 444–45.  Thus, the AEDPA gatekeeping requirements apply to this claim.[10]  To obtain habeas relief, therefore, Fields must show that the state

---

[10] Fields seems to concede this point in his opening brief: he argues that "[t]he state courts' treatment of the claim is contrary to and/or an unreasonable application of clearly existing Supreme Court authority," R. 6 at 34—an argument that would be irrelevant if AEDPA did not apply.  In Fields's reply, however, he seems to argue that this Court should instead review his claim de novo.  If Fields wished to argue that AEDPA does not apply to this claim, he should have done so in his opening brief.  Kentucky did not have the opportunity to respond to that argument in its own brief, and thus the argument is waived.  In any event, it is clear that AEDPA does indeed apply to this claim. It is true, as Fields points out, that the Kentucky Supreme Court analyzed his claim as an evidentiary claim rather than a constitutional one.  But AEDPA applies so long as the state courts adjudicated a claim based on its "substance" rather than on procedural grounds.  *See, e.g.*, *Muth*, 412 F.3d at 815 ("An adjudication on the merits is perhaps best understood by stating what it is not: it is not the resolution of a claim on procedural grounds.").

court's decision was contrary to—or an unreasonable application of—clearly established law as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d)(1).  In an attempt to show that, Fields points to a series of Supreme Court cases that recite the following language: "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense."  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotation marks omitted); *see also California v. Trombetta*, 467 U.S. 479, 485 (1984); *Washington v. Texas*, 388 U.S. 14, 19 (1967); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).  The Kentucky Supreme Court unreasonably applied the holdings of these cases, Fields argues, when it rejected his claim.

It goes without saying that a trial judge does not violate the Due Process Clause every time he sustains a prosecutor's objection.  Indeed, as the Supreme Court has recognized, in most cases "the accused . . . must comply with established rules of procedure and evidence designed to ensure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers*, 410 U.S. at 302.  And "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).  Thus, "[o]nly rarely" has the Court held that "the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence."  *Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013).  Those rare cases have

---

Whatever else might be said of the Kentucky Supreme Court's adjudication of the claim, it is certainly not a "procedural" decision.  Moreover, Fields raised the constitutional issues in his briefs before the Kentucky Supreme Court—he cited the same cases he cites now.  *See* R. 32-1 at 89–90.  Thus, when the Kentucky Supreme Court held that the trial court had not abused its discretion, it implicitly rejected Fields's argument that the trial court's rulings ran afoul of those cases and thus violated the Constitution.  That holding was therefore a "merits" holding even though the Kentucky Supreme Court did not discuss the cases that Fields cited.  *See Early*, 537 U.S. at 8 (holding that a state court need not even be "aware[]" of the Supreme Court's cases "so long as neither the reasoning nor the result of the state-court decision contradicts them"); *Miller v. Straub*, 299 F.3d 570, 578 (6th Cir. 2002) ("Although the Michigan Court of Appeals did not mention either *Hill* or *Strickland* by name, it did apply the law of those cases.").  AEDPA therefore applies to this Claim.

involved state evidentiary rules that "did not rationally serve any discernible purpose," were "arbitrary," "could not be rationally defended," or were left totally unexplained by the state court. *Id.* (citing *Rock v. Arkansas*, 482 U.S. 44, 61 (1987); *Chambers*, 410 U.S. at 302–03; *Washington*, 388 U.S. at 22).

Here, in contrast, the trial court excluded O'Brien's testimony on the basis that it would not "assist" the jury and was "irrelevant." *Fields*, 274 S.W.3d at 407 (characterizing the trial court's rulings). Fields does not seem to quarrel with the rules themselves, nor could he. If a witness's testimony is irrelevant or unhelpful, then the jury is not entitled to hear that testimony and a defendant's rights are not violated when a judge excludes it. Instead, Fields's argument seems to be that the Kentucky evidentiary rules were unconstitutional as applied to him—*i.e.*, that in his particular case, due process required the trial court to let O'Brien answer those questions.[11]

Under AEDPA, however, "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Jackson*, 133 S. Ct. at 1992. And the Supreme Court opinions at issue here— *Chambers*, *Rock*, and so on—say only that a defendant is constitutionally entitled to present a defense that is "meaningful." The trial court here allowed Fields to argue to the jury that he would not have had time to commit the crime. And he did so. R. 30-23 at 3374. The trial

---

[11] It is possible that Fields is really arguing that, if a trial court excludes evidence based on an erroneous interpretation of a state's evidentiary rules, then the trial court likewise deprives a defendant of his constitutional right to present a complete defense. To the extent that is his real argument, it is likewise meritless. As the Sixth Circuit has held, "errors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983); *see also Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007); *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001).

court also allowed Fields to argue more specifically to the jury that he could not have removed the screws from the storm window in the time required.  And he did that, too.  *See id.* at 3380.  Thus, notwithstanding the trial court's evidentiary ruling, it seems that Fields nevertheless had a meaningful chance to present his chosen defense.

Fields responds that O'Brien's testimony—about how long it usually takes O'Brien to perform similar work—would have further strengthened his defense.  And perhaps it would have.  But the question before the Court is only whether a "fairminded jurist" could believe that Fields was able to put on a "meaningful" defense even without O'Brien's testimony. *See Harrington*, 562 U.S. at 101; *Chambers*, 410 U.S. at 294.  Such a jurist could agree with the Kentucky Supreme Court that "how long it takes to remove a window screw" is a topic "well within the average juror's common knowledge and understanding," especially given that "the jury was shown the screws and the window itself and, thus, had the opportunity to make such an assessment."  R. 32-1 at 445.  Thus, a fairminded jurist could believe that the trial court allowed Fields to present his "not enough time" defense in a "meaningful" way even though the trial court forbade some of O'Brien's testimony.  Such a jurist could likewise agree with the Kentucky Supreme Court that, because "O'Brien stated that he had never worked on that particular storm window and had never handled [the twisty] knife," his testimony would have been "irrelevant."  *Id.*  For this reason as well, a fairminded jurist could believe that the trial court did not deprive Fields of a meaningful defense when it excluded some of O'Brien's testimony.   Fields has therefore failed to show that the Kentucky Supreme Court unreasonably applied any holding of the United States Supreme Court when it rejected his second claim.  Thus, Fields is not entitled to habeas relief on the basis of that claim.

### 3.  Claim 3

In his third claim, Fields argues that he is entitled to habeas relief because the prosecutor withheld exculpatory evidence from him, thus running afoul of the Supreme Court's holding in *Brady v. Maryland*, 373 U.S. 83 (1963).  "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is [itself] exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  A defendant is entitled to *Brady* materials even if he has not asked for them specifically.  *United States v. Agurs*, 427 U.S. 97, 107 (1976).  And a prosecutor must turn over any exculpatory evidence, even if the defendant could obtain it independently without the prosecutor's help.  *Banks v. Dretke*, 540 U.S. 668, 695–96 (2004).

Here, Fields contends that the prosecutor should have told the defense team about a man named James Berry, who was Phyllis Berry's half-brother.  Video Record, 12/15/11, 9:02.  Berry had been interviewed in 2009 by the defense's post-conviction mitigation expert, Heather Drake.  During that interview, Berry told Drake that a representative from the state Attorney General's office had contacted him but had declined to speak with him further after Berry told the representative what he wanted to testify about.  R. 33-2 at 633–34; Video Record, 12/15/11, 9:11-9:12; Video Record, 12/15/11, 12:38 ("He told us 'the A.G. came and saw me.'").[12]  In fact, Berry told Drake that a representative from the

---

[12] Berry's testimony about his interactions with the A.G.'s office was hard to follow.  For example, it is not even clear from the record whether Berry believes that this secret phone call occurred before or after Fields was convicted and sentenced.  In fact, at the post-conviction hearing—which was in 2011—he testified that he could not remember whether the attorney general's office had called him more than ten years ago or fewer than ten years ago.  Video

Attorney General's office had visited him "multiple times."  Video Record, 12/15/11, 12:38-39.  But Berry told a very different story during the post-conviction hearing.  There, he testified that he had spoken with the Attorney General's office only via telephone and stated flat out that representatives from that office had never visited him.  Video Record, 12/15/11, 9:08-9:15.

Berry apparently would have testified that "Mr. Fields ingested drugs the night Ms. Horton was killed, was extremely intoxicated, and was behaving strangely."  R. 6 at 34.[13] According to Fields, that testimony would have bolstered Fields's defense theory that he was too intoxicated to remove the screws securing the storm window (or, perhaps, that he was too intoxicated to form the specific intent to kill—or perhaps both).  Fields also says that Berry's testimony would have helped him during the penalty phase.  *Id.* at 40.  The Commonwealth "suppressed the evidence," Fields says, and he argues that there is a reasonable probability that the jurors would have acquitted him (or perhaps sentenced him to life in prison rather than death) if only they had heard Berry's testimony.  *Id.*  Thus, Fields concludes, the prosecutors violated *Brady*.  *Id.*

Of course, it is not enough for Fields to show a *Brady* violation *simpliciter*.  The Kentucky Supreme Court adjudicated this claim on the merits during Fields's post-conviction appeal, *see* R. 33-2 at 631, and thus Fields must show that the state court applied *Brady* in an unreasonable way when it rejected his claim.  Thus, he must show that all

---

Record, 12/15/11, 9:10.  To the extent that this phone call occurred after Fields's second trial, of course, then there was certainly no *Brady* violation.

[13] During the post-conviction hearing, Berry testified that Fields had been "pretty on his way" on the night in question, specifically that he had been "pretty intoxicated" and "pretty messed up" as a result of drinking and "eating pills."  Video Record, 12/15/11, 9:04-9:06.

"fairminded jurists" would believe that the prosecutors violated *Brady*.  *Harrington*, 562 U.S. at 102.

A fairminded jurist could certainly take a different view here.  As an initial matter, the Supreme Court has made clear that, to show a *Brady* violation, a defendant must show that the undisclosed evidence was "known to the prosecution" at the time of trial.  *Agurs*, 427 U.S. at 103; *see also Apanovitch v. Houk*, 466 F.3d 460, 474 (6th Cir. 2006) ("[*Brady*] only applies to evidence that was known to the prosecution, but unknown to the defense, at the time of trial[.]"); *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir.1994) (explaining that "*Brady* is concerned only with cases in which the government possesses information which the defendant does not").[14]  And a fairminded jurist could believe that the prosecutors here were not, in fact, aware that Berry was willing to testify that Fields was intoxicated.

After all, the only person who testified that the prosecutors had spoken to Berry was Berry himself.  R. 33-2 at 633.  Berry made that statement some ten years after the alleged conversation.  He is "a convicted felon suffering from paranoid schizophrenia."  *Id.* at 633. He apparently "hears voices sometimes."   Video Record, 12/15/11, 9:06-07.   And his testimony during the post-conviction hearing differed sharply from the testimony that he had previously given to Heather Drake about his conversation with the Attorney General's office.

---

[14] As discussed above, a defendant cannot obtain habeas relief merely by showing that the state court decision conflicts with holdings from the federal courts of appeals.  *See Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) ("A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from the [Supreme] Court is, at best, ambiguous.").  Nor may a federal court "canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to [the Supreme Court], be accepted as correct."  *Marshall v. Rodgers*, 133 S. Ct. 1446, 1451 (2013).  That said, the decisions of the lower federal courts are sometimes relevant even in an AEDPA case.  Specifically, those decisions might be useful to the state, something of a one-way ratchet.  If the "lower courts have diverged widely" on the question presented, for example, that divergence might "reflect the lack of guidance from [the Supreme] Court" and thus support the idea that "the state court's decision was not contrary to or an unreasonable application of clearly established federal law."  *Carey v. Musladin*, 549 U.S. 70, 76–77 (2006).  Moreover, the federal courts of appeals are populated with "fairminded jurists."  And thus if they have interpreted the Supreme Court's holdings in a certain way, it would not be "objectively unreasonable" for the state courts to follow their lead.  *Williams*, 529 U.S. at 365.

Most troublingly, Berry had told Drake that the Attorney General's representative had visited him in person "multiple times."  Video Record, 12/15/11, 12:38-39.  But during the post-conviction hearing, he testified that the Attorney General's office had only called him by telephone and had not visited him at all.  Video Record, 12/15/11, 9:09:58 ("Q: Did they ever actually come to see you in prison?  A: No, they didn't ever come to see me.").

Put plainly, a fairminded jurist could conclude that Berry was lying—or at the very least that he was mistaken—when he said that the Attorney General's office had contacted him.  And thus, a fairminded jurist could likewise believe that the prosecutor did not know about Berry's testimony at all.  It was therefore not "unreasonable" for the Kentucky Supreme Court to conclude that the prosecution had not "concealed" Berry from the defense team.  And if it was not unreasonable for the state court to conclude that, then it was not unreasonable for the state court to hold that no *Brady* violation had occurred.

Moreover, to prove a *Brady* violation, a defendant must show that the undisclosed evidence was "known to the prosecution but *unknown to the defense*."  *Agurs*, 427 U.S. at 103 (emphasis added); *see also Fautenberry v. Mitchell*, 515 F.3d 614, 629 (6th Cir. 2008).  And a fairminded jurist could agree with the Kentucky Supreme Court that defense counsel knew full well about Berry and what he had to say.  One of Fields's defense attorneys, Rebecca Lytle, testified during the post-conviction hearing that she knew that Berry was in jail and could have "tracked him down" if she had wanted to talk to him.  Video Record, 12/14/11, 10:19:50, 10:21:40.  And defense counsel meanwhile had another witness, Burton, who suggested in her own testimony that Fields was intoxicated that night.  *See* R. 30-19 at 2734.  Thus, a fairminded jurist could believe that the defense team was already fully aware of the relevant facts that Berry allegedly possessed—namely that Fields had been intoxicated

on the night in question.  Such a jurist could therefore hold that the prosecutor had not concealed those facts.

Finally, to show a *Brady* violation, the defendant must show that the undisclosed evidence was material, *i.e.*, that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Strickler*, 527 U.S. at 280–82 (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)).  And a fairminded jurist could believe that Fields failed to show a reasonable probability that the jury would have reached a different verdict (or sentence) if only Berry had testified.  Again, Berry was not the only witness to suggest that Fields was intoxicated on the night in question.  Burton testified to that fact, too, and thus the jury had before it evidence that Fields had been drinking and using drugs on the night in question.  Despite Burton's testimony, the jury evidently concluded that Fields was sober enough to have committed the crime.  A fairminded jurist could believe that the jury would have reached that same verdict if Berry had also testified.  In short, it is at least reasonable to think that, if Burton's testimony was not enough, Berry's testimony would not have been enough, either.[15]  For all three of these

---

[15] The Kentucky Supreme Court did not explicitly decide whether Berry's testimony was "material" for the purposes of *Brady*. *See* R. 33-2 at 631–34.  It held only that Fields had failed to show that the prosecution knew about Berry, and that Fields had failed to show that his defense counsel did not know about the information Berry had. *Id.* Thus, one might argue—by analogy to the Supreme Court's decisions in *Porter*, *Wiggins*, and *Rompilla v. Beard*—that this Court should make the materiality determination de novo rather than through the lens of AEDPA. *See Porter*, 558 U.S. at 39 (2009) ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim *de novo*."); *Wiggins*, 539 U.S. at 534 (holding much the same thing); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice[,] and so we examine this element of the *Strickland* claim de novo.").  It is not clear, however, how those decisions interact with the Court's later decision in *Harrington*, in which the Court held that "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.  This is so whether or not the state court reveals which of the elements of a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." 562 U.S. at 98.  Thus, if a state court provides no reasons at all when denying a multi-prong claim, then the habeas court must consider only whether a fairminded jurist could agree with the state court's ultimate decision denying the claim: any prong will do.  It would be strange that, if the state court provides reasons for some of the prongs but not others, then the habeas court must review de novo any prong that

reasons, Fields has failed to show that the Kentucky Supreme Court unreasonably applied *Brady* and related cases from the United States Supreme Court. And thus Fields is not entitled to habeas relief based on his third claim.

### 4.  Claim 4

In his fourth claim, Fields argues that his defense attorneys were ineffective for failing to interview two witnesses and call them to the stand: James Berry and his girlfriend, Cindy Mosley. As just discussed, Berry apparently would have testified that Fields was quite intoxicated on the night in question, thus lending support to the defense's theory that Fields could not have unscrewed the storm window or formed the necessary intent. R. 6 at 42. As for Mosley, Fields says that she would have "provided further evidence of Mr. Fields's intoxication and would have undermined any testimony to the contrary." R. 6 at 44. She apparently "would have testified that everyone at Berry's apartment, including Mr. Fields, was intoxicated." *Id.* Thus, the argument seems to go, when counsel failed to have Berry and Mosley testify at trial, he provided constitutionally ineffective assistance of counsel.

The Kentucky Supreme Court addressed this claim on the merits, R. 33-2 at 637–41, which means AEDPA applies to this claim. It is especially difficult to prevail on an ineffective-assistance claim governed by AEDPA. "The standards created by *Strickland* and

---

the state court fails to mention. Still, that is indeed what Sixth Circuit law seems to require, at least with respect to the two prongs of a *Strickland* claim. *See Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012) ("When a state court relied only on one *Strickland* prong to adjudicate an ineffective assistance of counsel claim, AEDPA deference does not apply to review of the *Strickland* prong not relied upon by the state court. The unadjudicated prong is reviewed de novo."). In any event, the Court believes that Fields has failed to show that Berry's testimony was material even under de novo review. During Fields's trial, defense counsel argued that Fields was intoxicated and cited Burton's testimony in support. There is no reasonable probability that the jury would have returned a different verdict if only he would have been able to cite Berry's testimony—which would have covered similar territory, and would have come from a witness who suffered from schizophrenia—as well. *See Brooks v. Tennessee*, 626 F.3d 878, 894 (6th Cir. 2010) (holding that evidence was not "material under *Brady*" because it was "cumulative to the evidence already in the record"); *Bell v. Bell*, 512 F.3d 223, 236 (6th Cir. 2008) (holding that evidence was not material for *Brady* purposes when it would have provided only "modest" assistance to the defense).

§ 2254(d) are both highly deferential . . . and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal quotation marks and citations omitted). "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Id.* Thus, "[t]he question . . . is not whether counsel's actions were reasonable, but whether there is any reasonable argument that counsel satisfied *Strickland*'s [already] deferential standard." *Id.* at 89.

There are a few such arguments here. With respect to Berry, one might argue that counsel did not call him to the stand because he would have testified to the same things that Burton testified to, and thus, would have provided only cumulative testimony. *Robins v. Fortner*, 698 F.3d 317, 330 (6th Cir. 2012) ("While [a certain witness's] testimony may have strengthened [the defendant's] alibi defense—a point which itself is debatable given [the witness's] ill and elderly state—it was cumulative to the testimony given by [the defendant's] mother and sister."); *Jells v. Mitchell*, 538 F.3d 478, 489 (6th Cir. 2008) ("[T]he failure to present evidence which is merely cumulative to that which was presented at trial is, generally speaking, not indicative of ineffective assistance of trial counsel."). One might also argue that counsel did not call Berry because he was a convicted felon who suffered from schizophrenia, had been drinking on the day in question, and thus, would not have made for a compelling defense witness. R. 33-2 at 633. Or one might argue that counsel did not call Berry because the gist of his testimony—that Fields was extremely intoxicated—could have hurt Fields more than it helped. After all, the jury might have concluded that Fields was sober enough to remove the storm window, but high enough to commit a brutal murder. *See Yarborough v. Gentry*, 540 U.S. 1, 7 (2003) (noting that an attorney is not constitutionally deficient when he fails to pursue a strategy that "might well have

backfired").   One might disagree with each of these arguments, but all three are surely "reasonable" arguments for why a constitutionally competent attorney would choose not to call Berry to the stand.  *Harrington*, 562 U.S. at 105.  And that is all the Commonwealth needs to prevail here.  *Id.*  Thus, Fields has failed to show that the Kentucky Supreme Court unreasonably applied *Strickland* when it determined that his counsel's performance was not constitutionally deficient.[16]

As for Mosley, the Kentucky Supreme Court assumed, *arguendo*, that counsel was deficient for not calling Mosley to the stand, but held that Fields had nevertheless failed to show prejudice.  R. 33-2 at 641 ("Clearly, this testimony would have made no difference in [Fields's] trial.").  Specifically, the state court pointed out that Mosley could testify only that Fields "seemed drunk," could not "comment on the extent of his intoxication," and did not "witness [Fields] consume any pills."  R. 33-2 at 641.  Given that another witness—Burton— did testify at trial that Fields was indeed drunk and suggested that he might also have taken pills, Mosley's testimony seems cumulative, or at least arguably so.  *See Brooks.*, 626 F.3d at 894.  For these purposes, however, it is enough to say that a fairminded jurist could agree with the Kentucky Supreme Court that Mosely's testimony would probably not have changed the outcome of Fields's trial—*i.e.*, a fairminded jurist could believe that there is no "reasonable probability" that Fields would have been acquitted or sentenced to life in prison if only counsel had called Mosley to the stand.  Thus, Fields has failed to show that the

---

[16] Fields also seems to argue that his counsel was ineffective for failing to interview Berry.  R. 6 at 40 ("Mr. Fields'[s] counsel were ineffective for failing to interview James Berry and Cindy Mosley.").  Interviews are not evidence, of course; they are simply ways to gather evidence.  The decision at issue, therefore, is counsel's failure, in the end, to call Berry to the stand to testify in court.  Since counsel apparently did not interview Berry before deciding not to call him, the Court will of course assume that, if counsel had done so, he would have learned all of the information that Berry had to offer.  Even with that information, however, there is a reasonable argument—for reasons explained above—that a competent attorney would have ultimately decided not to call Berry to the stand.

Kentucky Supreme Court unreasonably applied *Strickland* when it rejected Fields's claim that his counsel's failure to call Mosley violated his right to an attorney under the Sixth Amendment.  Fields is therefore not entitled to habeas relief on the basis of his fourth claim.

### 5.  Claim 5

In Fields's fifth claim, he again argues that he is entitled to habeas relief on the basis of ineffective assistance of counsel.  This time, he contends that his defense attorneys were deficient when they failed to call Officer Roger Jessie and Jailer Michael Stanaford to the stand at trial.  According to Fields, Jessie could have testified that Fields "appeared to be intoxicated" on the way to the hospital, "smelled of alcohol," was "unsteady on his feet," and was "acting strange."  *See* Video Record, 12/15/11, at 11:02-11:03, 11:04, 11:06-11:08.  Jessie also apparently could have testified that Minnie Tolliver [also known as Burton] was acting suspiciously on the night in question. *See* Video Record, 12/15/11, 11:01-11:02.[17]

Stanaford, on the other hand, apparently could have testified that "there was something wrong with Fields" when he was at the jail—specifically, that he was "dead on his feet," that the jailers needed to prop him up just to get him into his cell, that he was placed in the "mental room," that he could not take his own clothes off, that he was uncommunicative, and that he did not make eye contact with anyone.  *See* Video Record, 12/14/11, 1:14:56, 1:15-1:17, 1:17:10-1:17-38.[18]  The testimony of these two men, Fields argues, would have bolstered one aspect of his defense, namely his contention that he was too intoxicated to use the twisty knife in the manner suggested by the prosecution.  R. 6 at 47.  Thus, Fields

---

[17] Defense counsel did interview Officer Jessie, as one of counsel's memos indicates.  *See* R. 54-1 at 15.

[18] Defense counsel interviewed Stanaford as well.  *See* R. 54-1 at 17.

concludes, his attorneys rendered constitutionally ineffective assistance by failing to call these men to testify during his trial.

Fields made this argument before the Kentucky Supreme Court, and it was rejected on the merits.  *See* R. 33-2 at 641–44.[19]  Thus, the question is again whether there is any "reasonable argument" that counsel satisfied the *Strickland* standard.  *Harrington*, 562 U.S. at 89.  With respect to Stanaford, defense counsel testified during the post-conviction hearing that she thought that Stanaford's testimony might be irrelevant.  R. 33-2 at 642.  After all, Stanaford first saw Fields several hours after the murder and thus could not testify as to Fields's condition at the time of the crime.  *Id.*  Moreover, counsel said, calling Stanaford risked opening the door to Fields's criminal past: Stanaford knew that Fields had been in and out of the county jail since he was eighteen years old.  *Id.*  Admittedly, that risk seems like a small one.  Why would a trial judge allow a prosecutor to delve into a defendant's criminal past simply because the defense called the jailer to the stand?  But it was certainly a risk, however small.

Meanwhile the value of Stanaford's testimony seems slight.  He did not observe Fields near the time of the crime and the defense already had witnesses—Burton, John Fields, and Pritchard—who could testify as to Fields's intoxication.  Indeed, they did testify to exactly that during Fields's trial.  And they did so in some detail.  *See, e.g.*, R. 30-18 at 2618 (testimony that Fields was "pretty high, you know"); *id.* at 2628 (testimony that Fields

---

[19] Fields is correct that the Kentucky Supreme Court determined only that his defense attorneys had provided effective assistance even though they did not call Stanaford. R. 33-2 at 642–43. The state court did not reach the prejudice question. *Id.* And that means this Court is entitled to evaluate the prejudice question de novo. *Wiggins*, 539 U.S. at 534 ("In this case, our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis."). As explained below, however, the Kentucky Supreme Court did not unreasonably apply *Strickland* when it determined that counsel's performance was constitutionally effective. And thus this Court need not reach the prejudice question at all. The Kentucky Supreme Court reached both the performance and prejudice question with respect to Jessie. R. 33-2 at 643. Thus, AEDPA applies in full to that portion of the claim.

falsely told Burton that he had "killed [his] brother, John"); R. 30-19 at 2734 (testimony that Fields and others were "passing these pill bottles around" and that Fields had "poured" something into his hand and lifted it to his mouth); *id.* at 2762 (testimony that it was "fair to say" that Fields "had on a buzz" on the night in question); *id.* at 2763 (testimony that Fields was "[f]it to be tied I guess, you know, he had a good buzz going"); *id.* (testimony that Fields was "wired up and ready to fight"); *id.* at 2764 (testimony that Fields was "just drunk, had a good buzz on, you know"); *id.* at 2755 (testimony that Fields was "rubbing" a [butcher knife] "up and down [John Fields's] arm"); *id.* at 2796 (testimony that Fields was "probably feeling good"); *id.* at 2773 (testimony that Fields was standing outside in a parking lot, without a shirt or shoes, with a "silly look on his face," "being loud").

Deciding which witnesses to call is a strategic matter. *Boykin v. Webb*, 541 F.3d 638, 649 (6th Cir. 2008). Thus, courts allow counsel wide deference in deciding which witnesses to present in their case. *See id.* ("The decision not to call a particular witness is typically a question of trial strategy that appellate courts are ill-suited to second-guess." (quoting *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998))). Because other witnesses testified that Fields was intoxicated on the night in question, there is, at the very least, a "reasonable argument" that Fields's defense attorneys provided constitutionally effective assistance even though they decided not to call Stanaford as well. *Harrington*, 562 U.S. at 89. Thus, the Kentucky Supreme Court reasonably applied *Strickland* when it rejected Fields's claim. He is therefore not entitled to habeas relief on the grounds that counsel did not call Stanaford to the stand.

With respect to Jessie, things are even more straightforward. According to Jessie himself, Fields made a damaging statement soon after he was arrested. He apparently called

Jessie a "son of a bitch" and then asked him whether he wanted to "die too." R. 33-2 at 643. When one asks another whether he wants to "die too," one, at least arguably, implies that he has made others die in the past. And when one asks someone whether he wants to "die too" just hours after being found next to a dead body with a knife wound in the head, one, at least arguably, implies that he had some role in creating that wound. Put plainly, such a statement is, at least arguably, a straight-up confession to murder.

When defending a murder charge, a lawyer might not want the jury to know that his client had, at least arguably, confessed to the murder (again)—to rather understate the point—and thus a lawyer might choose not to call a witness who had heard his client do so. *See Gentry*, 540 U.S. at 7 (noting that an attorney is not constitutionally deficient when he fails to pursue a strategy that "might well have backfired"); *Tosh v. Lockhart*, 879 F.2d 412, 414 (8th Cir. 1989) (holding that the decision not to use testimony may "reflect the reasonable exercise of judgment in view of the attorney's concern that the testimony would be conflicting . . . or otherwise unfavorable."). Thus, there is a reasonable argument—a very reasonable one—for why counsel did not call Jessie to the stand here. *See Harrington*, 562 U.S. at 89. That means Fields cannot show that the Kentucky Supreme Court unreasonably applied *Strickland*. *Id.* The Court therefore cannot grant habeas relief on the basis of Fields's fifth claim.

### 6. Claim 6

In Fields's sixth claim, he argues that his defense attorneys provided constitutionally ineffective assistance when they failed to call an expert witness to testify about the intoxicating effects of the drug phencyclidine, commonly known as PCP. The jury had heard testimony that Fields was intoxicated and might have taken "horse tranquilizers" (a street

name for PCP). Fields argues that an expert could have informed the jury that PCP can "have an effect like LSD," *i.e.*, it can cause psychotic reactions and hallucinations. R. 6 at 49 (citing Video Record, 12/15/11, 12:48-12:49). "Having proceeded with a theory that Mr. Fields was too intoxicated to commit the crimes," Fields says, "counsel should have presented expert testimony to support that defense." *Id.* at 51. Indeed, Fields goes so far as to say that "prevailing professional norms required [counsel] to present expert testimony in support of Mr. Fields's defenses." *Id.* at 52. Because counsel had "no reasonable strategic reason for their failure," Fields argues, "their conduct is deficient performance." *Id.* at 52–53. In Fields's view, that deficiency was prejudicial as well. If the jurors had only heard expert testimony, he says, "there is a reasonable probability that the jury would have found [him] not guilty of murder." *Id.* at 53.[20] Thus, Fields concludes, his defense attorneys were constitutionally ineffective and he is therefore entitled to habeas relief.

"Even [on direct] review, the standard for judging counsel's representation is . . . most deferential[.]" *Harrington*, 562 U.S. at 105. The question under *Strickland* is not whether Fields's attorneys "deviated from best practices or most common custom," but whether their "representation amounted to incompetence under prevailing professional norms." *Id.* "[O]n habeas review the standard is more deferential still." *Carpenter*, 798 F.3d at 473. Given that Fields raised this claim before the Kentucky Supreme Court—which rejected it on the merits—the question here is whether any "fairminded jurist" could agree with the state court

---

[20] Fields seems to advance two prejudice theories that are mutually exclusive. On the one hand, he argues that the jury might have found him "guilty of second-degree manslaughter" if an expert had testified. The theory there, one supposes, is that the jury might have found that he killed Ms. Horton but was too high to form the specific intent to kill her. On the other hand, he argues that the jury might have acquitted him altogether. The theory there is that the jury might have believed that he was too intoxicated to unscrew the window—and thus might have found that Fields did not have enough time to kill Ms. Horton in the first place.

that counsel satisfied the reasonableness standard set forth in *Strickland*. *Harrington*, 562 U.S. at 101.

"That standard is a general one, governing a great blue-water of attorney conduct: from pre-trial discovery to plea-bargaining, from in-court trial tactics to post-verdict motions, from direct appeals to post-conviction challenges. The Supreme Court has charted only parts of that expanse." *Carpenter*, 798 F.3d at 473. The Supreme Court's *Strickland* cases

> serve as navigation buoys, marking the points on which courts have foundered in the past—and thus should not approach again. .If a defendant shows that his attorney failed to tell him about a potential plea deal, for example, then a state court should know [because of the Supreme Court's holding in *Missouri v. Frye*, 132 S. Ct. 1399 (2012)] that it cannot hold that counsel's performance was reasonable nonetheless. . . . And if a state court were to take that course anyway, we would say that no fairminded jurist would have done the same.

*Id.*

"But here the [Kentucky] courts found themselves in open water." *Id.* "The Supreme Court has never reached the specific question[]," *id.*, that the Kentucky Supreme Court answered in this case: namely, whether a defense attorney must call an expert to tell the jury about the effects of a drug when the defense theory is that the defendant is intoxicated. The Supreme Court has never said that a defense attorney need not call such an expert; nor has the Court said that he must. The Court has simply never said. Thus, when the Kentucky Supreme Court was adjudicating Fields's claim, "[t]he only buoy in sight, far off on the horizon, was the Court's guidance in *Strickland* itself that counsel's efforts must be within 'the wide range of reasonable professional assistance[.]'" *Id.* (citing *Strickland*, 466 U.S. at 689).

That rule is "as general as they come." *Id.* And "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Alvarado*,

541 U.S. at 664.  For "[a]pplying a general standard to a specific case can demand a substantial element of judgment."  *Id.*  The question is therefore whether there is "any reasonable argument" why defense counsel did not call an expert witness to testify about the effects of the drug PCP.  *Harrington*, 562 U.S. at 89.

There is such an argument, of course.  As the Kentucky Supreme Court pointed out, PCP "can induce a psychotic episode, consistent with causing an otherwise non-violent individual to stab an elderly woman in the head."  R. 33-2 at 645.  A "seasoned prosecutor" might have "twisted [an expert's] testimony to stand for the proposition that [Fields] was capable of brutally murdering [Ms.] Horton after ingesting PCP."  *Id.*  That is a perfectly valid reason not to call the expert.  Indeed, not calling one might well have been the correct decision.  After all, a jury might have concluded that Fields was sober enough to use the twisty knife—and sober enough to form the necessary intent—but high enough to be capable of shoving a kitchen knife through an elderly person's skull.

For these purposes, however, it is enough to say that there is at least a "reasonable argument" that defense counsel's representation did not fall below objectively reasonable standards when he failed to call an expert to tell the jury about the effects of PCP. *Harrington*, 562 U.S. at 89.  Thus, the Kentucky Supreme Court did not unreasonably apply *Strickland* when it rejected Fields's sixth claim.  *Id.*  He is therefore not entitled to habeas relief on the basis of that claim.

### 7.  Claim 7

In Fields's seventh claim, he argues that he is entitled to habeas relief on the basis of a faulty jury instruction.  During his trial, Fields asked the court to give the following instruction:

> Even though Sam Fields might otherwise be guilty of Murder under Instruction No. ___, you shall find him not guilty under that instruction, if at the time Sam Fields committed the act he was so intoxicated that he did not form the intention to commit the offense.
>
> If you believe from all the evidence beyond a reasonable doubt that he did act wantonly as defined under Instruction No. ____ then you shall find him guilty of Second-Degree manslaughter under Instruction No. ____.

R. 32-1 at 222.  The trial court instead gave the jury the following instruction:

> Even though the Defendant might otherwise be guilty of Intentional Murder and/or First Degree Burglary, you shall not find him guilty under those Instructions if at the time he committed the offenses, if he did so, he was so intoxicated that he did not form the intention to commit the offenses.

R. 30-23 at 3364.

The trial court's decision to give the second instruction rather than the first one, Fields says, "failed to adequately protect Mr. Fields'[s] right to present his intoxication defense." R. 6 at 55.  Specifically, he contends that the "[given] instruction failed to reflect Kentucky law that Mr. Fields's intoxication could contribute to a viable lesser included offense of murder, second degree manslaughter." *Id.*  Thus, he concludes, the "omission of the second paragraph" increased "the risk the jury would find Mr. Fields guilty of murder and burglary, thus enhancing the risk he would be convicted of an offense making him eligible for the death penalty." *Id.* at 56.

In his reply brief, Fields is a bit clearer about what, exactly, he finds objectionable about the jury instruction.  He says that the trial court's instruction did not "make clear that a finding of voluntary intoxication as a defense [would] not result in an acquittal." R. 59 at 74.  Instead, he contends, the trial court should have told the jury that "a voluntary intoxication finding should result in a conviction on a lesser charge such as second degree manslaughter." *Id*.  The argument thus seems to run as follows: Fields wanted the trial court to tell the jury

that, if they found that he was intoxicated, they could find him guilty of second-degree manslaughter rather than acquitting him of all homicide charges.  In his view, the given instruction put the jury to a starker choice: convict him of murder or let him go free.  Thus, he seems to argue, the instructions increased the chance that the jury would convict him.

There are at least two problems with this argument.  The first is that Fields has his facts wrong: the trial court did instruct the jury on the lesser-included offense of second-degree manslaughter.  Indeed, the court told the jurors that, if they were to "find the Defendant not guilty under [the murder instruction]," then they should "find the Defendant guilty of Second-Degree Manslaughter" if they believed that he had killed Ms. Horton and had done so "wantonly[,] as that term is defined under Instruction No. 2."  R. 30-23 at 3363. Instruction No. 2 in turn provided that a person acts "wantonly" if he creates a "substantial and unjustifiable risk" but is "unaware [of that risk] solely by reason of voluntary intoxication."  *Id.* at 62.  Thus, Fields is simply wrong when he faults the trial judge for failing to tell the jury that "a voluntary intoxication finding should result in a conviction on a lesser charge such as second degree manslaughter."  R. 59 at 74.  The trial court told the jurors precisely that, in no uncertain terms.

Thus, the trial court gave every bit of the substance that Fields requested—the court simply broke the instruction up into multiple parts.  Breaking up a unified jury instruction into smaller parts is certainly permissible under the Due Process Clause.  After all, we review those instructions as a whole rather than instruction by instruction.  *See Estelle*, 502 U.S. at 73 ("It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973))); *United States v. Park*, 421 U.S. 658,

674 (1975) ("Turning to the jury charge in this case, it is of course arguable that isolated parts can be read as intimating that a finding of guilt could be predicated solely on respondent's corporate position.  But this is not the way we review jury instructions, because 'a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'"); *Boyd v. United States*, 271 U.S. 104, 107 (1926).  The Court would therefore reject Fields's claim even if it was raised on direct review.

The second problem is that this case does not, in fact, come on direct review: this is a habeas case.  The Kentucky Supreme Court adjudicated this claim on the merits during Fields's actual direct appeal, R. 32-1 at 457–58, and thus AEDPA applies to this claim.  To obtain habeas relief, therefore, Fields must show that the Kentucky Supreme Court's application of the United States Supreme Court's case law was "objectively unreasonable." *Lockyer*, 538 U.S. at 75.  The only Supreme Court case that Fields identifies is *Beck v. Alabama*, 447 U.S. 625, 637–38 (1980).  There, the Court held that a jury in a capital case must be permitted "to consider a verdict of a lesser included non-capital offense" so long as "the evidence would have supported such a verdict." *Id.* at 627, 635–38.  As discussed above, the trial court here did indeed instruct the jury that they could render a guilty verdict on a "lesser included non-capital offense"—namely second-degree manslaughter—and thus the trial court in no way ran afoul of the Supreme Court's holding in *Beck*.  Fields has therefore failed to show that the Kentucky Supreme Court unreasonably applied "clearly established law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Fields is therefore not entitled to habeas relief on the basis of his seventh claim.

### 8.  Claim 8

In Fields's eighth claim, he argues that his defense attorney was ineffective "for failing to argue in closing that [Fields] took pills."  R. 6 at 57.  As discussed at length above, part of Fields's defense was that he was too intoxicated to unscrew the storm window (and perhaps too intoxicated to form the specific intent to kill Ms. Horton).  During closing arguments, defense counsel said that "[w]e've heard testimony that drugs may or may not have been ingested.  But, certainly, we have testimony that for sure drinking occurred."  R. 30-23 at 3368.  According to Fields, that language was not punchy enough.  In his view, counsel should have told the jurors that Fields had taken pills for sure, rather than telling them that Fields "may or may not have" done so.  *Id.*  "To state that the evidence on this point was somehow up in the air," Fields argues, was "prejudicial" to his case.  R. 6 at 59.  In the end, the argument boils down to this: Fields thinks that counsel should have said "drugs were definitely ingested" rather than "drugs may or may not have been ingested."  That choice of words was apparently constitutionally deficient.  And if counsel had chosen better words, Fields seems to suggest, "there is a reasonable probability" that the jury would have acquitted him.  *Id.*

As an initial matter, the words that counsel actually used were more accurate than the words that Fields wishes he had used.  Burton did not in fact testify that "drugs were definitely ingested."  What she said was that Fields poured something out of a bottle into his hand and then "went like this to his mouth."  R. 30-19 at 2734.  The record does not reflect in that moment what motion she made, but she apparently raised her hand to her mouth.[21]

---

[21] In a later colloquy, defense counsel stated "for the record" that Burton had "moved her hand to her mouth and held it over there when she was talking about the pills."  R. 30-23 at 3420.

At first glance, this testimony sounds like fairly strong evidence that Fields had taken drugs. The rub is that Burton immediately caveated her statement. She said that "I don't know if he for a fact had a pill in his hand." *Id.* She also said that she knew "nothing about them pills or if in fact they did take them how they was going to react." *Id.* at 2735. And she confirmed that she had told an investigating officer that she had not seen any pills at all. *Id.* at 2734. Thus, defense counsel's statement in closing—"[w]e've heard testimony that drugs may or may not have been ingested"—was a perfectly fair characterization of the evidence in the record.

Fields's response is essentially this: forget the record; a defense attorney should just say whatever sounds strongest for the defense. Counsel's job, Fields says, was to "advocate" rather than "equivocate," and counsel's closing argument about the pills, in his view, "was not advocacy." R. 59 at 76, 77. "There is no strategic reason," Fields concludes, "not to argue the evidence in the best possible light for your client." R. 59 at 77.

Few lawyers could quibble with that conclusion as stated. The question, however, is what light is the "best possible" one for one's client. Any seasoned trial lawyer knows that credibility is king in the courtroom. "Credible lawyers are the ones the jurors increasingly look to as the reliable source of information as the trial progresses." Thomas A. Mauet, *Trials: Strategy, Skills, and the New Powers of Persuasion* 11 (2005). And "[c]redible lawyers never misstate or overstate the facts or law[;] [they] candidly concede a point when the facts or the law are against them." *Id.*

Thus, as one treatise puts it, "[i]t is easy to state the basic rules of final argument[.] [The first is that] you may not misstate the evidence or the law." James W. McElhaney, *McElhaney's Trial Notebook* 479 (2d ed. 1987); *see also* Stewart Edelstein, *How to Succeed*

as a Trial Lawyer 178 (2013) ("Do not misquote *or exaggerate* any testimony or evidence.") (emphasis added). The reason for this rule is that jurors are only too willing to discount arguments from lawyers who try to overstate their case. *See id.* at 493 ("Overstatement in final argument is usually a needless withdrawal from your personal credibility account. It takes away without giving you anything in return. If the case is truly close—and everyone knows it—it is an opportunity for genuine candor. It is more effective than any gimmick, and can make a difference[.]"). On the other hand, trial lawyers who deal with all the facts in an evenhanded way—even the damaging ones—find that juries are more likely to trust their interpretation of the facts most important to their client's case. *See Gentry*, 540 U.S. at 9–10 ("[I]f you make certain concessions showing that you are earnestly in search of the truth, then your comments on matters that are in dispute will be received without the usual apprehension surrounding the remarks of an advocate." (quoting J. Stein, *Closing Argument* § 204, p. 10 (1992-1996))). And once a jury finds a lawyer to be less than fully credible, the lawyer might as well say nothing at all.

Of course, there are times to push the boundaries of the record to argue a disputed factual point. *See* McElhaney at 483 ("[M]ere exaggeration is not necessarily improper.") (citing *Nashville Ry. & Light Co. v. Owen*, 11 Tenn. App. 19 (1929)). But there is a time, too, for laying out the facts in a more objective manner so as not to oversell. *Cf. Ecclesiastes* 3:1-8. Knowing which time is which is perhaps the quintessential example of a "strategic" decision that a trial lawyer must make. *See Gentry*, 540 U.S. at 5–6 ("[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage."). Fields's counsel made such a decision here when

he decided to concede that Burton had not testified conclusively that Fields had taken drugs on the night in question.  And strategic decisions are "virtually unchallengeable."  *Akwal v. Mitchell*, 613 F.3d 629, 641 (6th Cir. 2010); *see also Strickland,* 466 U.S. at 690.

Could counsel have decided to be more aggressive with the facts during closing?  Perhaps.  But the Constitution does not guarantee that a defendant will have a perfect lawyer.  It does not guarantee that he will have a good lawyer.  It does not even guarantee that he will *not* have a "really bad one."  *Storey v. Vasbinder*, 657 F.3d 372, 374 (6th Cir. 2011) ("[T]he Supreme Court has gone out of its way to make clear that, in order to obtain a new trial on ineffective-assistance grounds, the petitioner must do more than show that he had a bad lawyer—even a really bad one.").  And it certainly does not guarantee a defendant the right to an attorney willing to exaggerate the evidence in his favor—one willing to toe the line between proper argument and misstating the record.  The Kentucky Supreme Court hardly applied *Strickland* in an unreasonable manner when it rejected Fields's claim that his attorney should have played faster and looser with the record.  He is therefore not entitled to habeas relief on the basis of his eighth claim.

### 9.  Claim 9

In Fields's ninth claim, he argues that he is entitled to habeas relief because the court sustained three of the prosecution's objections during trial.  Before going into more detail about the specific facts underlying this argument, it is important to define clearly the question before the Court.  The question is not whether the trial judge should have sustained or overruled the prosecution's objections to these three pieces of testimony.  "[E]rrors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus."  *Walker*, 703 F.2d at 962.  For "a state court's

violation of its own evidentiary law does not, *ipso facto*, provide a basis upon which a federal court may grant habeas relief." *Bey*, 500 F.3d at 519. Instead, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle*, 502 U.S. at 68. Thus, to form a basis for habeas relief—even in a non-AEDPA case—the evidentiary ruling in question must be "so fundamentally unfair" as to violate due process. *Bey*, 500 F.3d at 519–20.

Of course, this *is* an AEDPA case, so the question is not whether this Court would hold on direct review that the trial court violated Fields's Due Process rights. The reason is that the Kentucky Supreme Court considered Fields's claim when it performed its own direct review, and it rejected that claim on the merits. R. 32-1 at 442–444. The question before the Court is thus a narrow one: could a fairminded jurist believe that, when the Kentucky Supreme Court affirmed the trial court's evidentiary rulings, it rendered a decision that was "[consistent] with the holding in a prior decision of [the Supreme] Court" about the meaning of the Due Process Clause in the context of evidentiary rulings? *Harrington*, 562 U.S. at 102. If so, then Fields is not entitled to habeas relief.

The Supreme Court has given little guidance in this area. It goes without saying, of course, that the Due Process Clause does not give a defendant the right to enter any and all evidence that he believes will help his case. If this were so, a trial court would violate the Constitution every time the court said "sustained" in response to a prosecutor's objection. The Supreme Court has rejected such a freewheeling interpretation of the Due Process Clause, holding that "the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers*, 410 U.S. at 295. Still, there are limits on the kinds of evidence that a

state may constitutionally prevent a defendant from presenting.  The rule seems to be as follows: "[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense."  *Crane*, 476 U.S. at 690 (internal quotation marks omitted).[22]  If a state court's evidentiary ruling deprives a defendant of that "meaningful opportunity," then the ruling likewise violates the Due Process Clause.  If not, then the evidentiary ruling does not violate the Constitution and is therefore not a basis for a habeas claim in federal court.

First, Fields argues that the trial court deprived him of such a "meaningful opportunity" when it forbade him to question the investigating officer, Detective Gary Stevens, about a conversation that he had with Detective Hill from the Grayson Police Department.  Stevens admitted that he had "become angry" with the Grayson police when they made "comment[s] about how [Stevens was] doing the investigation."  R. 30-16 at 38. And Fields wanted to explore this anger further by asking Stevens whether he had "confronted" Hill at a local restaurant, "telling him to stay out of [Stevens's] case and telling him to quit telling [Stevens] what to do with [his] case."  *Id.*  The trial court sustained the prosecution's objection to this further questioning, telling defense counsel to "move on."  *Id.* at 40.

Part of Fields's defense theory was apparently that the police had rushed to judgment in his case, a theory that defense attorneys often employ.  He argued at trial that "the police did not do a thorough job in investigating the murder of Ms. Horton" because "the police

---

[22] The Supreme Court has stated the rule in slightly different ways over the years.  The Court has said that a defendant has "the right to a fair opportunity to defend against the State's accusations."  *Chambers*, 410 U.S. at 294. It has said that defendant has the right to have the prosecutor's case encounter and "survive the crucible of meaningful adversarial testing."  *United States v. Cronic*, 466 U.S. 648, 656 (1984).  And it has said that the exclusion of evidence violates a defendant's due process rights when it "significantly undermine[s] fundamental elements of the defendant's defense."  *United States v. Scheffer*, 523 U.S. 303, 315 (1998).  All of these appear to be nothing more than different ways of stating the same general rule.  *Crane*'s formulation is clearest; hence this Court will use *Crane*'s formulation.

thought they had gotten their man when they found Mr. Fields looting Ms. Horton's bedroom." R. 6 at 60. Thus, Fields argued, the police "failed to properly investigate the possibility that someone else actually murdered Ms. Horton." *Id*. Fields says that the trial court "hampered" his ability to present this theory when it "refused to allow counsel to ask [Stevens] about any conversations that [Stevens] had with Grayson Police [Detective] Hill." *Id*.

Earlier in the Stevens cross examination, however, counsel had already forced Stevens to admit that he believed "it looked like a strong case," that he "had in [his] mind" what another sergeant had told him about what happened at the crime scene, and that he was "focusing pretty much on one person at the time when [he] started investigating this case, and that person was Mr. Sam Fields." R. 30-16 at 37. Counsel even asked Stevens whether he thought he "had a slam-dunk [case] on [his] hands." *Id*. And of course Stevens had already admitted that he was indeed "angry" with the Grayson police for criticizing his investigation.

True, counsel wanted to go a bit further and explore the details of Stevens's confrontation with the Grayson police. But a fairminded jurist could nevertheless believe that Fields had a "meaningful" opportunity to present his chosen defense—that the police had rushed to judgment—even though the trial court forbade him to ask Stevens more detailed questions about his confrontation with Detective Hill. Put plainly: a fairminded jurist could believe that Fields had already made his point—earlier in the cross—and that the trial court, therefore, did not violate his right to defend himself merely by asking him to move on.

Second, Fields argues that the trial court should have allowed him to offer additional testimony that Murrie O'Brien "was able to enter through the back door of the crime scene and exit out the front door without encountering any police officers or being barred by police tape" on the morning after the murder.  R. 59 at 81.  In his view, "[a]llowing O'Brien to testify that he was able to walk right through the middle of the crime scene just hours after [the murder] without being stopped by an officer demonstrates the officers did not maintain the integrity of the crime scene." *Id.* at 83.  According to Fields, this testimony would have shown that the police failed to "preserv[e] crime scene evidence and maintain[] crime scene integrity during their investigation." *Id.* at 82.

During trial, however, O'Brien testified in open court that he entered the crime scene through "the back door" and exited out of "the front door."  R. 30-21 at 3148.  He testified that "some police officers and detectives" were there at the scene when he was. *Id.*  And he testified that he did not cross "any yellow tape" to get into the house. *Id.*  Thus, it is hard to know why Fields is complaining that O'Brien was not allowed "to testify that he was able to walk right through the middle of the crime scene" without "being stopped by an officer."  R. 30-21 at 3148.  O'Brien in fact testified to those facts.

Fields responds that the trial court should also have allowed O'Brien to answer the following question that a juror wanted to ask: "[w]hen you arrived & came through the back [way/why] did any officers try to stop you from coming into a crime scene."  R. 57-10 at 32; R. 30-21 at 3151–52.  As an initial matter, the parties dispute the precise wording of the question that the juror wanted to ask.  It appears that the trial court believed that the bracketed word was a "why" rather than a "way."  Thus, the trial court thought that the juror wanted to ask the following question: "[w]hen you arrived & came through the back why did

any officers try to stop you from coming into a crime scene." R. 57-10 at 32. The trial court said that "[h]e wouldn't have any—he wouldn't have the answer to that question, although it's a good question. I mean he just simply wouldn't have the answer to why? Wouldn't be within his knowledge." R. 30-21 at 3151. The Court thus refused to give the juror's proposed question, holding that the question "is not permitted under the rules." *Id.* at 3152.

The Kentucky Supreme Court seemed to accept the trial court's interpretation of the question. *See* R. 32-1 at 443 ("Though the record does not reflect the exact wording of the proposed question, it appears that the juror wanted to ask O'Brien why the police did not stop him from entering Horton's home."). As a result, the Kentucky Supreme Court held that the question was "speculative and outside O'Brien's knowledge" and therefore upheld the trial court's ruling. *Id.* The respondent seems to agree with that interpretation as well. *See* R. 41 at 76 ("A witness can only give testimony as to matters within their personal knowledge. Mr. O'Brien could not give testimony explaining why the police officers did or did not stop him from entering Ms. Horton's home.").

Fields, on the other hand, maintains that the scribbled word was a "way" rather than a "why" and that the juror was therefore asking only *whether* the police had tried to stop O'Brien rather than *why* they did so. As far as this Court can tell, Fields is correct. The juror who wrote this question wrote another question in which she used the word "way," and it looks nearly identical to this disputed word. *Compare* R. 57-10 at 34, *with id.* at 32. And meanwhile the state court's interpretation of the juror's question does not make much sense. Under their interpretation, the juror wished to ask "why did any officers try to stop you from coming into a crime scene?" But O'Brien never testified that the officers had tried to stop him in the first place, so it would be strange for a juror to want to ask him "why" they did so.

Finally, the word just looks like a "way" rather than a "why."  Thus, for these purposes, the Court will assume that Fields's interpretation of the question is the correct one and that the Kentucky courts misconstrued the juror's question.

It follows that the Kentucky courts were mistaken when they characterized the juror's question as "speculative."  R. 32-1 at 443; R. 30-21 at 3151.  After all, O'Brien certainly had personal knowledge of *whether* any police officers tried to stop him from coming into the house that day.  And thus, it seems like the trial court misapplied the state's evidentiary code when it refused to ask the juror's proposed question.  The problem for Fields, though—as explained above—is that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  *Estelle*, 502 U.S. at 67–68.  Even in a non-AEDPA case, a prisoner can obtain habeas relief only if the evidentiary ruling in question is "so fundamentally unfair" as to violate due process, *Bey*, 500 F.3d at 519–20, *i.e.*, if it deprives him of a "meaningful" opportunity to present a complete defense, *Crane*, 476 U.S. at 690.

Here, O'Brien had already answered the juror's question, at least implicitly.  As noted above, he explained that he entered "the back door," that he exited out of "the front door," that "some police officers and detectives" were there at the scene when he was, and that he did not cross "any yellow tape" to get into the house.  R. 30-21 at 3148.  Fields apparently wished to argue that O'Brien "was able to walk right through the middle of the crime scene" without "being stopped by an officer."  *Id*.  And given the testimony that O'Brien gave, Fields was fully able to do so.  Perhaps the juror's proposed question would have further clarified Fields's point, but he nevertheless had a "meaningful" opportunity to present his

chosen defense.  He is therefore not entitled to habeas relief on the grounds that the trial court refused to ask the juror's proposed question.[23]

Third, Fields says that the trial court violated his rights by limiting testimony from Johnny Rayburn, the man who bought Ms. Horton's house after she died.  R. 6 at 63. Rayburn had apparently given the police free access to the house—which he had converted into a real-estate office—while the prosecution was preparing for Fields's first trial.  R. 30-22 at 3279–80.  According to Rayburn's testimony, the state's lead investigator—Gary Stevens—had encouraged Rayburn to take the stand and lie on behalf of the prosecution.  *Id.* at 3289–90.  Rayburn testified that Stevens said, "I need you to go and be a witness" and "testify that you [put] the same two windows . . . on the house that came off."  *Id.* at 3290. Rayburn had apparently replaced the original windows with ones he had purchased himself, and thus Rayburn told Stevens that he couldn't "testify to that because that's not the truth." *Id*.  Rayburn went on to say that he had called the *Herald-Leader*—the flagship newspaper in Lexington, Kentucky—to report Stevens's misconduct.  *Id.*  Defense counsel went on to ask Rayburn *why* he had called the *Herald-Leader*, at which point the prosecution objected.  The trial court sustained the objection.  That ruling, Fields says, violated his due process rights.

---

[23] Given that the Kentucky courts seem to be plainly mistaken in their interpretation of the juror's question, those courts arguably made a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  It is at least arguable, therefore, that AEDPA should not apply to this portion of Fields's claim.  Thus, in an abundance of caution, this Court has analyzed this portion of the claim de novo rather than applying the deference that AEDPA requires.  As shown above, Fields's claim fails even under de novo review and thus he is not entitled to habeas relief.  *See Ben-Yisrayl v. Buss*, 540 F.3d 542, 550 (7th Cir. 2008) ("Despite a conclusion that the Indiana Supreme Court's finding was unreasonable, [he] still must establish that he is entitled to habeas relief."); *Harrison v. McBride*, 428 F.3d 652, 665 (7th Cir. 2005) ("[E]ven when the AEDPA standard does not apply—either because the state court's opinion was unreasonable or because the state judiciary did not address the constitutional claim—[a] prisoner still must establish an entitlement to the relief he seeks." (internal quotation marks omitted)).  The reason is that a federal court may grant habeas only if a prisoner is "in custody pursuant to the judgment of a State court . . . in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  AEDPA imposes additional hurdles, of course, but it does not remove that fundamental one.

As the Kentucky Supreme Court pointed out, however, "counsel was given great leeway in its examination of Rayburn and was able to fully develop Rayburn's allegations of police misconduct." R. 32-1 at 444. The trial court did allow Rayburn to testify, after all, that the investigator had asked him to lie. And the court likewise allowed Rayburn to testify that, in response to Stevens's urging, he had called the Lexington newspaper to ask them to "investigate." R. 30-22 at 3290.

Fields, of course, contends that the trial court should have allowed him to go even further and ask Rayburn *why* he called the newspaper. By that point, however, Rayburn's reasons were plainly obvious: Rayburn had just said that a police officer had asked him to perjure himself on the stand and that he wanted a major state newspaper to "investigate." A fairminded jurist could therefore conclude, as the Kentucky Supreme Court did, that the trial court's "minor limitation" on Fields's questioning "did not prejudice [Fields] or unduly impair his ability to develop his defense." R. 32-1 at 444. And a fairminded jurist could easily conclude that the trial court did not deprive Fields of a "meaningful" opportunity to present a complete defense when it forbade Rayburn to tell the jury explicitly why he called the *Herald-Leader*. Fields is therefore not entitled to habeas relief on the basis of his ninth claim.

### 10. Claim 10

In Fields's tenth claim, he argues that "the trial court improperly limited his ability to cross examine" two of the prosecution's witnesses: Officer Lindeman, the arresting officer, and James Dobson, an EMT who treated Fields at the hospital. R. 59 at 85. Specifically, Fields says that the trial court should have allowed him "to ask Officer Lindeman about his conviction for official misconduct based upon an improper relationship with an underage

girl[,]" and should have allowed him "to ask Dobson about his fourth degree assault conviction that resulted from hitting a patient in his care." *Id.* Both of these offenses were misdemeanors under Kentucky law. *Id.* at 429 (describing Lindeman's charge as one for "misdemeanor" counts of official misconduct, unlawful transaction with a minor, and harassment"); *id.* at 431 (describing Dobson's conviction as one for "misdemeanor" assault). Fields raised this claim on direct appeal, and the Kentucky Supreme Court denied it. R. 32-1 at 429–31. Thus, to obtain habeas relief, Fields must show that the state court unreasonably determined the facts or reached a decision that was either contrary to or an unreasonable application of clearly established law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d).

Fields does not seem to argue that the state court made any factual error. Instead, he contends that the state court's decision was "contrary to and/or an unreasonable application" of the Supreme Court's decision in three cases, *Chambers*, *Crane*, and *Davis*. R. 6 at 66–67 (citing *Davis v. Alaska*, 415 U.S. 308, 317 (1974); *Chambers*, 410 U.S. at 294; *Crane*, 476 U.S. at 683). Even when these cases are read in the light most favorable to Fields, however, they stand only for the broad propositions, respectively, that due process gives a defendant the right to a "fair opportunity" to defend himself, *Davis*, 415 U.S. at 317; that the Constitution gives a defendant a "meaningful opportunity to present a complete defense," *Crane*, 476 U.S. at 683; and that jurors are "entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place" on the evidence. *Davis*, 415 U.S. at 317.

What the Supreme Court has never said, however, is that the Constitution requires a trial court to allow a defendant to impeach testifying witnesses with prior convictions.

Indeed, as the Sixth Circuit pointed out, "[t]he Supreme Court has not held" that a defendant must "be permitted to cross-examine using a *crimen falsi* conviction," *i.e.*, a conviction for a crime involving deceit or dishonesty. *Olson v. Little*, 604 F. App'x 387, 399 (6th Cir. 2015). And if a defendant has no clearly established right to impeach a witness who has—say— committed perjury in the past, it would be odd that he would have the right to impeach using the convictions at issue here—sexual misconduct and assault—which have less bearing on the witness's honesty than perjury does.

After all, even the federal rules give the defendant no such right.  A defendant may impeach a witness if the witness has been convicted of a felony.  Fed. R. Evid. 609(a)(1). And he may impeach a witness if the witness has been convicted of a crime involving dishonesty or falsity.  Fed. R. Evid. 609(a)(2).  But the federal rules do not provide that a defendant may impeach a testifying witness using a conviction for more pedestrian forms of misdemeanors.  *See* Fed. R. Evid. 609.  Thus, to accept Fields's argument, one would have to believe that the federal rules themselves—at least the impeachment provisions—are unconstitutional.  Suffice it to say that a "fairminded jurist" could reject that argument and hold that a defendant has no constitutional right to impeach a witness using the misdemeanor convictions at issue here.  Fields has therefore failed to show that the Kentucky Supreme Court unreasonably applied any holding of the United States Supreme Court, which means he is not entitled to habeas relief on the basis of his tenth claim.

### 11. Claim 11

In his eleventh claim, Fields argues that he is entitled to habeas relief because the trial court refused to let him play for the jury the tape-recorded testimony of Vince Kimmel, a proposed witness for the defense.  R. 6 at 67.  Kimmel had given an earlier statement in

which he stated (stated, not testified, for he was not under oath at the time and was not subject to any form of cross examination) that Burton had confessed to killing Ms. Horton. R. 57-20 at 7 ("[S]he came straight out and come told me that she . . . nailed the bitch. She snuffed her out just for the simple fact that she thought she was a regular bitch and that's exactly what she said."); R. 57-13 at 2. After giving that statement, Kimmel was involved in a car accident that left him seriously injured. *Id.* at 1. Both parties agreed before trial that he was incompetent to testify and thus unavailable for the purposes of Kentucky's hearsay rules. R. 29-17 at 4. The defense therefore moved to admit the taped statement in lieu of Kimmel's live testimony. *Id.* The trial court denied that motion on the grounds that Kimmel was not under oath when he made the statement and that the prosecution had not been given the opportunity to cross examine Kimmel. *Id.* at 15 ("The motion to introduce the taped statement of Vincent Kimmel is OVERRULED for the basis that it's not subject to cross examination.").

That ruling forms the basis of Fields's claim. He first made that claim before the Kentucky Supreme Court, however, and the state court denied it on the merits. R. 32-1 at 432–33. Hence AEDPA applies. To obtain habeas relief, therefore, Fields must show that, when the Kentucky Supreme Court affirmed the trial court's ruling, it rendered a decision that was contrary to, or an unreasonable application of, clearly established law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d).

As the Kentucky Supreme Court quite correctly pointed out, a "criminal defendant's due process rights are not violated by every limitation placed on the admissibility of evidence." R. 32-1 at 432–33. For "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes*, 547

U.S. at 324.  "Only rarely" has the Supreme Court "held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Jackson*, 133 S. Ct. at 1992.  And thus, once again, the only Supreme Court decisions even remotely on point are *Chambers* and its follow-on cases.  And, once again, outside the specific factual contexts of those cases, all those decisions stand for is the general proposition that a state court may not use its evidentiary code to deprive a defendant of the right to present a "meaningful" defense.  *See Chambers*, 410 U.S. at 294; *Crane*, 476 at 690–91; *Scheffer*, 523 U.S at 315.  In this habeas case, the question is therefore whether any "fairminded jurist" could conclude that the trial court allowed Fields to present a meaningful defense even though it excluded Kimmel's statement.

The answer to that question is, of course, "yes."  It is true that a defendant has the right to present evidence, but a fundamental premise of our justice system is that witnesses must give their testimony in open court and subject to cross examination.  Moreover, Kimmel's testimony here would have been mostly cumulative: two other witnesses had already testified that Burton had confessed to the murder.  Fields concedes as much.  R. 59 at 90.  Thus, Fields is wrong to say that the trial court denied him the "right to introduce evidence that another person committed the offense with which he is charged."  R. 6 at 71.  Fields presented such evidence through the two other witnesses who testified that Burton had confessed.

Fields responds in a couple of ways.  First, he says that "[w]hile the Kentucky Supreme Court quite accurately noted two others indicated Burton confessed, a third unbiased, disinterested witness corroborating those other witnesses would have been dramatic."  R. 59 at 90.  "Indeed," Fields goes on to say, "three strikes and you're out—and

this would have been a third strike in the juror's eyes." *Id.*   Thus, Fields says, it was unreasonable for the state courts to conclude that his defense was not undermined when the trial court forbade him to enter Kimmel's statements.   "Obviously, Fields['s] defense was undermined," he concludes, "because he was found guilty." *Id.*

Where to begin?   As an initial matter, that a defendant "was found guilty" of course does not imply that the trial court's rulings "undermined" his right to present a certain defense theory.   Sometimes a jury just isn't buying a theory no matter how artfully or completely a lawyer presents it.   "Three strikes and you're out" is of course a rule of baseball, but there is no legal rule requiring a jury to accept a fact just because it is said in open court three times rather than two.   And, of course, the Supreme Court has never said that a state must allow a defendant to present cumulative testimony just because it would be more "dramatic."   And thus, a fairminded jurist could believe that the Kentucky Supreme Court reasonably applied Supreme Court case law when it rejected Fields's claim.   So this argument fails.

Second, Fields quibbles with the Kentucky Supreme Court's reasoning.   R. 59 at 90. He says the state court unreasonably determined that Kimmel's statement was hearsay, unreasonably held "that there was available cross [examination] to lessen the weight to be afforded this statement," and "unreasonably held that these statements bore 'little indicia' of reliability." *Id*.   Those arguments are simply not relevant in a habeas case like this one— especially one in which AEDPA provides the standard of review.   The question is not whether the Kentucky Supreme Court's decision was unreasonable *simpliciter*, *i.e.*, whether it is internally consistent, whether the premises are sound, whether the conclusions logically

follow, and so on.  The purpose of habeas review is not for federal courts to critique the state

courts' reasoning abilities: we sit as judges, not as law professors or writing instructors.

The question is also not whether the Kentucky Supreme Court unreasonably applied

Kentucky's hearsay rules.  *Estelle*, 502 U.S. at 67–68 ("[I]t is not the province of a federal

habeas court to reexamine state-court determinations on state-law questions."); *Early*, 537

U.S. at 10 (holding that a petitioner must show that the Supreme Court holding in question is

about a *constitutional* rule applicable to the states, rather than about some other kind of rule).

After all, there is no clearly established law from the federal courts interpreting the

evidentiary code of the Commonwealth of Kentucky—how could there be?—much less

federal law from the Supreme Court of the United States.

Instead, the reasonableness question is far narrower: did the Kentucky Supreme Court

reasonably apply *the holdings of the United States Supreme Court*?  As explained above,

nothing in that Court's cases suggest that a defendant has the right to offer unsworn,

uncrossed testimony just because it would be helpful to his defense or just because it would

be more "dramatic."  And thus, it was not "unreasonable" for the state court to conclude that

the holdings from those cases simply do not apply to this one.  Fields is therefore not entitled

to habeas relief on the basis of his eleventh claim.

## 12. Claim 12

In Fields's twelfth claim, he argues that he is entitled to habeas relief because the

trial court refused to transport him to two pre-trial hearings involving evidentiary motions.

The reason for the court's refusal was that Fields was "housed in the Rowan County jail, not

in Floyd County [where the trial was held], and that [Fields] was a security risk due to a prior

conviction for escape."  R. 32-1 at 455 n.12; *see also* R. 29-7 at 3–4; R. 29-14 at 2–3.

According to Fields, a defendant has a right to "be present" at "any and all proceedings."  R. 6 at 72–73.  This right, he says, comes from the Sixth Amendment—as interpreted by the Supreme Court's decision in *Faretta v. California*, 422 U.S. 806 (1975)—and the trial court violated that amendment when it excluded Fields from the hearings.  *Id.*

As an initial matter, the parties dispute whether Fields procedurally defaulted this claim.[24]  "The extent to which th[is] claim[] [is] procedurally defaulted is a nettlesome question; the extent to which [it is] meritless, much less so."  *Storey*, 657 F.3d at 380 (citation omitted).  Thus, the Court will "cut to the merits here."  *Id.*

Fields first raised this claim in the Kentucky Supreme Court, albeit in a single paragraph.  The state court denied that claim on the merits, holding that neither of the hearings were a "critical stage" in Fields's trial.  R. 32-1 at 455–56.  That means AEDPA applies to this claim.  Fields must therefore show that the state court's decision was contrary to or an unreasonable application of United States Supreme Court case law.  *See* 28 U.S.C. § 2254(d).

Under the Supreme Court's precedents, a defendant does not have a constitutional right to be present at all hearings that might concern his trial.  Instead, he has a right to

---

[24] The dispute is over whether Fields properly preserved his argument that the trial court committed "structural error" when it refused to transport Fields to the courthouse for the hearings.  *Compare* R. 6 at 73 ("This is a structural defect."), *with* R. 41 at 87 ("In his petition, Fields presents essentially the same perfunctory, one paragraph, argument he presented to the Kentucky Supreme Court . . . .  The only difference is he no[w] makes an assertion that 'this is structural defect."  No such claim was presented to the Kentucky Supreme Court in his direct appeal."), *and* R. 59 at 93 (arguing that the state has waived any procedural-default argument).  The argument that this is structural error, however, is meritless even under de novo review.  When a court commits structural error— for example, by denying a defendant the right to counsel altogether—then the defendant is entitled to a new trial, no questions asked.  *See, e.g.*, *Gideon v. Wainwright*, 372 U.S. 335 (1963); *Johnson v. United States*, 520 U.S. 461 (1997).  The opposite of a "structural" error is one subject to "harmless error analysis."  *See generally Neder v. United States*, 527 U.S. 1, 8–9 (1999) (discussing this distinction).  And the Supreme Court has made clear that when a trial court deprives a defendant of his right to be present, that error is nevertheless subject to "harmless error" analysis.  *Rushen v. Snyder*, 464 U.S. 114, 118 n. 2 (1983).  Thus, the error about which Fields complains is not in fact a "structural" one.  *See United States v. Riddle*, 249 F.3d 529, 535 (6th Cir. 2001) ("[T]he right to be present at voir dire is not one of those structural rights whose violation constitutes per se error. Rather, there must be prejudice in the absence to warrant reversal.").

present only if "his absence might frustrate the fairness of the proceedings." *Faretta*, 422 U.S. at 819 n.15.  As the Court put it in another case, "[s]o far as the Fourteenth Amendment is concerned, the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, *and to that extent only*." *Snyder v. Massachusetts*, 291 U.S. 97, 107–08 (1934) (emphasis added); *see also Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) ("[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.").  Fields is thus plainly mistaken when he says that "the right to be present extends to *any and all proceedings*."  R. 6 at 72–73 (emphasis added).

The "proceedings" at issue here were two hearings concerning evidentiary motions. During the first hearing, the parties discussed whether certain evidence would be admissible under Kentucky's version of the character-evidence rule.  R. 29-7 at 3.  As the trial court pointed out, the hearing concerned a purely "legal argument" and "didn't concern [the facts of the case]."  *Id.*  During the second hearing, the parties discussed whether Kimmel should be deemed "available" to testify.  R. 29-14 at 4–5.  The trial court noted, again, that nothing was done "on the merits of the case whatsoever" during this hearing.  *Id.* at 3.  Fields argues that, if he was allowed to attend those hearings, he could have helped his attorney.

As an initial matter, it is hard to see how Fields could have done so.  Neither of the issues discussed during these hearings involved factual disputes, and it is unclear how Fields—who had no legal training—could have assisted his attorney in making purely legal arguments.  Fields does not tell us.  And without such knowledge, it is hard to imagine what sort of "assistance" he could have provided in this legal setting.

More to the point, though, the question whether Fields *could* have helped his attorney during the hearings was not the question before the Kentucky Supreme Court. And it is certainly not the question before this Court now. The question in the state court was whether Fields's absence "thwarted" the "fair[ness]" and "just[ice]" of those two hearings. *Snyder*, 291 at 105–06; *see also United States v. Gibbs*, 182 F.3d 408, 436 (6th Cir. 1999). The question here is whether a fairminded jurist could believe that these hearings were fair and just despite Fields's absence.

Of course, a fairminded jurist could believe exactly that. Such a jurist could believe that fairness and justice—as those terms have been interpreted by the Supreme Court—do not require that a defendant be present during purely legal arguments. After all, the Supreme Court has never suggested that a defendant must be present during such arguments. And meanwhile, the operative terms—fairness and justice—are fuzzy enough that fairminded jurists could disagree as to what, precisely, they require. *See Alvarado*, 541 U.S. 652 at 664 ("The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

Without more specific guidance from the Supreme Court as to what those terms mean in this context, this Court has no basis on which to conclude that the state courts' interpretation of those terms was "objectively unreasonable." *Lockyer*, 538 U.S. at 75. What language in the Supreme Court's cases would allow this Court to say that? And what language would allow this Court to say that no fairminded jurist could take a different view than Fields does as to the importance of his presence at these hearings? Fields does not say, of course, and thus he has failed to show that the Kentucky Supreme Court unreasonably

applied the Supreme Court's cases when it denied Fields's claim.  That means he is not entitled to habeas relief on the basis of claim twelve.

### 13. Claim 13

In his thirteenth claim, Fields argues in his opening brief that the trial court erred by ordering a second competency hearing before his second trial.  R. 6 at 73.  In his reply brief, however, Fields states that he "withdraws this Ground for Relief."  R. 59 at 96.  Thus, the Court will not address the merits of claim thirteen.

### 14. Claim 14

In his fourteenth claim, Fields argues that the trial court should have excluded certain testimony from Detective Stevens.  During trial, the prosecutor asked Stevens about why he had not saved the section of the bed sheet that was around Ms. Horton's throat.  R. 30-22 at 3262–64.  Stevens responded that he had not saved the sheet because he had assumed that the blood on the sheet was Ms. Horton's—the sheet was, after all, next to the open neck wound on Ms. Horton's body.  *Id.* at 3263.  The prosecutor then asked Stevens whether, "based on [his] training[,] education[,] and experience," he would have expected "to find one or two drops of [one person's] blood in a gallon" of someone else's blood.  *Id.*  In response to this question, Stevens first caveated that he was "not a serologist."  *Id.*  He then specified the source of his knowledge: "in-service classes that we had and training."  And he finally answered that if the blood had been "coagulated"—by which it seems he meant "mixed" rather than "clotted"—then "you're not going to have a satisfactory result on that."  *Id.*

In Fields's view, that testimony "required scientific or other specialized knowledge that [Stevens] was not qualified to give."  R. 6 at 77.  Fields points out that "Stevens was never qualified as an expert in anything related to blood evidence."  *Id.*  And he contends that

there was therefore "insufficient evidence to support a finding [that] Stevens was qualified to give such opinion testimony." *Id.* Thus, Fields goes on to conclude, the trial court "erred to [his] substantial prejudice" and indeed "denied him due process." *Id.*

Again, Fields raised this claim on direct review. R. 32-1 at 445–47. Again, the Kentucky Supreme Court adjudicated it "on the merits," noting that Stevens was "a twenty-two year veteran of the Kentucky State Police who had also worked four years in the crime lab," that he had not "testif[ied] to the scientific process of blood examination," and that "his response was limited to an explanation for his own actions at the crime scene and his motivations for such actions." *Id.* at 446. And again, the claim concerns whether the trial court violated the Due Process Clause when it allowed Stevens to answer the prosecutor's questions. Thus—again—AEDPA applies, *Chambers* controls (along with its progeny), and the question presented is whether any fairminded jurist could conclude that Fields had a "meaningful" opportunity to present a complete defense despite Stevens's testimony.

Here, Fields points out that "[o]ne question the Commonwealth struggled throughout the trial to answer was 'where is the blood?'" R. 59 at 98. Fields had apparently cut his hand before going to Ms. Horton's house that night and was "dripp[ing] blood everywhere he went" but "none of [his] blood was found on Ms. Horton or her bed." *Id.* Thus, one key argument that defense counsel made was that Fields's blood would have been found on the bed if Fields were the real killer. In Fields's view, "Stevens'[s] testimony was an improper, inadmissible attempt to explain away the lack of blood evidence," thus depriving Fields—the argument seems to go—of the ability to present a meaningful defense. *Id.*[25]

---

[25] Fields says that "the Commonwealth sought to use Stevens's testimony to explain a negative with a negative." R. 59 at 98. It is not clear to the Court what that sentence means.

The problem with that argument is that Stevens's testimony did not explain away the lack of blood evidence.  Stevens did not testify that Fields's blood *was* found at the scene.  Indeed, nobody said that.  He testified only that he had not kept the sheet because he believed that it would not contain a detectable amount of Fields's blood.  Even that testimony was half-hearted at best, and the prosecution offered it only to rehabilitate Stevens after Fields himself attacked the integrity of Stevens's testimony on direct examination.  R. 30-22 at 3250–51 ("To the best of your recollection, you never sent any of those sheets, bedspreads, or clothing Ms. Horton may have had on at the time, into evidence for any type of evaluation?").  Thus, it seems like the prosecution was merely asking Stevens *why* he did what he did, rather than attempting to introduce scientific testimony.

In the end, though, Stevens failed to present any evidence that—or even suggest that—Fields's blood was *in fact* present at the crime scene.[26]  Fields was left free to argue— and argue he did—that the prosecution had failed to answer the question: "where is the blood?"  A fairminded jurist could therefore conclude that, notwithstanding Stevens's testimony, the trial court gave Fields the opportunity to present a "meaningful" defense. *Crane*, 476 U.S. at 690; *Chambers*, 410 U.S. at 294; *Trombetta*, 467 U.S. at 485; *Washington*, 388 U.S. at 19.  This is especially true given that Stevens explicitly pointed out that he was not an expert witness, thus encouraging the jury to give his testimony the appropriate significance, *i.e.*, an explanation for why he did what he did while investigating

---

[26] One might respond that Stevens's testimony provided a reason why no blood was found at the scene: namely that it would not have been possible to detect Fields's blood on the sheet given the large quantity of Ms. Horton's blood also present on the sheet.  That argument might have some teeth if the sheet had been tested and found not to have any of Fields's blood on it.  In that case, perhaps Stevens's testimony could have been thought to "explain" why Fields's blood was absent.  But that is not what happened.  The police never tested the sheet at all.  And if the sheet wasn't tested, then the fact that a test might not have detected any blood in no way suggests that there was blood.  That fact at most suggests that the police had a valid reason not to test the sheet.  And that does seem to be the purpose for which the prosecution used Stevens's testimony.

the case.  In sum, Fields has failed to show that the Kentucky Supreme Court unreasonably applied *Chambers* (and the Supreme Court cases saying roughly the same thing as *Chambers*) when it rejected Fields's fourteenth claim.  He is therefore not entitled to habeas relief on the basis of that claim, either.

### 15. Claim 15

In Fields's fifteenth claim, he argues that the trial court erred when it excused three jurors for cause after they equivocated about their ability to impose the death penalty.  Fields made this argument in the Kentucky Supreme Court, R. 32-1 at 422–24, the state court rejected it on the merits, *id.*, and thus AEDPA's gatekeeping requirements apply, 28 U.S.C. § 2254(d).  The question is therefore whether the state court unreasonably applied any Supreme Court cases when it affirmed the trial judge's decision to excuse those three jurors.

In *Witherspoon v. Illinois*, the Supreme Court "set forth the rule for juror disqualification in capital cases."  *White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (discussing *Witherspoon v. Illinois*, 391 U.S. 510 (1968)).  "*Witherspoon* recognized that the Sixth Amendment's guarantee of an impartial jury confers on capital defendants the right to a jury not 'uncommonly willing to condemn a man to die.'"  *Id.* (quoting *Witherspoon*, 391 U.S. at 521).  "But the Court with equal clarity has acknowledged the State's 'strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes.'"  *Id.* (quoting *Uttecht v. Brown*, 551 U.S. 1, 9 (2007)).  "To ensure the proper balance between these two interests, only 'a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause.'"  *Id.* (quoting *Uttecht*, 551 U.S. at 9).

68

The question whether a juror is "substantially impaired in his ability to impose the death penalty" is of course a tightly fact-bound one.  To answer that question, a trial court must evaluate the juror's demeanor, credibility, tone of voice, and so on.  The trial court must determine, for example, whether a juror "means it" when he says that he could (or could not) impose the death penalty, or whether he is instead "faking good" (or "faking bad").  That is a determination that must be made on "the front lines," as it were, rather than "back in a headquarters tent."  *United States v. Clay*, 667 F.3d 689, 703 (6th Cir. 2012) (Kethledge, J., dissenting) (discussing deference to a trial court in a different context).  After all, "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings."  *Wainwright v. Witt*, 469 U.S. 412, 424–25 (1985).

Even on direct review, therefore, "reviewing courts owe deference to a trial court's ruling on whether to strike a particular juror" on the grounds that he is "substantially impaired in his or her ability to impose the death penalty."  *White*, 136 S. Ct. at 460.  Thus, "a trial court's 'finding may be upheld even in the absence of clear statements from the juror that he or she is impaired[.]'"  *Id.* (quoting *Uttecht*, 551 U.S. at 7).  When a federal court "review[s] a state-court ruling under the constraints imposed by AEDPA," the court "must accord an additional and 'independent, high standard' of deference" to the trial judge's determination about whether a juror can exercise his duties.  *White*, 136 S. Ct. at 460 (quoting *Uttecht*, 551 U.S. at 10).  And thus when AEDPA applies—as it does here—the petitioner is not entitled to relief so long as "there is ambiguity in the prospective juror's

statements" about whether he would be substantially impaired in his ability to impose the death penalty. *Id.* at 461 (citing *Uttecht*, 551 at 7) (quoting *Witt*, 469 U.S. at 434).

Here, the prosecution asked juror 26 whether he "just [did not] feel like [he] could consider imposing the death penalty" and he responded "yeah." R. 30-1 at 162. The trial court asked juror 27 whether he was "saying that [he] could not even consider imposing [death] as a penalty" and he responded "[n]o I could not." R. 30-2 at 260. And juror 86 stated flat out: "I don't believe I could do it"—the "do it" being "impose the death penalty." R. 30-9 at 1235. It is true, as Fields points out, that these jurors waffled a bit under further questioning about whether they could impose the death penalty. On occasion, they made statements suggesting that they could perform their duties and consider a death sentence. *See* R. 30-1 at 125–26, 128–29; R. 30-2 at 262; R. 30-9 at 1228. But given the statements quoted above, there was at the very least "ambiguity" as to whether these jurors would be "substantially impaired" in their ability to impose the death penalty. And under *White v. Wheeler*, that ambiguity requires this Court to deny Fields habeas relief on the basis of claim fifteen.

### 16. Claim 16

In his sixteenth claim, Fields argues that the trial court erred by refusing to exclude, for cause, two jurors—juror 17 and juror 43—thus violating, in his view, the Supreme Court's holdings in *Morgan v. Illinois*, 504 U.S. 719 (1992) and *Lockhart v. McCree*, 476 U.S. 162 (1986). The problem is that Fields used two of his peremptory strikes to excuse jurors 17 and 43, and thus in the end they did not participate in Fields's trial. "Individuals who do not actually sit on the jury that renders a verdict have no impact on a defendant's right to an impartial jury." *Bowling v. Haeberlin*, No. CIV. 03-28-ART, 2012 WL 4498647,

at *23 (E.D. Ky. Sept. 28, 2012) (citing *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988)).  As the Supreme Court has made clear, "peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury."  *Ross*, 487 U.S. at 88 (citations omitted).

Thus, to show a constitutional violation, a defendant must show that an impartial juror was actually "empaneled."  *Morgan*, 504 U.S at 729.  "So long as the jury that sits is impartial," the Court held, "the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated."  *United States v. Martinez-Salazar*, 528 U.S. 304, 780 (citing *Ross*, 487 U.S. at 88); *see also Skilling*, 561 U.S. at 395 n.31 (holding that defendant was not deprived of "any constitutional right" where no partial juror sat on the jury); *Rivera v. Illinois*, 556 U.S. 148, 160 (2009) (rejecting the argument that "the deprivation of a state-provided peremptory challenge requires reversal as a matter of federal law").  Fields does not dispute that the actually empaneled jury was a constitutionally impartial one, and thus he has failed to show that the state courts violated his constitutional rights.  He is therefore not entitled to habeas relief.

### 17. Claim 17

In his seventeenth claim, Fields argues that the trial court erred when it excluded juror 34 from the jury.  Fields raised this claim on direct review, and the Kentucky Supreme Court denied it on the merits.  R. 32-1 at 422–23.  Thus AEDPA, applies.  28 U.S.C. § 2254(d). And as explained in great detail while addressing claim fifteen, when AEDPA applies to a juror-exclusion claim like this one—which the Supreme Court calls a "*Witherspoon-Witt*" claim—the federal habeas court must be "doubly deferential" in its review.  *White*, 136 S. Ct. at 460 (citing *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013)).  The petitioner is not entitled to relief

so long as "there is ambiguity in the prospective juror's statements" about whether he would be substantially impaired in his ability to impose the death penalty. *Id.* (citing *Uttecht*, 551 U.S. at 7 (quoting *Witt*, 469 U.S. at 434)).

During voir dire, juror 34 said, "I couldn't live with myself sending a person to the pen. . . . It would weigh heavy on my conscience." R. 30-5 at 582. She also said, "[w]hether they're guilty or not guilty, I just don't think I could [send someone to prison]." *Id.* at 583. Indeed, as the Kentucky Supreme Court correctly pointed out, she repeated this statement—or something like it—"no less than five times." R. 32-1 at 422. As for the death penalty in particular, she said, "[t]o tell you the truth, I don't know . . . I just don't know if I could or not." *Id.* at 584.

Fields responds that some of juror 34's answers suggested that she might be able to perform her duties as a member of the jury. After all, Fields says, she also "expressed that she could follow the law even if she disagreed with it," said that she "realized the importance of following the law," and "acknowledged an understanding, from her previous jury experiences, of what an admonishment was." R. 59 at 119 (citing R. 30-5 at 571, 576, 578). Fair enough, but what about her earlier statements about not being able to send someone to prison—much less impose a sentence of death—"[w]hether they're guilty or not guilty[?]" R. 30-5 at 582–83. Those statements are of course not consistent with a citizen prepared to serve as a juror in a criminal case of any kind, much less a capital case like this one. What to do in light of those statements?

Fortunately, the Supreme Court has instructed courts on exactly what to do. "The judgment as to whether a venireman is biased," the Court has held, "is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's

province." *Uttecht*, 551 U.S. at 7 (internal quotation marks omitted). "Such determinations [are] entitled to deference even on direct review; the respect paid such findings in a habeas proceeding certainly should be no less." *Id.* The reason is that "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." *Witt*, 469 U.S. at 424–25. "Thus, when there is ambiguity in the prospective juror's statements, the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State." *Uttecht*, 551 U.S. at 7 (citing *Witt*, 469 U.S. at 434).

In sum, juror 34 made some statements that suggested she could honor her oath as a juror. She made others that suggested she could not. The proper adjective for these statements is the word "ambiguous." Thus, because "there [was] ambiguity in the prospective juror's statements" about whether she could impose the death penalty, Fields is not entitled to habeas relief on the basis of claim seventeen. *White*, 136 S. Ct. at 460.

### 18. Claim 18

The Court has already dismissed claim 18 in a separate order. *See* R. 58.

### 19. Claim 19

In his nineteenth claim, Fields argues that the trial court erred by refusing to give six jury instructions that he requested. Fields made each of these arguments before the Kentucky Supreme Court, which rejected each of them on the merits. R. 32-1 at 463–65. AEDPA therefore applies to this claim. 28 U.S.C. § 2254. Fields does not argue that the state court unreasonably determined the facts, and thus to obtain habeas relief he must show

that the court rendered a decision that was contrary to, or an unreasonable application of, clearly established law as determined by the Supreme Court of the United States. *Id.*

Fields first faults the trial court for failing to define the term "mitigating circumstances" for the jury. R. 6 at 87–88. Fields had apparently asked the court to instruct the jury that such circumstances are "[a]ny facts or factors about Sam Fields, the crime, or the case which do not justify or excuse the offenses but which in fairness and mercy lessen or reduce his responsibility or moral culpability for the crime, or which demonstrate that he is someone whose past or present circumstances indicate that he should a receive a penalty other than death." *Id.*; *see also* R. 32-1 at 241–42; R. 30-23 at 3439–41. The trial court balked at the words "fairness and mercy"; in the court's view such language was "not what the law provides." R. 30-23 at 3441. The court thus refused to give that instruction or otherwise define the term "mitigating circumstances," which, in Fields's view was, a constitutional error.

Fields cites no case from the United States Supreme Court, however, suggesting that a trial court must define the term "mitigating circumstances" for the jury. He certainly cites no Supreme Court case *holding* that a trial court must do so. In the absence of such a case, of course, it is impossible to say that the state court acted "contrary to" (or "unreasonably applied") any clearly established law from the United States Supreme Court.

Moreover, if the trial court had defined mitigating circumstances for the jury in too narrow a fashion—or if he had simply chosen the wrong words with which to do so—then the trial court would have arguably violated language from the Supreme Court stating that a jury must be allowed to "consider[], as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as

a basis for a sentence less than death." *Mills v. Maryland*, 486 U.S. 367, 375 (1988) (internal quotation marks omitted); *see also Buchanan v. Angelone*, 522 U.S. 269, 276 (1998) ("[T]he sentencer may not be precluded, and may not refuse to consider, any constitutionally relevant mitigating evidence." (citations omitted)); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986). It is easy to see, therefore, why the trial court was not eager to say too much to the jury about mitigating circumstances. *See, e.g.*, *United States v. Gabrion*, 719 F.3d 511 (6th Cir. 2013) (en banc) (demonstrating the problems that arise when a trial court attempts to define which circumstances are "mitigating" and which are not).   Under the Supreme Court's case law, the question of what constitutes a mitigating circumstance is, with a few exceptions, *see id.* at 521, up to the jury to decide.   Mitigating evidence is any evidence that "the sentencer could reasonably find . . . warrants a sentence less than death."   *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (internal quotation marks omitted).

In sum, nothing from the Supreme Court's cases suggests that a trial court must define the term "mitigating circumstances."   Indeed, those cases, at least arguably, suggest that a trial court should not do so.   This is especially true when the proposed instruction would limit the kinds of mitigating evidence that the jury might consider—which this instruction, at least arguably, would have.   Fields is therefore not entitled to habeas relief on the grounds that the trial court failed to define the term "mitigating circumstances" for the jury.

Second, Fields argues that the trial court should have told the jurors that they were "not required to sentence Sam Fields to death" even if they "found the aggravating circumstance in this case."   R. 6 at 88; *see also* R. 32-1 at 243; R. 30-23 at 3444.   As an

initial matter, a court reviews jury instructions as a whole rather than instruction by instruction. *See Estelle*, 502 U.S. at 77 ("It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." (quoting *Cupp*, 414 U.S. at 147)); *Park*, 421 U.S. at 674 ("Turning to the jury charge in this case, it is of course arguable that isolated parts can be read as intimating that a finding of guilt could be predicated solely on respondent's corporate position. But this is not the way we review jury instructions, because 'a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" (quoting *Cupp*, 414 U.S. at 146–47)); *Boyd v. United States*, 271 U.S. at 107.

Here, the jury instructions as a whole made quite clear that the jurors need not impose the death penalty even if they found an aggravating factor.  The trial court told the jury that they could give Fields any one of four sentences: the death penalty, life imprisonment with no opportunity for parole within 20 years, life imprisonment, or at least 20 years imprisonment. R. 32-1 at 233.  The court went on to tell the jury that they *could* impose the death penalty *only* if they found an aggravating circumstance beyond a reasonable doubt.[27] *Id.*  Read in their entirety, these instructions make clear that the jury was allowed to impose the death penalty after finding an aggravating circumstance, but that the jury was not required to do so.   Fields's proposed instructions thus seems like mere surplusage.  Moreover, Fields points to no Supreme Court case holding that the trial court must give the jurors *a separate instruction* telling them that they may decline to impose the death penalty even after finding an aggravating circumstance.  For both of these reasons, Fields has failed

---

[27] The instruction also made clear that the jurors could impose one of the other sentences—namely "confinement in the penitentiary for life without benefit of probation or parole until he has served a minimum of 25 years of his sentence"—only if they found an aggravating circumstance.  R. 32-1 at 233.

to show that the Kentucky Supreme Court unreasonably applied a holding of the United States Supreme Court—much less that the state court acted "contrary to" such a holding. Fields is therefore not entitled to habeas relief on the grounds that the trial court failed to give this instruction to the jury.

Third, Fields argues that the trial court needed to tell the jurors that they did "not have to agree on the existence of any of the mitigating circumstances."  R. 6 at 89; *see also* R. 32-1 at 244; R. 30-24 at 3445.  The court's refusal to do so, Fields says, violated the Supreme Court's holding in *Mills*.  In that case, the Court reiterated that, "in a capital case," the jury must be allowed to consider "as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Mills*, 486 U.S. at 384 (first quoting *Eddings*, 455 U.S. at 110; then quoting *Lockett*, 438 U.S. at 604).  The "corollary" of that rule, the Court held, was that "the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence."  *Id.* (citations and quotations omitted).  The jury in *Mills* had been given a form requiring them to mark "yes" or "no" besides each aggravating and mitigating circumstance, *id.* at 370–71, and due to the format of the form, the Court held, the jurors "well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular [mitigating] circumstance."  *Id.* at 384.  Such a form was impermissible, the Court held, because one juror could "block" consideration of a mitigating circumstance "and consequently require the jury to impose the death penalty."  *Id.*

Here, Fields does not explain how the trial court's refusal to give his requested instruction implicates the concern at issue in *Mills*—that an individual juror might believe he

could consider mitigating evidence only if all of his fellow jurors decided to find a mitigating factor.  But in any event, the jury form here bore no resemblance to the one at issue in *Mills*, and nothing in the trial court's instructions otherwise suggested that the jury must make unanimous findings as to a mitigating circumstance.

In fact, the court's instructions suggested quite the opposite when read as a whole. The trial court instructed the jurors that, before they could sentence Fields to death, they needed to agree unanimously on the existence of an aggravating factor beyond a reasonable doubt.  This instruction came in two parts.  First the judge told the jurors that "you cannot fix [Fields's] sentence at death . . . unless you are satisfied from the evidence that one of the statements listed in [the aggravating-circumstances instruction] is true in its entirety."  R. 32-1 at 233.  The judge then told the jurors that their verdict "must be unanimous."  *Id.* at 236. Thus, under those instructions, the jurors could not sentence Fields to death unless each of them was convinced beyond a reasonable doubt as to an aggravating factor.

In stark contrast, the trial court's mitigating-circumstances instruction told the jurors only that "in fixing a sentence for the defendant for the offense of murder, you shall *consider* such mitigating or extenuating facts or circumstances as have been presented to you in the evidence and you believe to be true."  *Id.* at 231.  Thus, "when compared with the explicit unanimity instruction on aggravating factors, silence on mitigating factors would likely cause the jury to assume that unanimity was not a requirement."  *Bowling v. Parker*, No. CIV. 03-28-ART, 2012 WL 2415167, at *20 (E.D. Ky. June 26, 2012); *see also Kordenbock v. Scroggy*, 919 F.2d 1091, 1121 (6th Cir. 1990) (Kennedy, J., concurring) ("The instructions carefully stated that finding an aggravating factor required such agreement, but it cannot be reasonably inferred that silence as to finding a mitigating factor would likely cause the jury

to assume that unanimity was also a requirement. Indeed it would indicate the opposite."). "This makes sense. If a court specifically instructs that an aggravating factor must be unanimous, but says nothing about unanimity with regards to mitigating factors, a reasonable jury would conclude that the unanimity requirement did not apply." *Bowling*, 2012 WL 2415167, at \*20.

In sum, the question under *Mills* is whether there was a "substantial probability that reasonable jurors [given the jury instructions at issue] well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of [a mitigating circumstance]." *Mills*, 486 U.S. at 384.  For the reasons discussed above, a fairminded jurist could believe that there was no such "substantial probability" here. And thus, the Kentucky Supreme Court did not unreasonably apply *Mills*—or render a decision contrary to that case—when it rejected Fields's argument that the judge needed to explicitly tell the jurors that they did "not have to agree on the existence of any of the mitigating circumstances." R. 32-1 at 244.  Fields is therefore not entitled to habeas relief on the grounds that the trial court failed to give that instruction.

Fourth, Fields argues that the trial court should have given the jury more specific definitions of two of the available sentences: "life imprisonment" and "life without parole 25." R. 6 at 89–90.  In the instructions that the jury received, the trial court described these two punishments, respectively, as "confinement in the penitentiary for life" and "confinement in the penitentiary for life without the benefit of probation or parole until he has served a minimum of 25 years of his sentence." R. 32-1 at 233.  According to Fields, however, those instructions were not enough.  With respect to "life imprisonment," he says that the court also should have told the jury that "[t]here is no guarantee the defendant will

receive parole.  If the defendant does not receive parole, he will remain in prison until his natural death."  R. 6 at 89; *see also* R. 32-1 at 246.  With respect to "life without parole 25," he says that the court also should have told the jury that "[a]t the end of 25 years, the defendant will be eligible for parole, but there is no guarantee the defendant will receive parole.  If the defendant does not receive parole, he will remain in prison until his natural death."  R. 6 at 89; *see also* R. 32-1 at 246.  The court refused to give those additional instructions.  R. 30-23 at 3456.  According to Fields, that refusal was contrary to the Supreme Court's holding in *Shafer v. South Carolina* that a capital defendant has a right to inform the jury that he would not be eligible for parole if sentenced to life in prison.  R. 6 at 90 (citing *Shafer v. South Carolina*, 532 U.S. 36, 39 (2001)).

The problem with that argument is a factual one: Fields would have been eligible for parole if the jury had sentenced him to "imprisonment for life."  And Fields would have been eligible for parole if the jury had sentenced him to "imprisonment for life without the benefit of probation or parole for a minimum of 25 years."  The state is correct when it says that Fields would have been "parole eligible [either immediately or after twenty-five years] under any sentence the jury consider[ed] with the exception of death."  R. 41 at 118.  Indeed, even Fields's proposed instructions stated as much.  He proposed to tell the jury only that he *might* remain in prison for life—that there was "no guarantee" he would be paroled—rather than that he would never regain his freedom.  *See* R. 32-1 at 246 ("At the end of 25 years, the defendant will be eligible for parole, but there is no guarantee the defendant will receive parole."); *id.* ("There is no guarantee the defendant will receive parole.").

The Supreme Court has flatly stated that "[t]he parole ineligibility instruction is required only when, assuming the jury fixes the sentence at life, the defendant is ineligible

for parole under state law." *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000).  Here, Fields would have been eligible for parole under state law eventually.  And no other Supreme Court case suggests that a defendant has the right to tell a jury that he *might* stay in prison for life if sentenced to life imprisonment.  Thus, nothing in *Shaffer* or any other Supreme Court case suggests that the trial court violated the Constitution when it refused to give Fields's proposed instruction.  The Kentucky Supreme Court therefore did not act contrary to, or render a decision that was an unreasonable application of, any clearly established federal law as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d).  Fields is therefore not entitled to habeas relief on the grounds that the trial court refused to give his proposed instruction.

Fifth, Fields says that the trial court should have told the jury that "[i]f you have a doubt whether or not a mitigating circumstance exists, you must find that it exists."  R. 6 at 90; R. 32-1 at 247.  In support of this argument, Fields identifies not a single Supreme Court case.  His claim contains not even a passing citation to the United States Reports.  And this Court is aware of no Supreme Court case suggesting that the trial court must instruct the jury that they must find a mitigating circumstance exists so long as they have some "doubt" about whether it exists.  Moreover, the proposed instruction seems to be a misstatement of Kentucky law, which requires the jury only to "consider" mitigating circumstances rather than make formal findings of fact.  *See Tamme v. Commonwealth*, 973 S.W.2d 13, 38 (Ky. 1988).  And the Supreme Court has never suggested that this aspect of Kentucky's sentencing scheme is unconstitutional.

For both of these reasons, Fields has failed to show that, when the Kentucky Supreme Court rejected his argument, it acted contrary to any holding of the United States Supreme

Court.  And he has likewise failed to show that the state court unreasonably applied any holding of the United States Supreme Court.  He has therefore failed to show that he is entitled to habeas relief on the grounds that the trial court failed to instruct the jurors that they must find a mitigating circumstance so long as they had a reasonable doubt about whether it existed.

Finally, Fields argues that the trial court should have told the jury that "[n]o juror should surrender his or her honest conviction as to the weight of the evidence solely because of the opinion of other jurors, or for the mere purpose of returning a verdict" and that "[t]he inability to decide on a penalty is a lawful and legitimate verdict."  R. 6 at 90–91; *see also* R. 32-1 at 249.  Those do seem like sensible things for a judge to say to a jury.  But the United States Supreme Court has never held that such instructions—or anything like them—are constitutionally required.[28]   And thus, when the Kentucky Supreme Court rejected Fields's argument, it did not act contrary to any holding of the United States Supreme Court, nor did it unreasonably apply any such holding.  Fields is therefore not entitled to habeas relief on the basis of his nineteenth claim.

### 20. Claim 20

Fields's twentieth claim alleges ineffective assistance of counsel.  Fields says that his attorneys should have hired two experts, one to "examine the screws from the storm window to determine whether the twisty knife could or did unscrew the storm window," the other to

---

[28] In support of his argument, Fields does cite a case from the Supreme Court, *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988).  The Court made clear in that case that a trial court should not give the jury a "coercive" instruction—though the *Lowenfield* Court actually held that the instruction in that case was not coercive.  *Id.* ("We hold that on these facts the combination of the polling of the jury and the supplemental instruction was not "coercive" in such a way as to deny petitioner any constitutional right.").  But nothing in that case suggests that a trial court must affirmatively instruct a jury that "[n]o juror should surrender his or her honest conviction as to the weight of the evidence solely because of the opinion of other jurors, or for the mere purpose of returning a verdict" or that "[t]he inability to decide on a penalty is a lawful and legitimate verdict."  R. 6 at 90–91.

"explain to the jury the improbability of Mr. Fields being the person who killed Horton given that none of her blood was found on him and none of his blood was found on or near her." R. 6 at 91, 93. Fields made both of these arguments in the Kentucky Supreme Court during post-conviction proceedings, and the state court rejected both of them on the merits. R. 33-2 at 646–47 (twisty knife expert), 647–48 (blood-spatter expert). AEDPA therefore applies to this claim and, given that Fields does not quibble with the Kentucky Supreme Court's factual findings, the issue is whether the state court unreasonably applied Supreme Court precedent, one case in particular: *Strickland*. And since this case comes on habeas review, "[t]he question"—as explained in greater detail above when addressing claim six—"is not whether counsel's actions were reasonable, but whether there is any reasonable argument that counsel satisfied *Strickland*'s [already] deferential standard." *Harrington*, 562 U.S. at 89.

With respect to the twisty knife, it is not as if defense counsel failed to suggest that Fields could not have removed the window in the way suggested by the prosecution. This was a key element of his defense, and counsel vigorously cross examined the prosecution's expert about the knife—specifically, about the fact that the paint found on the knife was of a different color and type than the paint found on the window screws. Thus, the true question is whether there is any "reasonable argument" that defense counsel made a constitutionally permissible decision when they decided to elicit the twisty knife evidence via cross examination rather than via an expert retained to testify on Fields's behalf.

Of course there are at least two such arguments. First, one must remember that the police found Fields inside the house and standing next to Ms. Horton's dead body. Thus, expert testimony that Fields could not have come in through the window might have discredited the prosecution's precise timeline, but it hardly would have been a slam dunk.

After all, Fields got into the house somehow—if it was not via the window then it was by some other means. Meanwhile, expert witnesses are expensive, and resources that are spent on them cannot be deployed elsewhere. One "reasonable argument" that defense counsel provided effective assistance therefore goes as follows: counsel concluded that an expert would not have been worth the resources—time and money— needed to acquire him. This is an especially reasonable argument given that the "actual window" was apparently "not available to analyze," and thus it would have been especially difficult to find an expert able to testify about that window. R. 33-2 at 646.

Second, juries often respond better to concessions from a prosecution witness on cross examination than to testimony "bought and paid for" by the defendant himself. Indeed, counsel testified during the post-conviction hearing that he believed there was strategic advantage in presenting this information through the testimony of an expert seemingly endorsed by the prosecution. Video Record, 12/14/11, 2:54:55. Strategic decisions like this one are "virtually unchallengeable" even on direct review. *Akwal*, 613 F.3d at 641; *see also Strickland,* 466 U.S. at 690. This is especially true when counsel's strategy pays off, as it seems to have here. *See* R. 33-2 at 646 (noting that "trial counsel was able to obtain favorable expert testimony from the cross-examination of the Commonwealth's expert[.]"). And on habeas review, of course, strategic decisions are even less open to attack. In sum, a fairminded jurist could believe that counsel was not constitutionally deficient for deciding not to retain an expert witness to testify about the twisty knife. And thus, Fields has failed to show that the Kentucky Supreme Court unreasonably applied *Strickland* when it rejected his argument that counsel should have called an expert to testify about that knife.

Moreover, a fairminded jurist could also believe that the failure to call a twisty knife expert did not prejudice Fields's defense.  With respect to prejudice, the question before the state court is whether "there [was] a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  In this context, a "reasonable probability" is a "probability sufficient to undermine confidence in the outcome."  *Id.*

Here, Fields was found next to the body and confessed to killing Ms. Horton—first to the police, and later to a paramedic—so it is hard to see how paid-for testimony about his precise method of entry would somehow have led to his acquittal.  True, such testimony might have discredited the prosecution's timeline and suggested—exactly how, Fields does not say—that he could not have killed Ms. Horton.  But this is habeas review.  The Kentucky Supreme Court held that failure to call a twisty knife expert probably would not have saved Fields's case, and—agree or disagree—that is a holding that a fairminded jurist could make.  Given the evidence against Fields, a fairminded jurist could have "confidence" in the jury's guilty verdict despite counsel's failure to call a twisty knife expert.  *See id.*  This is especially true given that Fields offers only speculation about what a hypothetical "tool-mark analyst" might have testified to.  *See Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) ("[The defendant's] uncalled expert witness claim encounters the exact problem of speculation that the Fifth Circuit seeks to avoid. . . .  [The defendant is therefore] asking the Court to take the leap of faith that counsel 'would have found something' that may have created a different result at trial had counsel performed as [the defendant] proposes."); *Bentley v. Motley*, 248 F. App'x 713, 717 (6th Cir. 2007) (upholding the state court's decision to "reject[] [the defendant's] assertions about what [a certain witness] 'might' have testified because they

were based on mere speculation."); *Pillette v. Berghuis*, 408 F. App'x 873, 887–88 (6th Cir. 2010) ("Lacking evidence that calling [a certain witness] actually would have produced the favorable testimony he hoped for, [the defendant] cannot establish either unreasonable performance or prejudice, so his claim fails.").  For this reason as well, Fields has failed to show that the state court unreasonably applied *Strickland* when it held that he did not receive ineffective assistance of counsel.  Fields is therefore not entitled to habeas relief on the grounds that his attorney failed to call a twisty knife expert.

The analysis is similar for the blood-spatter expert that Fields says his lawyers should have retained.  The absence of blood—Fields's on Ms. Horton; Ms. Horton's on Fields—was the heart and soul of the defense that counsel presented.  Video Record, 12/14/11, 9:54 (defense counsel stating that "[m]y theory of the case was: 'where's the blood?'").  On direct examination, the state's medical examiner testified that Ms. Horton's carotid artery and jugular vein had been severed, and that such injuries "do cause some spurting of blood" that "can squirt for feet[,] [t]here's no doubt."  R. 30-20 at 2976.  On cross examination, defense counsel followed up on this testimony.  He first asked the medical examiner whether Ms. Horton's carotid artery had been severed.  R. 30-21 at 3018.  The medical examiner responded that it had been.  *Id.*  Counsel forced the medical examiner to admit that, when an artery is severed, the blood can spurt out for "feet," even "yards."  *Id.* at 3023.  And counsel asked the medical examiner a "kind of point blank question," namely, whether it was "probable" that the person who severed Ms. Horton's carotid artery would have gotten blood on himself.  *Id.* at 3019.  "It's more likely, yes, I would say," the witness responded.  *Id.*

According to the testimony given by defense counsel during the post-conviction hearing, this strategy was a deliberate one.  Counsel "believed that the medical examiner had

made certain concessions during the first trial that were very likely to be repeated in the [second]." R. 33-2 at 647. And thus he "believed it would be more beneficial to present [the blood-spatter testimony] through cross examination." *Id.* "Based on my training and experience," counsel said, "I felt I had a good idea of what a blood spatter expert would have had to say, and [I] believed based on what we had sort of in the can[,] so to speak[,] from the prior case that we could achieve our goals via cross examination of what would at least be perceived by the jury . . . as the state's witnesses." Video Record 12/14/11, 11:11–12.

This seems like a reasonable strategic judgment. Again, some jurors respond better to points made via an effective cross than to those made by an expert on direct, especially when the expert in question is on the defendant's payroll. And this cross examination was particularly effective. After all, the state's medical examiner admitted that, if Fields were the true killer, it was "more likely than not" that he would have had blood on him, thus giving defense counsel ample ammunition with which to make his chosen argument: "where's the blood?" And what would Fields's hypothetical defense expert have said, exactly? Fields does not say, of course, but presumably it would have been something like: "in my opinion, if Fields were the true murderer, he would have gotten blood on him." Of course, the state's *own* expert said exactly that, so it is hard to see why it was so important that counsel pay another expert to testify to the same conclusion.

In the end, a competent attorney certainly could have chosen, as a matter of tactical judgment, to try to bring out the blood-spatter evidence via cross examination and forego expert testimony altogether. Indeed, counsel's tactics here seem like artful ones. At the very least, a fairminded jurist could believe that a competent attorney could have chosen such tactics. That means the Kentucky jurists here did not "unreasonably apply" *Strickland* when

they rejected Fields's argument that his attorney provided ineffective assistance by failing to call a blood-spatter expert.  Fields is therefore not entitled to habeas relief on the basis of his twentieth claim.

### 21. Claim 21

In Fields's twenty-first claim for habeas relief—another one alleging ineffective assistance of counsel—he argues that his lawyers provided constitutionally deficient assistance during the sentencing phase of his trial.  Specifically, he says that counsel should have:  (1) put on more evidence about his traumatic childhood; (2) called an expert to testify about the effects of neglect and abuse; (3) presented more evidence about his substance-abuse issues; and (4) called an expert to testify about the effects of drug and alcohol addiction.  R. 6 at 93.  Fields raised an identical claim before the Kentucky Supreme Court during post-conviction proceedings, and the state court rejected that claim on the merits.  *See* R. 33-2 at 649–54.  To obtain habeas relief, therefore, Fields must satisfy the double-deference standard laid out in *Harrington*.  That is, Fields must show that there is no reasonable argument that counsel provided constitutionally effective assistance despite the omissions about which Fields complains.  *Harrington*, 562 U.S. at 89.

There is such an argument that applies to each of these omissions, namely that pushing the mitigating circumstances argument with the jury would have undermined Fields's claim of actual innocence.  If counsel had called an expert to testify, for example, that Fields's upbringing or drug abuse was to blame for the murder, that testimony might have sounded to the jury like Fields was admitting—finally—that he had killed Ms. Horton, thus undermining his residual-doubt argument.  After all, "residual doubt" is something that a jury is entitled to consider when deciding whether to sentence a defendant to death.  The

jury here had taken "over eight hours to return their guilty verdict," and thus defense counsel quite reasonably believed that the jurors might "have had some residual doubt."  R. 33-2 at 651.  Fields himself even went so far as to ask defense counsel not to "present any mitigating testimony" at all, as "doing so [in his view] would have been inconsistent with his defense of innocence." *Id.*

In short, defense counsel had his work cut out for him.  He needed to make sure that the jury was aware of Fields's upbringing and substance-abuse issues without accidentally implying that Fields was, in fact, the true murderer.  Quite a delicate balance to strike, to say the least.  And thus, counsel decided to use two close family members—Fields's mother and brother—to introduce evidence of Fields's background.  His mother testified, among other things, that Fields's father had been abusive, that she herself had been a drug user and had suffered a stroke, that Fields had been shuttled back and forth between various guardians, that he had attended seven different schools, that he had run away from home, and that he— that is, Fields himself—had been in drug rehab as a child three different times.  R. 30-24 at 3487-3509.  His brother, on the other hand, testified that Fields's father had thrown Fields through a wall, threatened the two sons with a pistol, pushed their stepmother's head into a toilet, locked the children out of the house for days at a time, told Fields that he was not his son, and been a generally violent and abusive man.  *Id.* at 3517-3527.

Fields now argues that counsel should have offered more evidence about his bad upbringing and more evidence about his drug use.  And perhaps counsel should have done so—it is difficult to say, looking back through two decades onto a cold record.  But a competent attorney could nevertheless make the strategic decision to bring in the upbringing and substance-abuse evidence via the mother and brother alone, rather than "pile on" such

evidence and thereby risk that the jury might reject Fields's residual-doubt argument.  Or a competent attorney could make the strategic decision to tread carefully when presenting evidence of addiction and childhood trauma, on the theory that the jury might decide that the defendant was somehow "incurable" and thus might kill again.  Or a competent attorney could make the strategic decision that the additional testimony would have merely been more of the same, especially given that the mother and brother had both testified about Fields's upbringing and substance-abuse struggles.  At the very least, a fairminded jurist could believe that a competent attorney could make such strategic decisions, which is all the Commonwealth needs to prevail under AEDPA.  *See Harrington*, 562 U.S. at 89.  Thus, the Kentucky Supreme Court did not unreasonably apply *Strickland* when it rejected Fields's claim alleging ineffective assistance of counsel during sentencing.

## 22. Claim 22

In his twenty-second claim, Fields argues that he is entitled to habeas relief on the basis of prosecutorial misconduct.  R. 6 at 132–35.  Fields raised this claim on direct review, and the Kentucky Supreme Court rejected it on the merits.  R. 33-2 at 634–36.  Thus, AEDPA applies to this claim, and Fields must show that the state courts unreasonably determined the facts, acted contrary to a decision of the United States Supreme Court, or else unreasonably applied a decision from that Court.  *See* 28 U.S.C. § 2254(d).  Fields does not contend that the state courts made any factual error with respect to this claim, and thus, the question is whether the state courts' decision was consistent with those from the United States Supreme Court.

It is true, as Fields points out, that the prosecutor "may strike hard blows" but "he is not at liberty to strike foul ones."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  Even on

direct review, however, prosecutorial misconduct violates a defendant's due-process rights only if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Macias v. Makowski*, 291 F.3d 447, 451 (6th Cir. 2002). Thus, the question in this AEDPA case is whether any fairminded jurist could believe that the prosecutor's purported misconduct did not rise to that level. If so, then Fields is not entitled to habeas relief. *See Harrington*, 562 U.S. at 86–88.

Here, Fields says that "the prosecutor committed misconduct when he stated in closing that there was no evidence [that] Mr. Fields took pills." R. 6 at 132. That statement was a false one, Fields says, because Burton had "clearly testified that Mr. Fields took pills." *Id.* Thus, Fields concludes, the prosecutor's "deliberate deception of [the] court or jurors by the presentation of argument known to be false" violated Fields's rights under the Fourteenth Amendment. *Id.*

The biggest problem with that argument is that Burton "clearly testified" to nothing of the sort. What Burton actually said was that Fields poured something out of a bottle into his hand and then "went like this to his mouth." R. 30-19 at 2734. The record does not reflect in that moment what motion she made, but she apparently raised her hand to her mouth.[29] Although this sounds like fairly strong evidence that Fields had taken drugs, Burton immediately caveated her statement: "I don't know if he for a fact had a pill in his hand," she said. *Id.* She also stated that she knew "nothing about them pills or if in fact they did take them how they was going to react." *Id.* at 2735. And she confirmed that she had told an

---

[29] In a later colloquy, defense counsel stated "for the record" that Burton had "moved her hand to her mouth and held it over there when she was talking about the pills." R. 30-23 at 121.

investigating officer that she had not seen any pills at all.  *Id.* at 2734.  Thus, the prosecutor's characterization of the record—"that's all we've heard is alcohol that this Defendant had"—was, at worst, a one-sided characterization of the actual testimony contained in the record.  It was hardly "deliberate deception of [the] court or jurors by the presentation of argument known to be false."  R. 6 at 132.

The other problem with Fields's argument is that the prosecutor immediately told the jury that they should decide the case based on their own memory of Burton's testimony rather than based on the prosecutor's characterization of that testimony.  "You know what, you go with what you remember," he said.  R. 34-20 at 3420.  "Don't go with what the lawyers say [] happened.  Go with what you recall.  Minnie Burton said something about the Defendant telling her something about horse tranquilizers.  My recall of Ms. Burton's testimony is that she couldn't say whether he did or didn't."  *Id.*  If the prosecutor's goal was to confuse the jury by "incepting" them with false memories about the record, it is hard to imagine why he would tell them to trust their own memories—to "go with what you recall" rather than "what the lawyers say [] happened."  *Id.*

In the end, the question is whether any fairminded jurist could believe that the prosecutor's statements did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly*, 416 U.S. at 643.  The answer to that question is obviously "yes."  Indeed, it is hard to see how the prosecutor here struck any "foul [blows]" at all.  *Berger*, 295 U.S. at 88.  Especially given his instruction to the jury to trust their own memories, the prosecutor's conduct here hardly seems improper.  Fields has therefore failed to show that the Kentucky Supreme Court acted contrary to precedent from

the United States Supreme Court when it rejected his claim.  And he has likewise failed to show that the state court unreasonably applied any such precedent.

Fields responds that "the Commonwealth knew that, if Berry had been called to testify, he would have said Mr. Fields ingested pills."  R. 6 at 133.  Berry did not testify during Fields's trial at all, of course.  Hence the *Brady* and *Strickland* claims discussed above that are premised on Berry's absence from trial.  And thus, Fields's argument seems to be a rather unusual one: that a prosecutor has a duty not only to characterize fairly the actual record, but also to characterize fairly the record as it might have been if all available witnesses had testified.  As far as this Court is aware, that argument is one that has never been accepted by any court.  Unlike Burton and the other witnesses, Berry never swore to tell the truth in open court.  Nor was he subject to cross examination by the prosecution.  And in any event the prosecutor is, of course, entitled to disbelieve the testimony of potential defense witnesses.  For this purpose, though, it is enough to point out the following: the United States Supreme Court has never suggested that a prosecutor violates the Due Process Clause when he fails to base his closing arguments on the record established during a hypothetical trial—and one hypothesized in the light most favorable to the defendant—rather than the one established during the actual trial.  Fields is therefore not entitled to habeas relief on the basis of his twenty-second claim.

### 23. Claim 23

In Fields's twenty-third claim for relief—another one alleging prosecutorial misconduct—he argues that, during closing arguments, the prosecutor made five statements so improper as to warrant habeas relief.  R. 6 at 135–41.  Fields made this argument in front of the Kentucky Supreme Court, which rejected it on the merits.  R. 32-1 at 456–57.  And

thus AEDPA applies to this claim.  28 U.S.C. § 2254.  Fields does not make any serious argument that the state court unreasonably determined the facts—at least in the sense that this phrase is used in the AEDPA statute—so he must show that the state court rendered a decision that was contrary to, or an unreasonable application of, clearly established law as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d).  The question is therefore whether any fairminded jurist could reject the idea that the prosecutor's five comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly*, 416 U.S. at 642; *see also Darden*, 477 U.S. at 181.

Fields first faults the prosecutor for making comments that in his view "shift[ed] the burden of proof" from the prosecution to the defense.  R. 6 at 135.  Specifically, Fields notes that the prosecutor stated that the defendant was free to obtain testing of blood found at the crime scene, that the timeline of the case "really hasn't been disputed," and that the jury had heard no "other explanation for why [Burton and Fields] were arguing."  R. 30-23 at 3391, 3404, 3413.  In Fields's view, the prosecutor commented on the defendant's "refusal to testify" when he made these statements, thus violating the Supreme Court's holding in *Griffin v. California*, 380 U.S. 609 (1965), or, perhaps, instead violating *Donnelly* and *Darden*—Fields does not identify exactly which Supreme Court opinion he wishes to rest his argument on.[30]  *See* R. 6 at 135–41

As for *Griffin*, that case holds only that a prosecutor may not comment on a defendant's decision not to take the stand and testify.  *See* 380 U.S. at 615 ("We . . . hold that the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence

---

[30] Fields cited *Eberhardt v. Bordenkircher,* 605 F.2d 275, 278 (6th Cir. 1979), for this proposition.  That case is of course from the Sixth Circuit rather than the Supreme Court, which means that, under AEDPA, it is not enough for Fields to show that the state courts acted contrary to *Eberhardt*.  Nevertheless, *Eberhardt* in turn cites *Griffin, id.*, and given that this is a death-penalty case, the Court will construe Fields's legal arguments as broadly as possible.

or instructions by the court that such silence is evidence of guilt.").  It says nothing about whether a prosecutor may point out that the defendant could have commissioned forensic testing.  It says nothing about whether a prosecutor may point out that the defendant failed to "dispute[]" the prosecution's timeline.  R. 30-23 at 3404.  And it says nothing about whether a prosecutor may point out that a defendant failed to provide "an explanation" for particularly damning evidence.  *Id.* at 3413.  Thus, the Kentucky Supreme Court's decision rejecting this portion of Fields's claim was neither contrary to nor an unreasonable application of the United States Supreme Court's holding in *Griffin*.

As for *Donnelly* and *Darden*,[31] "the *Darden* standard is a very general one leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'"  *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (quoting *Alvarado*, 541 U.S. at 664).  Indeed, the "Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because constitutional line drawing in prosecutorial misconduct cases is necessarily imprecise."  *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (internal quotation marks omitted).

Admittedly, it is probably not the best practice for prosecutors to comment on failings in the defense's case.  The better course is to argue that the prosecution has proven its own case beyond a reasonable doubt.  And thus, the prosecutor probably should not have suggested that Fields could have commissioned forensic testing, failed to present evidence to dispute the prosecution's timeline, and so on.  After all, the defendant is entitled to present no evidence at all in his own defense and instead hold the prosecution to its burden of proof.

---

[31] The Court has already given a more detailed explanation of the *Donnelly/Darden* standard when addressing Claim 22.  For these purposes, the Court will merely quote the operative language from those cases.

Even so, this is a habeas case governed by AEDPA, and no holding of the United States Supreme Court suggests that the prosecutor's statements here were so improper as to rise to a constitutional violation.  Thus, a fairminded jurist could reject the idea that the prosecutor's comments about the defense's case "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly*, 416 U.S. at 642.  That means the state courts did not unreasonably apply *Donnelly*—or any other Supreme Court holding— when they rejected Fields's claim.  And the state courts certainly did not render a decision "contrary to" any such holding.

Second, Fields says that the prosecutor "referr[ed] to matters outside the record," R. 6 at 136, when he made the following statement:

> This is the knife that was taken outside of Ms. Horton's head.  This is the one that says Harvard Cutlery on it.  And you can just feel—and you can have— you can weigh these two (2) things.  This is a solid substantial knife.  But as you can see, this is—this is quality.  The blade goes all the way through the handle.  The one doesn't.  This is not quite as high quality as this.  This knife, members of the jury, came from Ms. Horton's own kitchen.  This knife came from Minnie Burton's home.  The defendant got this knife and went over to Ms. Horton's.

R. 30-23 at 3399.  In Fields's view, the prosecutor may argue to the jury only about "evidence that has been heard from witnesses" and he says that "[t]here was no evidence adduced at trial to support the prosecution's theory that one can tell where a knife originates from based on the way the knife feels."  R. 6 at 136.

As an initial matter, it is not clear exactly why Fields believes this statement was prejudicial to his case; he makes this argument in nearly perfunctory manner and nowhere explains why the prosecutor's statement about the knife either helped the prosecution's case or hurt his.  Moreover, it is not clear that the prosecutor was actually arguing that "one can

tell where a knife originates from based on the way the knife feels." *Id*.  The more likely explanation is that the prosecutor was merely commenting on the quality of the knives— again, for reasons that are not clear from the record—and independently arguing that the one knife came from Ms. Horton's kitchen and the other from Burton's house.  After all, the prosecutor did not say, "this knife is not quite as high quality and *thus* this knife came from Minnie Burton's home" and there is no reason to think that he meant to imply any logical connection between those two statements.  It is therefore far from obvious that the prosecutor was in fact referring to facts outside the record.  More to the point though, Fields has identified no United States Supreme Court case suggesting that a prosecutor commits a due process violation when he refers to evidence outside the record.  Without such guidance, a fairminded jurist would be left free to conclude that the prosecutor's statements did not "make [Fields's] resulting conviction a denial of due process."  *Donnelly*, 416 U.S. at 642.

Third, Fields contends that the prosecutor misstated the evidence when he told the jury that Burton had testified "yeah, that [knife] looks like the one that might have come from my home."  R. 30-23 at 3398.  He goes on to fault the prosecutor for arguing that "the knife came from Minnie Burton's home" and that "the Defendant got this knife and went over to Ms. Horton's."  *Id.* at 3399.  But Burton had in fact admitted that she kept in her home "a set of knives" with the same symbol as the one on the knife in question "right there on them."  R. 30-18 at 2663.  True, Burton also said that the knife did not "look like anything that I had," *id.*, but a prosecutor is entitled to argue the facts in the light most favorable to the prosecution.  Given Burton's testimony, the prosecutor's statement here—that Burton had said "yeah, that looks like the one that might have come from my home"—was, at worst, an overly zealous characterization of the evidence.  But that statement was not so egregious that

no fairminded jurist could reject the notion that it deprived Fields of a fair trial.  And thus, the state courts did not unreasonably apply *Donnelly* when they rejected Fields's claim based on the prosecutor's characterization of the knife.

Fourth, Fields says that the prosecutor should not have made the following statement about the window screws:

> When you look at these screws, no, not all of them have marks on them.  But in my opinion, and the thing is[]—if you go with your opinion and that's what counts—but when I look at some of these, I do see marks.

R. 30-23 at 3393–94.  He also says that the prosecutor should not have said that "the work that the Grayson Police Department did to me epitomizes community law enforcement."  *Id.* at 3410.  These statements, Fields says, were examples of the "prosecutor express[ing] his opinion as to how the jury should interpret physical evidence, and his opinion about what kind of job the police did."  R. 6 at 138–39.  Perhaps so.  But Fields points to no United States Supreme Court opinion suggesting that a prosecutor violates the Due Process Clause when he says the words "in my opinion" followed by an otherwise permissible bit of closing argument.

Fields does point to language from *United States v. Modica*, 663 F.2d 1173, 1173–79 (2d Cir. 1980), suggesting that prosecutors should refrain from doing so.  But that case comes from a court—the Second Circuit—that is one level below the Court whose holdings matter in an AEDPA case.  In the absence of more specific guidance from the United States Supreme Court, Fields has failed to show that the state courts unreasonably applied *Darden*, *Donnelly*, or any other Supreme Court case when they rejected his claim based on the prosecutor's statement of his own opinion.

Fifth, Fields takes issue with the prosecutor's statement of the relevant law. The prosecutor told the jury that "when you find the Defendant guilty of murder and burglary in the first degree[,] we move on to the second phase of the trial in which you hear more evidence. Not second degree. Not second degree manslaughter." R. 30-23 at 3415. These remarks, Fields says, "may have led the jury to believe Mr. Fields would get a 'get out of jail free card' if he was convicted of something less than murder." R. 6 at 139. The prosecutor said nothing like that, of course. Indeed, he said nothing at all about what would happen if the jury convicted Fields of something less than murder. Fields is not entitled to habeas relief because a juror might—*might*—have unreasonably understood the prosecutor to say something he plainly never said. This argument is meritless.

Fields also quibbles with the prosecutor's argument about the trial court's intoxication instruction. He says that the prosecutor made "numerous misstatements of law and facts concerning the intoxication and second degree murder instructions" and then proceeds to block quote the prosecutor's closing for more than half a page without explaining why anything in that portion of the closing was improper. R. 6 at 139–40. As far as the Court can tell, it has something to do with the underlying jury instructions on intoxication. The underlying instructions were themselves flawed—the argument seems to go, perhaps?—and thus the prosecutor committed misconduct when he recited those instructions. As an initial matter, a prosecutor of course does not commit misconduct by stating the actual jury instructions that the trial court gave. And this is true even when the court inadvertently gives erroneous instructions. An error in jury instructions is an error in jury instructions—and as is true for any error, it is best to avoid an error in jury instructions—but such an error does not automatically transform the prosecutor's closing argument into an example of misconduct

simply because he recites the erroneous instructions that the trial court gave.  In any event, as explained above when addressing Fields's seventh claim, the instructions were proper ones. For both of these reasons, Fields is not entitled to habeas relief on the basis of the prosecutor's comments about the trial court's intoxication instructions.

Finally, Fields argues that the prosecutor made an "obvious misstatement of fact" when he argued that Fields was only drunk and that there had been no trustworthy testimony suggesting that he had taken drugs as well.  But this Court has already explained why the prosecutor did not violate Fields's constitutional rights by making that argument.  This final sub-claim is merely a rehashing of the first one.  In sum, Fields has failed to show that the Kentucky Supreme Court unreasonably applied the Supreme Court's holdings when it rejected his prosecutorial-misconduct claims.  He is therefore not entitled to habeas relief.

## 24. Claim 24

In his twenty-fourth claim, Fields argues that he is entitled to habeas relief because of the prosecutor's closing arguments during the penalty phase.  He made this argument before the Kentucky Supreme Court, which rejected it on the merits.  R. 32-1 at 465–66.  Thus, AEDPA applies to this claim.  28 U.S.C. § 2254.  Fields does not argue that the Kentucky Supreme Court unreasonably determined the facts.  To obtain habeas relief, therefore, he must show that the state court's decision was contrary to, or an unreasonable application of, clearly established law as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d).

Fields takes issue with six facets of the prosecutor's closing argument.  First, he argues that the prosecutor should not have told the jury that Fields had previously escaped from prison.  Specifically, Fields says that the prosecutor should not have said that Fields had

been "convicted of escape, escaping jail in 1997," that "this escape probably more [than Fields's other crimes] gives you an indication of what that man is like as he sits here right now[,]" and that the jury should consider the proper punishment for "a murdering burglar who escapes from prison." R. 30-24 at 3459. When the prosecutor made these statements, Fields says, he "violated his oath to the court by using Fields'[s] escape conviction as a non-statutory aggravator amounting to future dangerousness and requiring the jury to return a death sentence." R. 6 at 142. In Fields's view, this violated the Supreme Court's holding in *Zant v. Stephens*, 462 U.S. 862 (1983).

As an initial matter, the prosecutor's statements about Fields's prior conviction for escaping prison were plainly proper—even as a matter of state law. A Kentucky statute instructs that, "[i]n all cases in which the death penalty may be imposed[,]" the court "shall resume the trial and conduct a presentence hearing before the jury." Ky. Rev. Stat. § 532.025(1)(b). That hearing shall include "the record of any prior criminal convictions . . . of the defendant." *Id.* Thus, although evidence that a defendant has previously escaped is not listed as an aggravating circumstance under the statute, if the defendant has been *convicted* for escaping—as Fields had been—then state law gives the prosecutor the right to tell the jury about that conviction. *See id.*

More importantly, however, nothing in *Zant* or any other Supreme Court case suggests that the Constitution forbids a prosecutor to tell a jury that the defendant has escaped—or even tried to escape—in the past. Indeed, *Zant* itself suggests quite the opposite. As that Court held, "[n]othing in the United States Constitution prohibits a trial judge from instructing a jury that it would be appropriate to take account of a defendant's prior criminal record in making its sentencing determination . . . even though the defendant's

prior history of noncapital convictions could not by *itself* provide sufficient justification for imposing the death sentence." *Zant*, 462 U.S. at 888 (internal citation omitted). "There would have been no constitutional infirmity in an instruction stating, in substance: 'If you find beyond a reasonable doubt that the defendant is a person who has previously been convicted of a capital felony, or that *he has escaped from lawful confinement*, you will be authorized to impose the death sentence[.]'" *Id.* (emphasis added). Thus, the trial court's instruction was entirely consistent with the Supreme Court's holding in *Zant*. When the Kentucky Supreme Court denied Fields's claim, therefore, the court did not act contrary to any holding of the United States Supreme Court, nor did it unreasonably apply any such holding. Fields is therefore not entitled to habeas relief on the grounds that the prosecutor told the jury about his prior escape from prison.

Second, Fields says that the prosecutor should not have asked the jury to "fix a punishment that fits the crime." R. 30-24 at 20. His opening-brief argument on this point spans a total of two sentences, so it is hard to know exactly why Fields is so sure that the state courts unreasonably applied Supreme Court precedent when they rejected this claim on direct review. Judging from the lone citation in his argument--which includes not even a pincite—it appears he thinks that there is something in *Pepper v. United States*, 562 U.S. 476 (2011), that shows he is entitled to habeas relief. That case concerns the proper application of the federal sentencing guidelines, which, of course, are not binding on the states. *Id.* at 489. It is therefore entirely unclear why Fields believes that the Kentucky Supreme Court unreasonably applied *Pepper* when it approved of the prosecutor's statement. In any event, nothing in that case suggests that a prosecutor violates the United States Constitution when he tells the jury to "fix a punishment that fits the crime." That means that the Kentucky

Supreme Court's decision is perfectly consistent with *Pepper*.  Fields is therefore not entitled to habeas relief.

Third, Fields argues that the prosecutor should not have pointed out to the jury that Fields had apparently been "waving and winking and nodding" throughout trial.  R. 30-24 at 94.  According to Fields, these "comments amounted to a back door violation of Fields's right to remain silent."  R. 6 at 143.  Thus, Fields concludes, the Kentucky Supreme Court unreasonably applied the United States Supreme Court's decision in *Mitchell v. United States*, 526 U.S. 314 (1999).

That case stands for the proposition that a defendant does not waive his right to remain silent during his sentencing hearing just by pleading guilty to the crime itself.  *See* 526 U.S. at 321 ("The Government maintains that petitioner's guilty plea was a waiver of the privilege against compelled self-incrimination with respect to all the crimes comprehended in the plea. We hold otherwise and rule that petitioner retained the privilege at her sentencing hearing.").  It of course says nothing about whether a prosecutor violates a defendant's Fifth Amendment rights by pointing out that the defendant has been misbehaving during trial.  Nor does any other Supreme Court case.  The Constitution gives a defendant the right to refuse to take the stand and testify; it does not give him the right to stay seated at counsel table and make winky-faces without fear of repercussions.  This portion of Fields's claim is meritless.

Fourth, Fields argues that the prosecutor "improperly appealed to the jurors' sense of responsibility when he told them at the beginning of his argument '[y]ou speak for the community.'"  R. 6 at 143 (quoting R. 30-24 at 87).  These comments apparently were "meant to appeal to the jurors' fears and prejudices," to "divert the jurors' attention from examining the facts and circumstances of the case," and to "arouse their passions and fears."

*Id.* In support of this argument, Fields cites not a single case from the United States Supreme Court. Nor is the Court aware of any such case holding that the Constitution forbids a prosecutor to tell jurors that they speak for the community.[32] Fields is therefore not entitled to habeas relief.

Fifth, Fields argues that the prosecutor should not have asked the jury to "[i]magine what—what it was like for . . . [the] people who worked for Ms. Horton, who lived in that community." R. 30-24 at 93. These comments were a "variation of the improper 'Golden Rule' argument," Fields says, and thus, he argues, that he is entitled to habeas relief. R. 6 at 143–44. By way of background, a "Golden Rule" argument is one that asks the jurors to put themselves "in the shoes" of the victim (or the defendant—the argument takes several forms). When a lawyer makes such an argument, it is common to hear an objection "under the Golden Rule." This language is a bit imprecise, for it makes it seem like the rule is the central—"golden"—one in all of evidentiary law. This is not true, of course—the rule forbidding irrelevant evidence is quite a bit more important. It is likewise common to hear an objection that an attorney's argument "violates the Golden Rule." This language is likewise imprecise. An attorney does not *violate* the Golden Rule—"do unto others as you would have them do unto you," *Luke* 6:31; *Matthew* 7:12—when he invites the jurors to put themselves in the shoes of the victim or defendant. Quite the opposite, the attorney is

---

[32] The Supreme Court has noted that a prosecutor should not "exhort the jury to 'do its job'" by convicting the defendant. *United States v. Young*, 470 U.S. 1, 18 (1985); *see also United States v. Modena*, 302 F.3d 626, 634 (6th Cir. 2002) ("Statements that exhort the jury to 'do its job' are improper." (quoting *Young*, 470 U.S. at 18)). And the Sixth Circuit has recognized "the cardinal rule that a prosecutor cannot make statements calculated to incite the passions and prejudices of the jurors," *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005) (internal quotations omitted), though it is not clear that this is a Constitutional rule or one that the Supreme Court has recognized. But it is far from obvious that telling the jurors that they "speak for the community" is an exhortation for the jurors to "do their job and convict" or an improper appeal to passion or prejudice. At the very least, a fairminded jurist could see a difference between the statements that the prosecutor made here and the kind of statements that the Supreme Court has forbidden. Fields is therefore not entitled to habeas relief.

inviting the jurors to *follow* the Golden Rule. And thus, the correct objection is to an argument "in the form of the Golden Rule." *See generally* McCaffery, Kahneman & Spitzer, *Framing the Jury: Cognitive Perspectives on Pain and Suffering Awards*, 81 Va. L. Rev. 1341, 1383–84 (1995) (discussing the various rationales for the rule).

       As an initial matter, it is far from clear that the prosecutor here made an argument in the form of the Golden Rule. He asked the jurors to "imagine what it was like" for the other people in the victim's community. He did not ask them to "put themselves in the shoes" of the victim or to "do unto" anybody what they would have anybody "do unto" them. In any event, the parties' dispute over whether this was a "true" Golden Rule argument—or perhaps merely a "variant" of such an argument—is of only academic interest here because this is an AEDPA case. As the Sixth Circuit has pointed out, "Supreme Court precedent does not directly address" whether a prosecutor may use "a 'golden rule' argument." *Ross v. Pineda*, 549 F. App'x 444, 451–52 (6th Cir. 2013). Thus, when the Kentucky Supreme Court affirmed Fields's conviction despite the prosecutor's closing argument, it did not unreasonably apply, or act contrary to, any clearly established law as determined by the Supreme Court of the United States. Fields is therefore not entitled to habeas relief.

       Sixth, Fields says that the prosecutor committed misconduct when he told the jury that the mitigating circumstances "may go into your decision making process; they may not. It's up for you to decide." R. 30-23 at 89. This statement was improper, Fields says, because the trial court instructed the jurors that they "shall consider" the mitigating circumstances. R. 32-1 at 231. And in Fields's view, the prosecutor's statement suggested to the jurors that they were allowed to ignore the mitigating circumstances.

The problem with this argument is that Fields quotes only part of what the prosecutor said.  What he really said—in full—is that "these [mitigating circumstances] are things that you *are to consider*.  They may go into your decision-making process; they may not.  It's up for you to decide."  R. 30-24 at 89 (emphasis added).  Any fair reading of the prosecutor's statement makes clear that he was merely telling the jury that the factors did not dictate a verdict—*i.e.*, that they could impose death even if they found some mitigating factors and that they could impose life imprisonment even if they found some aggravating factors.  In any event, a fairminded jurist could believe that the prosecutor's comments—which seem, at worst, to be a slip of the tongue—did not "so infect the trial with unfairness as to make the resulting [sentence] a denial of due process."  *Darden*, 477 U.S. at 181.  This is especially true given that the trial court specifically instructed the jurors that they "must consider" the mitigating factors, R. 32-1 at 231, and that a "crucial assumption underlying our constitutional system [of trial by jury] is that juries will follow the instructions given them by the trial judge."  *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985) (quoting *Parker v. Randolph*, 442 U.S. 62, 73 (1979)).  Fields is therefore not entitled to habeas relief on the basis of his twenty-fourth claim.

### 25. Claim 25

In his twenty-fifth claim, Fields argues that he is entitled to habeas relief based on a variety of "erroneous rulings" that he says the court made during his trial.  Fields raised this claim before the Kentucky Supreme Court, which rejected each component of it on the merits.  R. 32-1 at 417, 427–28, 431–32, 446–47, 452–53, 459–60.  Fields does not argue that the state court unreasonably determined the facts and thus, to obtain habeas relief, he must show that the state court's decision was inconsistent with one from the United States

Supreme Court—either flatly contrary to such a decision, or else an unreasonable application of it.

Fields first says that the trial court erred during voir dire when it told the jurors that "[a]ggravating circumstance or evidence is evidence about a person's character, background, or circumstance that may be considered as a reason for imposing a more severe punishment than might otherwise be imposed." *E.g.*, R. 30-1 at 27, R. 30-10 at 15.  As the Kentucky Supreme Court pointed out, this statement was arguably inconsistent with state law.  Under a Kentucky statute, aggravating factors "relate to the defendant's prior criminal history, the status of the victim, and the circumstances of the crime."  R. 32-1 at 428 (citing Ky. Rev. Stat. 532.025(2)).  Fields argues that "the trial court's definition, instead, gave the erroneous impression that evidence of [Fields's] character, his *general* background, and his *personal* circumstances would be considered as aggravating circumstances."  *Id.*

"[E]rrors in application of state law," however, "are usually not cognizable in federal habeas corpus."  *Walker*, 703 F.2d at 962.  For "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction"—or in this case a death sentence—"violated the Constitution, laws, or treaties of the United States."  *Estelle*, 502 U.S. at 68. And the Supreme Court has never said that it would be constitutionally improper to instruct a jury to consider a defendant's "character, background, or circumstance" when deciding whether to impose the death penalty.  It is true, as Fields points out, that the Supreme Court has said that aggravating circumstances must genuinely narrow the class of persons eligible for the death penalty. *Zant*, 462 U.S. at 877.  And the Court has likewise said that the jury must be able to consider mitigating evidence when deciding whether to sentence a defendant to die.  *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989).  But the Court has never said that

"character, background, or circumstances" are invalid criteria to use when narrowing the set of defendants eligible for death.  And of course instructing the jury that it may consider such criteria as aggravating circumstances says nothing about what mitigating circumstances the jury may consider.

Moreover, the trial court here did not, in fact, give the jury improper instructions before the jury left to deliberate; the court merely misstated the aggravating-circumstances definition during voir dire.  The instructions in the end were perfectly accurate, even as a matter of state law.  *See* Ky. Rev. Stat. 532.025.  The United States Supreme Court has certainly never made clear that a trial court acts contrary to the Constitution when it misspeaks during voir dire but ultimately gives the jury a formal instruction that is entirely accurate.  For all of these reasons, the Kentucky Supreme Court did not render a decision that was contrary to, or an unreasonable application of, clearly established United States Supreme Court precedent when it denied Fields's claim.  That means he is not entitled to habeas relief.

Second, Fields argues that the trial court erred by "not allowing full and fair voir dire."  R. 6 at 148.  Specifically, he says that the court should have allowed him to ask jurors four additional questions about how they felt about capital punishment.   The four questions—whose exact wording Fields fails to quote at all or cite in a way that would allow the Court to locate them in the record—apparently dealt with prospective jurors['] feelings about the death penalty.  R. 32-1 at 129.  The United States Supreme Court has never said, however, that a defendant has a constitutional right to ask potential jurors any particular questions, even in a death-penalty case like this one.  Fields has therefore failed to show that, in rejecting his argument, the Kentucky Supreme Court unreasonably applied any holding of the United States Supreme Court.

True, the Supreme Court has said that "the right to an impartial jury carries with it the concomitant right to take reasonable steps designed to insure that the jury is impartial." *Ham v. South Carolina*, 409 U.S. 524, 532 (1973).  But that rule—that the trial court must take "reasonable steps"—is quite general.  And "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Carpenter*, 798 F.3d at 473 (citing *Alvarado*, 541 U.S. at 664).  It is not as if the trial court here forbade voir dire altogether—it simply did not allow Fields to ask four specific questions.  And without more specific guidance from the Supreme Court, a fairminded jurist could believe that the steps taken by the trial court to insure juror impartiality were "reasonable" ones.  Fields is therefore not entitled to habeas relief.

Third, Fields argues that the trial court should have allowed "evidence that car keys and empty beer cans were found in Ms. Horton's car after her death[.]" R. 6 at 152.  One of Ms. Horton's employees, James Craig, had testified during the first trial that he had found car keys, beer cans, and marijuana seeds in Ms. Horton's car after she had died.  R. 30-21 at 66 (transcript from second trial during which the parties discuss the testimony from the first trial).  Craig was unavailable to testify at the second trial, however—he had died by then—so the defense moved to read his prior testimony into the record.  R. 30-22 at 6.  The trial court granted that motion, but redacted the portion in which Craig testified about the keys, beer cans, and marijuana seeds.  R. 30-21 at 67.  The defense also attempted to elicit similar testimony from another one of Ms. Horton's employees, Elmer Pritchard, but the trial court excluded that testimony.  R. 6 at 151.[33]

---

[33] This citation is to Fields's habeas petition, in which he asserts that Pritchard's excluded testimony is located in the trial transcript at page 2965–66.  The excluded testimony does not appear on that page, and the Court is not able to

In Fields's view, these rulings "impaired" his "right to present a defense." *Id*.  The defense's theory of the case was that Burton had murdered Ms. Horton, and in support of that theory, the defense argued that Ms. Horton had "bec[ome] angry with Burton when [Horton] learned [Burton] was driving [Horton's] car around with people drinking in it" and had later "evicted [Burton] from [Horton's] property." *Id*.  Thus, Fields argues, his "right to present a defense was impaired when the trial court disallowed evidence of empty beer cans and car keys found in Ms. Horton's car after her death" as well as evidence "indicating Ms. Horton was not agreeable to people drinking in her car." *Id*.

The biggest problem with that argument is that the excluded evidence—the beer cans and car keys—did not truly advance the defense's theory—*i.e.*, that Burton had been driving Horton's car with people drinking in it.  The reason is that "multiple persons had access to Horton's car" and the defense offered "no other evidence . . . to prove that Burton was the last person to drive [Horton's] car or that the beer cans . . . belonged to her."  R. 32-1 at 432.  As the Kentucky Supreme Court noted, "there was no evidence linking any particular individual to the vehicle, and the vehicle was in no way tied to the crime." *Id*.  And the trial court did not exclude Fields's *defense*.  The court allowed Fields to argue that Minnie Horton had committed the murder, and Fields vigorously argued exactly that.  Thus, the trial court, at worst, excluded arguably irrelevant evidence that was only tangentially related to Fields's defense.  At the very least, therefore, a fairminded jurist could conclude that the trial court's exclusion of the cans and keys did not deprive Fields of "a fair opportunity to defend against

---

locate the correct citation given the size of this record.  Thus, the Court will assume for these purposes that Fields's characterization of Pritchard's proposed testimony is accurate.

the State's accusations." *Chambers*, 410 U.S. at 294. Hence, Fields is not entitled to habeas relief.

Fourth, Fields argues that the trial court should have allowed "evidence as to how Ms. Horton felt about Burton driving her car around." R. 6 at 152. The argument is similar to the one about the cans and keys: the defense theory was that Horton became upset with Burton and kicked her out of the apartment, upsetting Burton and driving her to murder Horton. Thus, Fields argues, he should have been allowed to enter evidence about how Ms. Horton felt about Burton driving the car around. But the defense introduced evidence detailing the stormy relationship between Burton and Horton. Indeed, the prosecution admitted during closing argument that Burton had been "upset," even "mad" about the fact that Ms. Horton had evicted her. Evidence that Horton was specifically upset about the car thus seems to add very little. In any event, a fairminded jurist could conclude that Fields had a fair opportunity to defend himself even though the trial court excluded evidence that Horton was upset about the car. He is therefore not entitled to habeas relief.

Fifth, Fields argues that he is entitled to habeas relief because the trial court "improperly allow[ed] the Commonwealth to present hearsay evidence." R. 6 at 152. The hearsay in question came from Kim Baker, Burton's cousin. Baker and Burton had spoken on the morning of August 19, 1993, and, in describing that conversation, Baker testified as follows: "[Burton] just wanted to leave. She said that Sammy would come out and beat the shit out of her." R. 30-20 at 34. Fields says that this statement was hearsay testimony that the trial court should have excluded. But "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67–68. And thus "errors in application of state law, especially with regard to the admissibility of

evidence, are usually not cognizable in federal habeas corpus." *Walker*, 703 F.2d at 962. Fields here alleges only a violation of state law—namely the state's hearsay code. What he has failed to allege, however, is that the trial court's ruling violated any provision of federal law. Nor has he explained how the Kentucky Supreme Court unreasonably applied a United States Supreme Court holding when it affirmed the trial court's ruling. Indeed, this portion of his claim contains not a single citation to the United States Reports. He is therefore not entitled to habeas relief.

Sixth, Fields argues that he is entitled to habeas relief because the trial court allowed "improper[] . . . opinion testimony" from Dr. Hunsaker, the forensic pathologist who performed the autopsy on Ms. Horton. R. 6 at 154. Specifically, he says that the court should not have allowed Dr. Hunsaker to answer "yes" to the following question: "Can the manner in which a person is murdered . . . reflect the mood of the person committing the crime?" R. 30-21 at 56–57. [34] But Dr. Hunsaker's "opinion" was only that the manner of death "can" reflect the mood of "the" culprit. He did not testify, for example, that the manner of *Ms. Horton's* death reflected *Fields's* mood, or that the jury here should infer anything about Fields's state of mind from the way in which Ms. Horton died. Thus, it is hard to see how Dr. Hunsaker's testimony "violated [Fields's] rights to confrontation, due process, a fair trial, and reliable capital sentencing." R. 6 at 155. And a fairminded jurist could certainly conclude that Dr. Hunsaker's testimony violated none of those rights. Fields is therefore not entitled to habeas relief.

---

[34] The prosecutor repeated this testimony during closing—reminding the jury that Dr. Hunsaker had agreed that "the [manner] in which a person was killed [can] show the mood of the attacker." R. 30-23 at 116.

Seventh, Fields argues that the trial court erred by admitting seven pictures of Ms. Horton's dead body.  These pictures were "gruesome and repetitive," Fields says, and "none of [them] . . . were necessary to prove a point in controversy," because "[t]here was no dispute [that] Ms. Horton [had] died as a result of sharp force injuries to her head and neck." *Id.* at 156.  The United States Supreme Court has never held, however, that a trial court violates a defendant's constitutional rights when it allows the jury to see photographs of a murder victim—even "gruesome and repetitive" ones.  And the Sixth Circuit has refused to grant habeas relief even when the trial court admitted photographs that were at least as gruesome as the ones at issue here.  *See Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005) (refusing to grant habeas relief even though the state trial court admitted photographs "depicting [the victim's] severed head, her severed head near her torso and severed breast, and her torso with the severed head and severed breast replaced on [her] torso").  Thus, when the Kentucky Supreme Court affirmed Fields's conviction despite the photographs, the state court did not act contrary to any holding of the United States Supreme Court, nor did it unreasonably apply any such holding.  Hence Fields is not entitled to habeas relief.

Eighth, Fields argues that the trial court should not have given the jury an instruction on wanton murder.  R. 6 at 156–57; R. 30-23 at 29, 32.  But the jury here did not convict Fields of wanton murder; it convicted him of intentional murder.  R. 32-1 at 459.  Fields points to no Supreme Court case suggesting that a defendant's rights are violated when the trial court gives the jury the opportunity to convict on a lesser offense.[35]  There is no such case, of course.  After all, it would seem that a defendant's rights are enhanced, rather than abridged, when the jury is given the opportunity to convict on a lesser offense—rather than

---

[35] Again, he cites to no Supreme Court cases at all.

forced to make the binary choice between a greater conviction and outright acquittal.  And in any event, the jury here convicted Fields of the greater offense: intentional murder.  This argument is meritless.

## 26. Claim 26

In his twenty-sixth claim for relief, Fields argues that he is entitled to habeas relief because the trial court denied his request to change venue from Rowan County to Carter County.  R. 6 at 158.  Fields made this argument before the Kentucky Supreme Court, which rejected it on the merits, holding that the state law "prohibit[ed] an additional change of venue" and that the Rowan Circuit Court therefore "retained jurisdiction of the matter upon remand."  R. 32-1 at 453–54.  Fields does not quibble with the state court's factual findings with respect to this claim, and thus to obtain habeas relief he must show that the state courts acted contrary to clearly established Supreme Court law—or else unreasonably applied such law.  28 U.S.C. § 2254(d).

Although Fields contends that he had a "constitutional right to be tried in the county of indictment[,]" R. 6 at 158, the United States Supreme Court would be surprised indeed to learn that it has ever recognized any such right.  The Kentucky Supreme Court unreasonably applied no holding of the Supreme Court, therefore, when it rejected Fields's change-of-venue claim.  At worst, the state court erred in applying state law, which—to belabor the point yet again—is simply not a basis for federal habeas relief.  *Estelle*, 502 U.S. at 67–68.  Fields is therefore not entitled to habeas relief on the basis of his twenty-sixth claim.

## 27. Claim 27

In his twenty-seventh claim for relief, Fields argues that the trial court should have "allow[ed] a jury view of Carter County."  R. 6 at 159.  Fields made this argument before the

Kentucky Supreme Court, which rejected it on the merits, holding that the trial court had not abused its discretion by denying his request for a jury view.  R. 32-1 at 453.  Fields does not quibble with the state court's fact finding with respect to this claim, and thus to obtain habeas relief he must show that the state courts acted contrary to clearly established Supreme Court law—or else unreasonably applied such law.  28 U.S.C. § 2254(d).

Fields says that a "jury view was necessary if the jurors were to understand the proximity of the four locations to one another" and that "this, in turn, was critical for jurors to understand in order to evaluate the differing timelines advocated by the Commonwealth and by the defense."  R. 6 at 159.  However true those statements might be, the United States Supreme Court has never held that a defendant has a right to a jury view.  Thus, the Kentucky Supreme Court did not unreasonably apply any holding of the United States Supreme Court when it affirmed the trial court's refusal to order one.  Fields is therefore not entitled to habeas relief on the basis of his twenty-seventh claim.

## 28. Claim 28

In his twenty-eighth claim for relief, Fields argues that, during the sentencing portion of his trial, the court should have allowed him to present to the jury "parole eligibility statistics" and "criteria relied on by the Parole Board in determining parole."  R. 6 at 160. Fields made this argument before the Kentucky Supreme Court, which rejected it on the merits, holding that the evidence "had little relevancy or direct relationship to Fields's case." R. 32-1 at 467.  Fields does not dispute the state court's fact finding with respect to this claim, and thus to obtain habeas relief he must show that the state courts acted contrary to clearly established Supreme Court law—or else unreasonably applied such law.  28 U.S.C. § 2254(d).

Fields points to no decision from the United States Supreme Court that suggests a defendant has a right to present such evidence to the jury during his sentencing hearing. Fields has therefore failed to show that the Kentucky Supreme Court unreasonably applied any holding of the United States Supreme Court when it rejected his parole-statistics claim. Hence he is not entitled to habeas relief.

### 29. Claim 29

In his twenty-ninth claim for relief, Fields argues that "lethal injection is cruel and unusual punishment" and thus violated his rights under the Eighth Amendment to the U.S. Constitution.  R. 6 at 161.  He says that lethal injection "does not comport with [Eighth Amendment] requirements because of the substantial likelihood that it will result in undue pain and suffering for the inmate."  *Id.* at 162.  He made this argument before the Kentucky Supreme Court, which rejected it on the merits.  R. 32-1 at 189–90.   Fields does not argue that the state court made an unreasonable factual finding with respect to this claim, and thus to obtain habeas relief he must show that the state courts acted contrary to clearly established Supreme Court law—or else unreasonably applied such law.  28 U.S.C. § 2254(d).

The Supreme Court has never held that lethal injection constitutes "cruel and unusual punishment" as that term is used in the Eight Amendment.  Indeed the Supreme Court has routinely affirmed death sentences that will be carried out via lethal injection.  *See, e.g.*, *Glossip v. Gross*, 135 S. Ct. 2726 (2015); *Baze v. Rees*, 553 U.S. 35 (2008).  Thus, when the Kentucky Supreme Court rejected Fields's claim that lethal injection violated the Eighth Amendment, its decision was perfectly consistent with the current state of death-penalty law as articulated by the United States Supreme Court.  Fields has therefore failed to show that

the Kentucky Supreme Court acted contrary to, or unreasonably applied, any holding of the United States Supreme Court.  He is therefore not entitled to habeas relief.

### 30. Claim 30

In Fields's thirtieth claim for relief, he argues that he is entitled to habeas relief on the basis of "cumulative error."  He says that "cumulative effect" of the errors alleged in claims one through twenty-nine "render Fields'[s] convictions and sentence arbitrary and require that they be set aside."  R. 6 at 162.  Fields made this argument in front of the Kentucky Supreme Court, which rejected it on the merits, holding that "[u]pon comprehensive review of the proceedings in this case, we are convinced that [Fields] received a fundamentally fair trial and penalty proceeding."  R. 32-1 at 469.  Fields does not argue that the state court made an unreasonable factual finding with respect to this claim, and thus to obtain habeas relief he must show that the state courts acted contrary to clearly established Supreme Court law—or else unreasonably applied such law.  28 U.S.C. § 2254(d).

"The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."  *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002).  Thus, when the Kentucky Supreme Court rejected Fields's cumulative-error claim, it did not act contrary to any holding of the United States Supreme Court.  Nor did it unreasonably apply any such holding.  Fields is therefore not entitled to habeas relief on the basis of cumulative error.

### Conclusion

As the Supreme Court has stated, if the AEDPA "standard is difficult to meet[,] that is because it was meant to be."  *Harrington*, 562 U.S. at 102.  It gives federal courts the authority to "issue the writ" only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents."  *Id.*  For the

past twenty years, the Kentucky state courts have reviewed Fields's conviction and sentence. In the Kentucky Supreme Court's most recent opinion, it considered the claims that Fields raises now, and a fairminded jurist could believe that the state court's opinion was consistent with the holdings of the United States Supreme Court.  Under AEDPA, that is the end of the matter.  This Court cannot grant Fields habeas relief.

Accordingly, it is **ORDERED** that Fields's petition for a writ of habeas corpus, R. 6, is **DENIED**.

This the 23rd day of June, 2016.

Signed By:

*Amul R. Thapar*

United States District Judge