UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| SAMUEL FIELDS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Civil No. 15-38-ART |
| v. | ) | |
| | ) | |
| RANDY WHITE, *Warden*, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Respondent. | ) | |
| | ) | |

*** *** *** ***

Samuel Fields sits on Kentucky's death row, convicted of murdering a woman named Bess Horton. For twenty years, he has fought that conviction in the state and federal courts. The fight has included a habeas petition stating numerous grounds for relief, all of which this Court denied. R. 68. Fields now submits three more briefs, asking the Court to (1) order the government to pay for his expert witnesses, R. 62, (2) allow him to assert a habeas claim that he has procedurally defaulted, R. 63, and (3) reconsider its previous decision denying his other habeas claims, R. 69. For the following reasons, none of his arguments have merit. These motions must therefore be denied.

I.

These facts have been told before. *See* R. 68 at 2–11; *Fields v. Commonwealth*, 12 S.W.3d 275, 277–79 (Ky. 2000); *Fields v. Commonwealth*, 274 S.W.3d 375, 390–91 (Ky. 2008). The Court will give the CliffsNotes version here. On the afternoon of August 18, 1993, Fields and some friends were having a lively time: drinking beer, drinking whiskey, buying more beer, and taking horse tranquilizers. Among the revelers was Minnie Burton,

with whom Fields had been in a relationship for a few days that August, and to whose niece he had once been married.  The group ended up at a house owned by Fields's mother and brother, intending to stay the night.  There the party turned wilder as Fields turned violent. He quarreled with Burton; threw food, furniture, and knives around the house; and then started to cry.  Burton left because Fields was scaring her.  After she left, Fields punched through the glass on the kitchen door, cutting up his right arm; grabbed more cans of beer; and then followed after Burton.

She lived in the neighborhood—and rent-free—in a duplex owned by Bess Horton. But relations between the women had soured.  Now Horton was apparently trying to evict Burton by turning off the power and water in the duplex.  And when she made it home that night, Burton found herself locked out.  She sat down on the front porch.

The night had turned to fog.  As she sat, Burton heard lots of hooting and hollering and a sound like someone hitting street signs.  Through the fog came Fields, holding a knife. He said that he had killed his brother—which he had not—and gave her the knife to dispose of.  She threw it in some bushes.  He then became frantic, ripping screens off the windows. Burton fled again.  Elmer Pritchard, the other resident of the duplex, was inside and called the police.  Fields left the porch, too, apparently to find Burton, who, he would later testify, had said that she wanted to rob Horton.

Two officers arrived at the scene to investigate the potential break-in at the duplex. Searching the buildings in the area, they noticed that the garage door was open at Horton's house nearby.  Sweeping around back, they saw lights on in the house.  Funny, they thought: Horton never left her lights on that late.  Then they saw Fields—he was inside the house.

2

One officer looped back around front.  Seeing that a front window been removed, he climbed through.  In the bedroom he found Fields rummaging through a drawer.  Also in the room was Horton, lying on the bed, with her throat slashed and a knife protruding from her skull.  Fields had blood on his clothes.  His pockets were bulging with knives, other sharp objects, and jewelry.  With the officer holding him at gunpoint and waiting for backup, Fields confessed to the murder on the spot.  And then he confessed twice more: first after the other officer had arrived and read him his *Miranda* rights, and then, after being put under arrest, to an EMT on the way to the hospital.

Eventually Fields was indicted for burglary and the murder of Bess Horton.  The state jury found him guilty of both and sentenced him to death.  But the Kentucky Supreme Court overturned the conviction because jury had heard impermissible evidence and the trial judge had instructed them improperly.  *See Fields*, 12 S.W.3d at 277.

Fields was tried again.  At the second trial, his defense theory was that "Ms. Horton was dead before [he] ever entered that house."  R. 30-13 at 1874.  He built that defense on three main pillars.  The first was about the blood.  *See* R. 68 at 9.  The bricks of that argument were all the evidence of where blood was at the crime scene and where it was not.  The mortar was simple logic.  Fields was leaving blood on the sidewalk, on the back steps, on the front-screen-porch handle—everywhere he went, really.  Horton, of course, had let out a good amount of blood herself.  Yet all that blood was not quite where one would think it should have been if Fields had killed Horton.  Fields argued that the true culprit of such a gruesome murder would have had some of the victim's blood on him.  And none of Horton's blood was found on Fields.  Plus, Fields had cut himself earlier and dripped blood

3

everywhere he went.  And none of his blood was found on Horton.  From the beginning of trial until the end, Fields's lawyer hammered away at this point:  Where's the blood?  *See* R. 30-23 at 3367.

His second pillar was that the alleged timeline simply does not work, an argument again made of hard evidence and simple logic.  Triangulating from the police reports and witness testimony, Fields had fewer than fifty minutes to commit the murder:  Pritchard had called the police around 1:57 a.m.; by 2:47 a.m., they had found Fields in Horton's house and were radioing the incident in.  *See* R. 30-23 at 3373–74.  In that time, the prosecution said, Fields had walked from the duplex to Horton's house, found a way inside, murdered Horton, and robbed her.  And he did not just waltz through the front door, either: he took out a storm window.  How?  With a knife that had a bent tip and became affectionately known at trial as the "twisty knife."  The jury got to check this knife out for themselves.  *See* R. 30-13 at 1880 ("You will get to hold this knife, and feel this knife and look at this knife.").  Apparently, Fields used this odd instrument to unscrew the seventeen screws holding the window in place—without making any sound to alert the officers already prowling the area.  In the black of night, this is an arduous task even for the stone-cold sober.  But Fields was drunk, boisterously so.  He had spent the better part of the last day *making* noise, not suppressing it.  Thus, Fields argued at trial, the chronology simply did not hold up:  He could not have entered Horton's house when—and how—the government said.  *See* R. 30-23 at 3380–82.

So who did kill Bess Horton?  That is the last pillar:  According to Fields, it was Minnie Burton.  Burton, who had been drinking before the murder, too.  Who had motive:  Horton was trying to evict her from a cushy, rent-free living situation; indeed, Fields argued

4

she had been "soliciting others to rob Ms. Horton." R. 30-13 at 1876. Who had knowledge: Burton knew where Horton lived and where she kept her valuables. Who had opportunity: She is largely unaccounted for in the couple hours before the murder, hours she apparently spent evading Fields. And who, Fields has argued, has told conflicting stories about that night ever since—including at both trials. *See id.* at 1876; R. 63 at 19. Testimony supported this pillar. Trial witnesses described Burton confessing to the murder, taking a shower and changing clothes after the event, and acting nervous the rest of the night. *See* R. 30-22 at 6926, 7529–60.

In sum, the defense argued that evidence recovered from the scene, the pictures taken of the scene, the forensic evidence—or, in the case of the blood, the gaps in that evidence— and the testimony all pointed away from Fields. But once again, the jury found Fields guilty and sentenced him to death. *See* R. 68 at 11. This time, the Kentucky Supreme Court affirmed. *Id.* After the United States Supreme Court denied his petition for certiorari and the state court denied his motion for post-conviction relief, Fields came to this Court with a petition for a writ of habeas corpus. *Id.*

That petition contained thirty claims for relief. R. 6. The Court denied one claim (number eighteen) on procedural grounds. R. 58. In that claim, Fields argues that his trial and appellate lawyers were ineffective, but he has conceded that he failed to raise that claim in accordance with state rules. *Id.* at 3–4; R. 6 at 87. The Court therefore dismissed the claim, but it dismissed the ineffective-assistance-of-*appellate*-counsel (IAAC) part of it without prejudice. Fields had argued that the "actual-innocence exception" applies to that

claim and asked for more time to prove why. *Id*. at 5–6. If Fields proves actual innocence, the law will allow him to reassert his procedurally defaulted IAAC claim.

In a separate one-hundred-and-eighteen-page opinion, the Court denied the rest of Fields's claims. R. 68.

## II.

"The quintessential miscarriage of justice is the execution of a person who is entirely innocent." *Schlup v. Delo*, 513 U.S. 298, 325 (1995). If an innocent man sits on death row because of a constitutional error in his trial, and cannot get off because he has defaulted his constitutional claim, the law provides a remedy: He may argue that he is actually innocent. And if he can prove that he is, then he may assert his defaulted claim. Thus, proving one's actual innocence does not itself entitle him to relief, but is "instead a gateway through which [he] must pass" before the Court can consider his barred constitutional claims on the merits. *Herrera v. Collins*, 506 U.S. 390, 404 (1993).

In practice, that gateway is not wide. This is because society has an interest in preserving the "finality" of court decisions, maintaining "comity" between the different courts that make those decisions, and conserving "scarce judicial resources." *Schlup*, 513 U.S. at 324. Moreover, experience teaches that defendants who remain in prison based on an unaddressed constitutional error—after passing through the many levels of the judicial system—are "extremely rare." *Id*. Thus, actual-innocence claims are themselves "rarely successful." *Id*.

What makes a viable actual-innocence claim is evidence—and not just any evidence, but "new reliable evidence." *Id*. To pass through the gateway, the petitioner must show the

6

Court that "it is more likely than not that no reasonable juror," after seeing the new evidence, "would have found [him] guilty beyond a reasonable doubt." *Id*. at 327.  New evidence could include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Id*. at 324.  Results from a new DNA analysis.  A previously unknown witness come forth to tell all.  A different murder weapon found under the floorboards, still smoking (at least figuratively) after all these years.  Such evidence could support an actual-innocence claim.

But whatever it might be, that evidence must always be two things:  First, "new." *Id*. Something is only new, of course, if it was not available before.  A petitioner's evidence is therefore only "new" if he could not have used it at trial, either because the trial judge "wrongly excluded" it or because it "bec[a]me available only after the trial." *Id*. at 328 (quoting Henry J. Friendly, *Is Innocence Irrelevant?  Collateral Attack on Criminal Judgments*, 38 U. Chi. L. Rev. 142, 160 (1970)).  Second, the new evidence must be "reliable." *Id*. at 324.[1]

Putting the pieces back together:  If Fields presents new reliable evidence, and if it is more likely than not that a jury would find him innocent in light of that new evidence, then the Court can consider the merits of his defaulted IAAC claim. *See Schlup*, 513 U.S. at 327. Of his three new motions, two pertain to actual innocence.  In the first, Fields argues that he

---

[1] Fields's main sources of new evidence are the experts that he hopes the Court will appoint at the government's expense.  Courts have a well-tuned, many-factored machine to measure whether expert testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592 (1993)).  If this were the rare case in which the petitioner clears the first obstacle blocking the actual-innocence gateway—by presenting "new" evidence—the *Daubert* factors would help to verify the reliability of that evidence.  But as shown below, Fields cannot clear the first hurdle.  The Court therefore need not reach the second.

7

needs the help of experts to establish his innocence.  R. 62.  But experts take money, and Fields does not have enough.  He has therefore asked the Court to appoint him the experts and to make the government pay for them.  And in the second, Fields develops his actual-innocence claim, relying in part on the evidence he says his experts will provide.  R. 63.

The Court will take the motions in their logical order.  First, the Court must assess whether Fields really needs the experts he wants.  If he does, then the inquiry is presently at an end, since Fields will need time to develop his claims with their help.  But if he does not need them, then the Court must move on to assess whether—aside from requesting experts—Fields has presented any new, reliable evidence to get him through the actual-innocence gate.

A.

Fields wants experts—about fourteen-thousand-dollars' worth of them altogether. R. 62.  And he wants the government to pay for them.  To loosen the federal purse strings for this purpose, Fields must satisfy the requirements of 18 U.S.C. § 3599(f), a statute permitting the Court to allocate public funds for expert services when they are "reasonably necessary" to a defendant's case.  *Id.*  Experts are always nice to have, insofar as people are more apt to believe a story told or verified by someone with a Ph.D.  Under the statute, however, the expert must be reasonably *necessary*, and an expert is not reasonably necessary when his testimony will merely "duplicat[e] [the] information already available."  *Fautenberry v. Mitchell*, 572 F.3d 267, 271 (6th Cir. 2009).  For the taxpayer to pay for his experts, then, Fields must show two things: first, that this case involves a "substantial question," and second, that he cannot tackle that substantial question "without professional assistance."

8

*Matthews v. White*, 807 F.3d 756, 760 (6th Cir. 2015) (quoting *Wright v. Angelone*, 151 F.3d 151, 163 (4th Cir. 1998)).

How substantial is "substantial"?  The higher courts have not quite said, which makes sense:  Appointing experts is a matter for the district court's discretion.  *Fautenberry*, 572 F.3d at 268.  But the Sixth Circuit has mentioned that questions which "could affect the outcome of proceedings" may "be considered 'substantial.'"  *Matthews*, 807 F.3d at 760.  Which also makes sense:  After all, if a question had *no* effect on the outcome, that question would be clearly *in*substantial.  Was planet Mars in the ascendant on the night of the murder?  That question is insubstantial—and thus, a defendant does not need an astrologist to testify.  Were someone else's fingerprints on the murder weapon?  That question is more substantial, and thus, if the question is really an open one, the defendant might need a forensicist to resolve it.  For the Court to appoint him an expert, at the government's expense, Fields must first show that the expert would affect the outcome of this particular proceeding, *i.e.*, help establish his innocence.

Second, Fields must show that he could not establish his actual innocence "without professional assistance."  *Matthews*, 807 F.3d at 760.  For this to be true, the proposed expert testimony must be a reasonably necessary source of "the information [the Court] need[s]" to decide whether to let Fields through the actual-innocence gate.  *Foley v. White*, 835 F.3d 561, 563 (6th Cir. 2016).  Many types of information do not require expert messengers.  "Blood was on the walls"—that testimony requires only an eye witness, not an expert.  But "the blood splatter indicates the victim was shot by a nine millimeter at a distance of three feet"— that takes an expert.  Thus, for the Court to appoint an expert, Fields must show not only that

9

experts would help his actual-innocence claim, but also that his actual-innocence claim depends on information that only an expert can reasonably provide.

Though providing experts under Section 3599(f) is usually a two-step dance, this case requires an extra shimmy.  Fields is not trying to prove his innocence at trial.  He has already been to trial—where a jury already convicted him—and is now trying to show that he is actually innocent.  As discussed, actual-innocence claims face unique obstacles, namely the condition that they must be accompanied by some new reliable evidence.  So unless Fields's experts can provide new and reliable evidence, their testimony will not affect the outcome of this proceeding.  For example, if an actual-innocence claimant finds a vial of never-before-tested crime-scene DNA, and that DNA could potentially exonerate him, the Court could make the taxpayer pay for an expert to examine it.  If the petitioner merely wants a new expert to look at old DNA test results, however, he offers no glimmer of new evidence—and thus no reason for the Court to make the taxpayer pay for the expert.

This standard is admittedly difficult to meet.  There are just not that many vials of untested DNA lying about.  And because of the public interest in letting final judgments lie, the actual-innocent gateway remains closed unless the petitioner can identify new evidence.  *See Schlup*, 513 U.S. at 324.  Ultimately, therefore, Fields must show that his experts will provide new, reliable evidence on a question that could prove his actual innocence.

1.

Fields requests four types of experts.  First, he wants a metallurgical expert to show how "highly improbable" it was that a drunk Fields could have quickly unscrewed the storm window—in the dark, no less—with the "twisty knife."  R. 62 at 3.  Anyone with some

background in amateur handiwork might guess that, after Fields had gone at the screws with such a faulty tool, the screw heads would probably appear mangled.  But as Fields points out, "there appears to be no scoring of the screws to the naked eye."  *Id.* at 4.  He asserts that an expert in the properties of metals could "examine" the knife and screws for "any markings" and "offer an opinion as to the[ir] presence or absence."  *Id.* at 4–5.  The expert would also explain "what level of difficulty, effort, and time it would take" to open a window with only a twisty knife.  *Id.* at 5.  "This," Fields says, "would be based on science."  *Id.*

Fields has mentioned an expert of this ilk before.  In his habeas petition, Fields argued that his trial attorney was constitutionally ineffective for failing to call an expert who could "determine whether the twisty knife could or did unscrew the storm window."  R. 6 at 91.  This argument failed for two main reasons.  First, a fairminded jurist could agree that the attorney's strategic choice was a reasonable one, given that he could—and did—present the commonsense-based twisty-knife argument without shelling out for an expensive expert.  R. 68 at 83–84.  And second, Fields only speculated as to what this hypothetical tool-mark specialist would even say.  *Id.* at 85.

Dressing up his claim a little more, Fields now asks for a metallurgist.  But he still fails to show what exactly this expert will help him prove—or disprove.  Regardless of *how* he got in the house, the undisputed fact remains that he *was* in the house.  A metallurgist could likely talk until sundown about the various effects of grating one metal against another.  But that testimony would not change the fact that Fields was found next to a dead woman with sharp objects and her valuables stuffed in his pockets.  Nor would it bolster Fields's timeline argument.  Expertise in metals is not expertise in opening storm windows.  Thus,

this expert could not reliably testify about the time it might have taken Fields to open the window, about whether Fields could have gotten into the house before Horton died, or about any other part of the government's chronology. Without much to say on the relevant facts, this expert would not bring Fields any closer to proving his actual innocence.

Fields responds that his point about the absence of scoring nevertheless makes the government's timeline unlikely. R. 62 at 3. If Fields could not have gotten into the house the way the government says he did, the argument has to go, it is more likely than not that a jury would have actually found him innocent. For the reasons just discussed, that is not so. But even assuming it is so, Fields himself has shown that an expert is unnecessary to show why. By Fields's own telling, the metallurgist would discuss details already obvious "to the naked eye," namely the lack of scoring on the knife and screws. *Id.* at 4. So this expert testimony would merely "duplicat[e] [the] information already available." *Fautenberry*, 572 F.3d at 271. Moreover, Fields wants the expert to voice the same, commonsensical theory he used at trial: Fields was not trained in the art of the twisty knife, so where's the scoring? But applying common sense is the job of the factfinder, not the expert. If an expert can only speak in terms of common sense, his testimony is not even *relevant*, let alone reasonably *necessary. See Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 905 (6th Cir. 2006). Rather than assist the factfinder, this expert would merely invade its province.

And most importantly for current purposes, this expert testimony would not be "new." It would merely bring old arguments back to life. Indeed, Fields's trial attorney made the very same points about the twisty knife to the jury—without needing the help of an expert— that Fields seeks the help of an expert to make now. *See* R. 68 at 82–86 (discussing the role

12

of the twisty knife at trial). And Fields himself has shown that he can get by just fine without an expert: He makes all these same twisty-knife arguments—and at some length—in his new actual-innocence memorandum. *See* R. 63 at 6–10 (arguing that the timeline does not work). Thus, Fields does not reasonably need a metallurgist to support his actual-innocence claim.

2.

Second, Fields wants an expert to test the DNA from four cigarette butts found in Horton's house after her death. R. 62 at 5. That DNA has already been tested, but the tests did not identify the smokers, and Fields thinks modern technology will yield better results. "This is important," Fields says, "because Ms. Horton was not a smoker." *Id*. at 5 n.3. Thus, the theory goes, any new DNA test that yielded a match "would place a different suspect on the scene," specifically one with a bad habit. *Id*. at 6. So Fields wants an expert to conduct new tests. Then he wants the Kentucky police to run the results through its DNA index, "compel[ling]" samples "from possible suspects" that it does not already have on file. *Id*.

But Kentucky need not do all that. This DNA evidence would admittedly be "new." But it would not go to any substantial question. Again, Fields must show not that the expert is reasonably necessary for proving just any point, but for showing new evidence in the light of which a jury would more likely than not find him innocent. The cigarette butts might conceivably be relevant to his innocence—if they could prove someone else was in the house the night Bess Horton died. So the issue is not just who, but *when*. Fields does not say when the butts were deposited. Nor does he say the DNA tests would (or could) show when they were smoked. Could have been the night of. Could have been days, weeks, maybe even months before. All the factfinder—here played by the Court—can do is guess. And without

13

more than a guess, the cigarette butts prove little.  Nor do they *disprove* that Fields was the only person found next to Horton's dead body.  Whoever else might have been in the house, Fields was the one there are the wrong time, not to mention the one who quickly confessed.  Up against those facts, the Court cannot say that a jury would more likely than not find Fields guilty even if someone else smoked those cigarettes.

Thus, this DNA expert is not reasonably necessary to prove Field's actual innocence; the expert could only hope to prove a point that bears little relevance to who killed Horton.  And an expert is not even reasonably necessary for proving that point.  According to Fields, the facts already show that (1) Horton did not smoke, (2) four cigarette butts were in her ash tray, and (3) Fields was only in the house for a little while.  Logic, again, is all one needs to connect the dots:  If Horton smoked none of those butts, and Fields did not have enough time to smoke all four, then someone else must have visited the house.  And if Horton was a reasonably tidy person, who cleaned her ashtray somewhat regularly, someone else might have been in the house *that day*.  Even in its strongest form, this argument still is not very convincing.  When was this person there?  Who was he (or she)?  What were his motives to kill?  But the point is:  It does not take an expert to make the argument.  As such, this expert would not provide any "information [the Court] need[s]" to determine whether Fields is actually innocent.  *Foley*, 835 F.3d at 563.  If what he says about Horton's smoking habits is true, it seems likely that someone else smoked those cigarettes.  The argument is thus as convincing without experts as it would be with them.  The problem is that the argument is just not that convincing.

So even if the Court took Fields at his word—that someone other than he or Horton was the smoker—the DNA tests would not change the facts. Fields, not the mystery smoker, was found beside Horton and confessed to killing her. Nor would the tests add facts that would likely have pushed the jury the other way than the one it went. And needless to say, Section 3599(f) does not allow defendants to order the state police to drum up new suspects. Because a DNA expert is not reasonably necessary to proving Fields's actual innocence, the Court need not order the taxpayer to pay for one.

3.

Third, Fields wants a "Crime Scene Reconstruction Expert" to bolster his "where's the blood?" argument. R. 62 at 6–7. As Fields points out, the crime scene left behind some eyebrow-raising facts: None of Horton's blood was on Fields, and though he had cut himself earlier, none of Fields's blood was on or near Horton. *See id*. Given these facts in his favor, Fields says, a crime-scene reconstructionist "is critically important." *Id*. at 7. For what? Fields does not quite say, although he seems to want the expert to examine photographs of the scene and report on what they show.

This request is similar to the request for a metallurgist, and it fails for similar reasons. As with the metallurgist, Fields has previously argued that his trial attorney was ineffective for failing to call a blood-splatter expert at trial. R. 6 at 93. But just as he failed to show why such an expert was necessary then, he fails to show why a "Crime Scene Reconstruction Expert" is necessary to prove his actual innocence now. His argument is based on evidence already written on the walls (and whatever else blood might have touched or not touched). Were Fields arguing that some hidden pattern lurks beneath the blood splatter, he might need

15

an expert to point it out. Experts are useful that way—specifically when they can help the factfinder notice or understand facts that he might not otherwise have noticed or understood. And experts can be especially useful for proving actual-innocence claims—specifically when they can point out facts that no one noticed or understood before. But as already discussed, factfinders are the experts of common sense. Thus, other experts are unnecessary when they would merely explain how to apply simple logic to the facts at hand. According to Fields, that is all this expert would do.

The where's-the-blood argument does, of course, have a certain amount of oomph to it. But the question remains: Is an expert really necessary for making that argument here? To be reasonably necessary, the expert must say something new. The Court cannot see what that something would be. After all, those photographs look the same now as they did during trial. They look the same no matter who is looking at them, whether a trained expert or a lay juror. Most importantly, the photos would show the same amount of blood—or lack thereof. And the argument Fields still seeks to draw from those photos is one founded in simple logic: Where's the blood? A crime scene reconstructionist might have much to say on that topic, but nothing new. If any new blood has somehow appeared in, or disappeared from, those old photos, Fields does not mention it. And logic, of course, has worked much the same since Fields was on trial.

This expert is therefore not reasonably necessary to providing new reliable evidence of Fields's innocence. The expert would *have* no new evidence on that point to present. Although the new-evidence requirement does not require petitioners to concoct new theories, evidence must still be evidence. And an expert who merely rehashes the same old theory

16

does not present new evidence.  Granted, that expert would definitely be a new speaker.  But the speaker does not matter—the facts do.  *See, e.g.*, *Bousely v. United States*, 523 U.S. 614, 623 (1998) ("'[A]ctual innocence' means factual innocence[.]").  Because this expert would merely discuss facts that a jury has heard before, the Court cannot order the taxpayer to pay for him now.

4.

Finally, Fields would like a digital forensicist to fish through the police dispatch tapes from the night of the murder, which Fields obtained from the Grayson Police Department. R. 62 at 7.  The audio transmissions of those dispatches are contained in a spool of old tape—some pretty outdated technology that Fields apparently cannot access himself.  *See id.* at 8.  So he wants the taxpayer to pay for a forensics consulting firm to listen to the tape. "Any data retrieved could be critical in deconstructing the [government's] timeline," he says, "especially if there are specific time markers on the tapes."  *Id.*  The tapes could "also potentially provide contemporaneous statement supportive of [Fields's] innocence."  *Id.*

The very phrasing of this request suggests that this expert is not reasonably necessary. According to Fields, "if" the tapes contain certain information, they "could" "potentially" be relevant to his case.  *Id.*  Any fishing expedition might conceivably turn up something useful. But one cannot reasonably say that evidence which *might* turn up is *necessary* to a case.  *See Foley v. White*, Civil No. 6:00-552-DCR, 2013 WL 990828, at **4–8 (E.D. Ky. Mar. 12, 2013) (discussing fishing-expedition requests), *aff'd*, 835 F.3d 561 (6th Cir. 2016).  Evidence cannot be considered necessary if it is as (or more) likely not to exist as it is likely to exist. Fields can only guess at what new evidence these tapes might hold, and as such he cannot

say what "substantial question" this evidence might help him answer.  It is his burden to do that much.  *Matthews*, 807 F.3d at 760.

5.

Overall, Fields fails to show that any of the requested experts would provide new reliable evidence of his actual innocence.  The Court therefore cannot consider any of them reasonably necessary to Fields's case and cannot order the taxpayer to shell out for them. *See* 18 U.S.C. § 3599(f).  Fields's request for public funds must be denied.

B.

Despite his lack of experts, Fields has filed a detailed memorandum in support of his actual-innocence claim.  R. 63.  If he can develop that claim without those experts, the Court can consider the claim without them, too.  If Fields shows his actual innocence, the Court can allow him to assert his defaulted IAAC claim.  If he does not, then the Court cannot.

Fields erects his actual-innocence claim on the same foundation as his trial defense. Back then, the defense rested on these three main pillars:  (1) The timeline does not work. (2)  Where's the blood?  (3) Minnie Burton did it.  Now, he argues:  The supposed timeline "is unbelievable," R. 63 at 8; his blood was not "where it should [have been] if he was the killer," *id*. at 11; and Burton "is the more likely killer of Ms. Horton," *id*. at 18.  To these old pillars he only adds that his confession was "not credible."  *Id*. at 27.

Yogi Berra might say that it's like déjà vu all over again.  But Fields's actual-innocence claim does not fail simply because he has recycled his old trial arguments for new purposes.  It will fail, however, if Fields has not added any "new reliable evidence" to the

18

existing foundation.  *Schlup*, 513 U.S. at 324.  When it comes to proving actual innocence, simply remodeling the structure is not enough.  The petitioner must expand.

1.

For his timeline argument, Fields offers a near minute-by-minute account of the night Bess Horton was murdered.  R. 63 at 7–8.  His point is that, given other evidence of his whereabouts during those fifty some-odd minutes, Fields with his twisty knife simply could not have made it into the house in time to do the deed.  Fields meticulously sources his story, but all the sources are old.

Fields relies mainly on trial testimony.  *See* R. 63 at 6–11.  A neighbor testified that she was awoken by fighting at Fields's brother's house at around 1:25 a.m., which is likely around the time Fields left the party and headed for the duplex.  *Id*. at 7 (citing R. 30-19 at 6852).  At the duplex, Pritchard testified that he called the police on Fields at 1:55 a.m., and Mrs. Pritchard testified that she saw Fields under a streetlamp at 1:57 a.m.  *Id*. at 7–8 (citing R. 30-19 at 6889, 6924).  So he could not have been at Horton's house yet.  The government then alleged that each screw on Horton's storm window would have taken a full minute to unscrew—when using a twisty knife, at least—meaning even the soberest burglar could only hope to break and enter in seventeen minutes.  *Id*. at 10 (citing R. 30-13 at 5888).  During the time Fields was apparently doing this noisome work, officers testified that they were patrolling the area on "high alert."  *Id*. (citing 30-14 at 6116–17)).  And they were on the scene, looking at Fields through Horton's well-lit window, by about 2:30 a.m.  *Id*. at 11.  Fields had little time to remove the window, kill Horton, and stuff his pockets with her jewelry.  That much at least is hard to doubt.

19

Though this argument is well-cited and does make some sense, nothing in it is new. The citations themselves give away why the timeline argument is no grounds for an actual-innocence claim. Such claims require new evidence. If you could look up "old evidence" in the dictionary, you might well find "trial testimony." The jury has heard all of that before. Jurors had the chance to consider it when reaching their verdict. The actual-innocence doctrine provides a space for evidence that a jury has *not* heard before and thus could not have considered. However persuasive the timeline argument is now, it was just as persuasive when Fields was on trial. Then and now, the story rests on the same testimony. When one is trying to get through the actual-innocence gate, what matters is not the persuasive force of the argument, but the newness of the evidence that supports it.

Granted, Fields does not rely on testimony alone. He also includes photos of the crime scene and some exhibits, and he mentions an arresting officer's report of the incident. R. 63 at 9–10. To be considered new, however, evidence must have "become available only after the trial." *Schlup*, 513 U.S. at 328. The officer's report was of course available then— it was born the night of the murder, and Fields does not now argue that it was withheld. The photos were available, too—and not to mention what they depict. *See* R. 30-13 at 1913–14 (officer testimony identifying some of the photos). Indeed, the whole trial was *about* what those photos depict: the broken window, the screws, the twisty knife, the blood, the lack of blood, etc. The twisty knife was in fact so available that jurors took it into the jury room to fiddle with and thus to find out for themselves whether the prosecution's story made sense.[2]

---

[2] Although Fields has complained about this conduct before, the Court has explained why it did not violate his rights. *See* R. 68 at 17–21.

Clearly, Fields still thinks that his take on the evidence is the most convincing.  At this stage, however, he must support his claim with evidence that was unavailable at the time of trial. Evidence *from* trial will not support an actual-innocence claim because a jury has already considered that evidence and found the petitioner not innocent—and a petitioner cannot turn a habeas court into a second jury.  *See Schlup*, 513 U.S. at 328.  Here, Fields's support for his actual-innocence claim is the evidence from trial.

Fields does mention some evidence that the Court could technically consider "new." To prepare his actual-innocence memorandum, he apparently hired an investigator to walk the route from Fields's house to the duplex and thereafter to form a "conservative" estimate about the time it would have taken Fields to do so on that foggy night long ago.  *See* R. 63-1 at 2 (affidavit).  Field's lawyer also measured the distance herself—twice.  R. 63 at 7.  And Fields now asks the Court to put on its walking shoes and take the tour for itself.  *Id*. at 7 n.3.

Even if the Court did lace 'em up, however, this perambulatory data would not be "new."  Fields has argued all along that he would have needed superhuman speed—and fewer drinks in his system—to make it to Horton's house, through the window, and into her room within the government's timeline.  All the roads and sidewalks connecting his house to Horton's existed, and were thus available for do-it-yourself investigating, at the time of trial. Nor does Fields identify a new walking technique that would make his measurements more accurate now than they were or could have been at trial.  So no matter how reliable the Court could find statements from people who visit a crime scene twenty years after the crime, the evidence that those statements would contain, in this case, is not newly available.  And the first thing evidence must be, at the actual-innocence stage, is new.  *Schlup*, 513 U.S. at 324.

21

The Court therefore cannot permit Fields to assert his defaulted IAAC argument based on his timeline argument.

2.

The premise of the recycled where's-the-blood argument is that "there is no scientific evidence that establishes" Fields as the murderer.  R. 63 at 11.  None of his blood on Horton, none of her blood on him.  *See id*. at 11–15.  "[I]t is astonishing to believe," Fields argues, that no blood from Horton's slashed throat would have landed on him, if he was indeed the one that slashed it.  *Id*. at 15.

As mentioned previously, that argument is not a bad one.  But it is past its prime. Astonishment can be a useful reaction to evoke among jurors when one wants to undermine one of the other side's positions.  Hence the knowing pause that a lawyer might take in order to let the force of a devastating cross-examination sink in.  But Fields is no longer trying to convince a jury to find him innocent.  He is trying to convince a court to find him "actually innocent"—a task that, as discussed, has unique requirements.  First among them is that Fields must show some new reliable evidence.  Astonishment, by itself, just isn't worth much anymore.  By reviving his argument why the jury should have found him innocent, therefore, Fields has instead shown why the Court cannot find him actually innocent now.  He focuses on the *government's* failure to present sufficient evidence of his guilt.  But the government has already presented evidence, convinced a jury, and at this point has nothing left to prove. It is Fields who must present new evidence.  And this he fails to do.

To be fair, Fields does not play the hypocrite:  While harping on the government's lack of evidence in some paragraphs, he cites some favorable evidence of his own in others.

22

*See* R. 63 at 12–15.  But again, none of that evidence is new.  Fields refers to trial testimony, photos of the crime scene, and whatever blood the jury could have seen—or not seen—in them.  *Id.*  If any new evidence has somehow appeared in those photos in the years since trial, Fields does not point to it.  Indeed, he admits that he could not have dug up or photographs any new evidence from the crime scene:  Horton's house has been torn down.  *Id.* at 10 n.6.  Thus, Fields has shown nothing that supports his actual-innocence claim.  The Court therefore cannot permit Fields to assert his defaulted IAAC claim on where's-the-blood grounds, either.

3.

Next up, Minnie Burton.  As Fields reminds the Court, "Burton has always been the defense's prime alternate suspect in this case."  R. 63 at 19.  And as a suspect for the murder, Burton does seem to have much to recommend her.  But a jury decided that Fields had more.  To prove that decision wrong, Fields must show new reliable evidence not only connecting Burton to the murder, but connecting her so strongly that a jury would more likely than not find Fields innocent.

Like his other claims, however, this one relies on old evidence.  Fields contends that Burton "was hardly a credible witness."  R. 63 at 18.  That may be true.  The problem is how, according to Fields, one can tell that it is: by reading her conflicting testimony *at his trials*.  Fields reprints that testimony at length.  *See* R. 63 at 19–27.  The Court need not examine it at length, however—at this point what matters is not what Burton said, but when she said it.  Whatever she said during trial was, of course, available for Fields to use against her at trial.  Indeed, if her testimony really was "drastically inconsistent" from one trial to the next, then

she made his job easy; self-contradiction is the lifeblood of witness impeachment. *Id.* at 18. If at the second trial Burton said the opposite of what she had said—on the record—before, Fields had a lawyer at the ready to call her out. But by now, neither her statements nor their inconsistencies are new. Nor are the other statements that Fields has dug back up. As he points out, "[a] number of individuals testified over the two trials that [Burton had] admitted her guilt." *Id.* Unfortunately for Fields, the part of that phrase that matters the most now is "over the two trials." If these admissions were known before, they are not new.

Fields does mention one witness who never testified: Vince Kimmel, who got into a serious car accident before trial but who allegedly would have testified that Burton confessed to the murder. *Id.* at 27. Kimmel being unavailable, Fields tried to admit his taped statement at the trial. The trial court denied on state-law hearsay grounds. *See* R. 29-17 at 15. For this testimony to count as new evidence, Fields must show that the court "wrongly excluded" it. *Schlup*, 513 U.S. at 324. But he does not argue that the court was wrong, nor would he get far if he did: This Court has already denied a habeas claim premised on that very argument. R. 68 at 57–61. Plus, given that two other witnesses already testified to hearing Burton confess, Kimmel would merely have told the jury what it already knew. If this Court looked at Kimmel's testimony, therefore, it would find nothing new. Nor would it find anything likely to convince a jury to find Fields innocent. One confession did not do it. Two did not. The Court cannot reasonably say that a third would.

### 4.

Finally, Fields advises that "[b]efore accepting [his two confessions to the police], this Court should consider a number of relevant factors." R. 63 at 27. Those include that:

24

Burton confessed more times than Fields did, thus making her "the guiltier party," *id*. at 28; "the trial court improperly limited [Fields's] ability to cross[-]examine" one arresting officer for a misdemeanor involving an underage girl and the EMT for another involving a patient, *id*.; Fields testified at his first trial that he only confessed because he feared the officer would shoot him. *Id*. at 29.

Whether these factors would cause a factfinder to doubt that Fields meant to confess, this Court is not currently wearing its factfinder hat. It is wearing its habeas hat. As such, the Court need not "accept" any confessions, because the Court is not "finding" Fields guilty. A jury has already done that. Now, Fields must show evidence that—confessions aside—he is actually innocent of murder. Had he done that, the Court could find him actually innocent regardless of what he said to anyone in the past. But he has not done that.

5.

Of course, Fields also alleges that government-funded experts could bolster his claim by reconstructing the crime scene, monkeying around some more with the twisty knife, and testing out the cigarette DNA. *See id*. at 16–17. "So give 'em a chance," one might argue. But as discussed, those experts would say nothing new. Based on what Fields states in his funding request actual-innocence memorandum, he wants these new experts to voice old theories. Since the content would be no different, however, the speaker makes no difference. Fields has clearly demonstrated that he, like jurors, does not need experts to help him apply logic to self-evident facts. As such, experts would add no new or reliable evidence beyond what his actual-innocence memorandum already contains.

In the end, then, Fields's actual-innocence claims rely on facts already available to him at trial.  Thus, he fails to present any new reliable evidence of his innocence.  Failing to do that, he fails to give the Court grounds for permitting him to assert his defaulted habeas claim.  That claim (number eighteen) must remain dismissed.

## III.

Fields also asks the Court to reconsider its decision to deny his habeas petition and, after reconsidering, to vacate it.  Rule 59 permits such motions.  Fed. R. Civ. P. 59(e).  But a "motion under Rule 59(e) is not an opportunity to re-argue a case." *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998).  Additionally, "Rule 59(e) motions are aimed at *re* consideration, not initial consideration."  *Harley-Davidson Motor Co. v. Bank of New England*, 897 F.2d 611, 616 (1st Cir. 1990).  Thus, a litigant will not get himself a new judgment simply by making points he already has made or could have made. *See United States v. LaDeau*, 734 F.3d 561, 572 (6th Cir. 2013).  If he simply disagrees with the district court's judgment, he can appeal.

To convince a district court to reverse itself, a litigant must show either: that the court made "a clear error of law," or some "newly discovered evidence," or "an intervening change in controlling law," or "a need to prevent manifest injustice" that vacating the last decision presumably would fulfill.  *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 496 (6th Cir. 2006).  As discussed, Fields has no new evidence.  Nor does he identify any intervening change in controlling law.

But he argues that the Court made errors of law.  He also argues keeping him on death row under false pretenses would be manifestly unjust.  R. 69 at 4.  Fair point.  But the basic

26

premise of both arguments is that the Court was just plain-old wrong.  Fields is therefore entitled to relief under Rule 59 only if that is true.

A.

The Court committed its first alleged error by not addressing the "argument" that certain state-court post-conviction rulings were the product of a "constitutional insufficient and legally improper process."  R. 68 at 6.  According to Fields, the state court asked the state attorneys for a proposed order and, later, adopted it.  *Id*. at 5.  This process, he argues, was "corrupt."  *Id*. at 6.  The Court never considered whether this argument entitles Fields to habeas relief because Fields never raised it in any of his claims for habeas relief.  If "issues averred to in a perfunctory manner . . . are deemed waived," it follows that issues not averred to at all are deemed waived as well.  *Leary v. Livingston Cty.*, 528 F.3d 438, 449 (6th Cir. 2008); *see also Engler*, 146 F.3d at 374 ("Because the Lac Vieux [tribe] could have, but did not, raise their argument before the district court ruled on the motion to compel compliance, the argument is barred.").  Thus, this argument does not entitle Fields to habeas relief.

Fields responds that this argument does not entitle him to relief in and of itself, but rather undermines the Court's analysis of some of his other claims.  He first mentioned this process in the brief part of his habeas petition "provid[ing] notice of his intent to challenge the correctness of state court findings."  R. 6 at 21.  He now argues that, by "accord[ing] deference to the state post-conviction rulings," this Court erroneously decided his "First, Third, Fourth, Fifth, Sixth, Eighth, Twentieth, Twenty-First[,] and Twenty-second" habeas claims.  R. 69 at 6.  But as the Court explained when it first decided those claims, Fields has waived any argument that the state court "unreasonably determined" the facts because his

27

petition only mentions that argument as an afterthought.  R. 68 at 14.  As such, the Court had no cause to quibble with the state courts' factual findings; its task was to double-check their *legal* determinations.  Thus, the Court did not even mention—let alone rely on—the state-court order in the sections of its analysis that Fields says are corrupted.

And at any rate, a state court's findings of fact are presumed to be correct.  28 U.S.C. § 2254(e)(1).  If a petitioner wishes to rebut that presumption, the burden is on him, and he can only carry it by presenting "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Fields presented no evidence, just a citation to a case in which, he says, the Supreme Court "criticized the practice" that the state court had used here.  R. 6 at 21 (citing *Anderson v. Bessemer*, 470 U.S. 564 (1985)).  The *Anderson* Court did criticize *a* practice, but the exact opposite practice.  There, the court announced a ruling and then allowed the parties to submit factual findings that filled in the gaps; here, as even Fields remembers the events, the court asked for a proposal, reviewed it, and then incorporated it into a ruling.  *Anderson* is a case for different facts, and it does not require the Court to quibble with the state court here.  More importantly, judicial criticism in one case is not "clear and convincing evidence" in another.  Without any such evidence to show that the state court determined any particular issue of fact incorrectly, Fields fails to rebut the presumption that Section 2254 requires the Court to apply: that the state-court findings are correct.  Thus, to the extent the Court relied on any of the findings Fields takes umbrage with, the Court was required to do so.

## B.

Second, Fields argues that the Court committed an error of law by not addressing all of his habeas claims.  R. 69 at 7–9.  As he points out, the Court did not spend much time on

28

claim 18, which it had already dismissed in a previous order—the same order in which it gave Fields leave to file his actual-innocence memorandum. R. 58. Specifically because the actual-innocence issue was still pending, the Court did not issue a judgment along with its decision. Thus, it has not yet dismissed his habeas petition at all, let alone incompletely. The Court first needed to decide the actual-innocence issue. This is that decision.

## C.

Third, Fields fires the shot that would sink the entire ship: He argues that the Court misunderstood and therefore misapplied the Antiterrorism and Effective Death Penalty Act (AEDPA), which controls how the Court assessed each of his habeas claims. R. 69 at 9–17. A court commits an error of law by either misstating or misapplying it. *See, e.g.*, *Geier v. Sundquist*, 372 F.3d 784, 789–90 (6th Cir. 2004) (describing types of legal error).

## 1.

The Court stated the law in its previous opinion, and will hit only the highlights here. R. 68 at 11–17. Because Fields raised all but one of his habeas claims before the Kentucky Supreme Court, and because the court rejected each of them on the merits, AEDPA applies to those claims. *Id*. at 11–13.[3]   Under AEDPA, a federal court may only grant habeas relief in three circumstances: First, when the state court based its decision "on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). Second, when the state court's decision "was contrary to . . . clearly established Federal law." *Id*. § 2254(d)(1). And third, when that decision "involved an unreasonable application of . . . clearly established federal law." *Id*. In the second and third scenarios, "Federal law" does not mean just any federal law, but a

---

[3]  The one exception is claim eighteen, which the Court has dealt with separately. *See supra* Part II.

federal law "determined by the Supreme Court of the United States." *Id*.  As noted, Fields waived any unreasonable-determination-of-fact claim by not making it.  R. 68 at 14.  He waived any contrary-to-law claim the same way.  *Id*.  Thus, his case rests on contrary-to-law grounds.  *Id*. at 15.

So far so good:  Fields does not ding the Court for its understanding of the statute or the marrow of his claims.  But he argues that the Court proceeded to interpret "unreasonable application" incorrectly.  R. 69 at 13.  The statement he seems to take particular issue with is one that the Court took directly from the Supreme Court: that "a habeas court must determine what arguments or theories supported [or] could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  R. 68 at 15–16 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

Fields argues that—by asking "what might a fairminded jurist think?"—the Court "reverse[d]" the Supreme Court's prior decision in *Williams v. Taylor*, 529 U.S. 362 (2000).  Of course, the case this Court cited, *Harrington*, came after the case Fields cites, *Williams*.  If anyone reversed *Williams*, it was the Supreme Court, the only court with power to do so.

And the Supreme Court has overturned neither *Williams* nor *Harrington*.  Both are the law, and together they explain how a federal habeas court should determine whether a state court has unreasonably applied Supreme Court law.  In *Williams*, the Court held that habeas courts should not do so by asking whether "all reasonable jurists would agree that the state court was unreasonable."  529 U.S. at 409.  In *Harrington*, the Court held that they should instead ask whether "fairminded jurists could disagree" that the state court's decision was

"inconsistent" with a prior Supreme Court decision.  562 U.S. at 102; *see also Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) (establishing this rule earlier).

These holdings are not mutually exclusive.  Under *Williams*, habeas courts may not ask whether *all* reasonable jurists *would* find the state court's decision unreasonable (which here means out of line with Supreme Court precedent).  Such an inquiry is too subjective. *See Williams*, 529 U.S. at 409.  Rather, under *Harrington*, habeas courts must ask whether *any* fairminded jurist—and a fairminded jurist is presumably a reasonable one—*could* find the state court's decision reasonable (in line with precedent).  *Harrington*, 562 U.S. at 102. Putting the two together and the point more simply:  A habeas court's job is not to ask what a judge would do in the state court's shoes, but whether any judge could find what the state court did reasonable.  If so, then the petitioner is not entitled to relief.  *See* R. 68 at 16.

This rule alleviates the practical problem that Fields alludes to.  If the question were "what would all judges do?"—rather than "what might a reasonable jurist think?"—then no habeas petitioner could prevail if some rogue judge somewhere issued an opinion "consistent with or accepting the state's view."  R. 69 at 13.  That one decision would end the matter. But *Williams* prevents that, and *Harrington* turns the habeas court's attention to the more cerebral type of inquiry.

Fields nevertheless argues that *Harrington* should be confined to its facts.  Fields is right that habeas courts must look to *Harrington* when confronted with a state-court decision "unaccompanied by an explanation," as *Harrington* has a specific holding on that point. *Harrington*, 562 U.S. at 98; *see also Rayner v. Mills*, 685 F.3d 631, 638–39 (6th Cir. 2012) (applying this holding).  But Fields is wrong that the Court may *only* look to *Harrington* in

31

such situations, because that holding is not all the *Harrington* Court said.  The Court also explained and applied the unreasonable-application rule discussed above.  And that Court was not even the first to enunciate that rule.  *See Yarborough*, 541 U.S. at 664.  Nor did the *Harrington* Court attempt to limit this general rule to only the exact type of case before it.  Thus, this Court was not wrong—indeed, it was bound—to consider *Harrington*.

Fields broaches one last legal issue:  What is a habeas court to do when the Supreme Court has not spoken on a topic?  In other words, when are holdings from lower federal courts relevant to determining whether a state court has unreasonably applied "federal law"?  28 U.S.C. § 2254(d)(1).  The answer is: sometimes.  If the "lower courts have diverged widely" on a topic, that divergence might be a sign that "the state court's decision [on the topic] was not contrary to or an unreasonable application of *clearly established* federal law."  *Carey v. Musladin*, 549 U.S. 70, 76–77 (2006) (emphasis added).  This Court described the rule as "something of a one-way ratchet," because it can only help the state—if the lower federal courts diverge, then the state court's decision stands.  R. 68 at 28 n.14.

Fields calls this description a "clear error of law" because the Supreme Court itself has never described the rule in this particular way.  R. 69 at 13.  And that may be.  But this Court was merely paraphrasing what that Court said, and it immediately followed the paraphrase with the Supreme Court's exact words (the same ones quoted above).  *Id.*  That is the law that applies—and that this Court applied.

At any rate, the Court never relied on this law in its analysis, but simply mentioned it in a footnote.  That footnote explained why the Court had cited two Sixth Circuit cases after it had already cited a Supreme Court case for the same proposition.  Federal appellate courts

32

cannot "establish" federal law for AEDPA purposes.  But they can provide evidence of what fairminded jurists would think that law is.

Thus, this Court sees no reason to modify the AEDPA rule statement from its opinion, which guided its analysis of Fields's many habeas claims.  As the Court stated back then: "The task before the Court is therefore as follows: to examine each of Fields's remaining twenty-nine claims and determine whether a 'fairminded jurist' could believe that the Kentucky Supreme Court's decision rejecting those claims was consistent with the holdings of the United States Supreme Court (concerning constitutional issues that apply to the states). If a fairminded jurist could believe that, then this Court need go no further:  Fields is not entitled to habeas relief."  R. 68 at 16.

2.

The task now is to consider whether the Court applied the law incorrectly.  Much of Field's AEDPA argument, however, discusses errors of *fact*, which he says are strewn about the opinion.  *Id.* at 9–15.  "These factual errors," he says, "frame" the Court's use of AEDPA, by which he seems to mean that if the Court had understood the case better, it would have applied the law better.  *Id.* at 9.  As discussed, Fields waived any factual challenges to the state court's ruling; his arguments before this Court were purely legal.  Because this Court never considered any factual arguments in the first place, it of course cannot *re*consider them now.  So Fields can win on his motion for reconsideration only if he has some errors of law, not of fact, in his hand.  *See Henderson*, 469 F.3d at 496.  That he relies on factual arguments suggests that the Court has no need to rethink its opinion.

33

But these arguments might reveal that the Court committed an error of law by relying on bad facts. If the Court decided, for example, that Fields could not possibly have received ineffective assistance of counsel because he was represented by the legendary Edward Bennett Williams, that would be a legal ruling based on a mistaken fact.

The Court will therefore briefly consider whether, in the long list of its *alleged* factual errors, any affect its legal conclusions. If the Court was wrong on the facts, and if those facts caused it to be wrong on the law, then relief under Rule 59(e) would be appropriate. *Cf. Huff v. Metropolitan Life Ins. Co.*, 675 F.2d 119, 122–23 (6th Cir. 1982) (considering whether the decision to summary judgment because no facts were at issue was based on a "fundamental error of fact"). And to reiterate, the only legal question before this Court was whether the *state* court misapplied federal law, as determined by the Supreme Court.

The Court will group its alleged errors by the section of its previous opinion in which Fields says they occurred.

***Errors in the introduction***. While setting the scene, so to speak, the Court quoted facts from the Kentucky Supreme Court decision that vacated Fields's first conviction, rather than from the one that upheld the second. R. 68 at 1. Fields argues that the Court committed an error by "rel[ying]" on that opinion. R. 69 at 9. But the facts are the facts; they did not change between the first time the Kentucky Supreme Court decided the case and the second. If the facts in that first opinion were incorrect, that would be a different story. But Fields does not argue that they are, nor does he point to any place in this Court's *legal* analysis—which begins ten pages after the introduction—that relies on factual errors from that court. Thus, he fails to identify a legal error.

34

Also in the introduction, the Court describes Fields standing "next to" Horton's body. R. 68 at 1. Fields argues that the testimony only puts him "in the very room where the blood soaked body lay." R. 69 at 9 (quoting R. 41 at 121). The fact remains: He was in the room. And although he reappears "next to" Horton at a couple points in the Court's legal analysis, no legal calculation depends on how close he actually was to the body. The Court mentioned this proximity when discussing certain of his ineffective-assistance claims. R. 68 at 37, 85. Given the amount of evidence against him—including, but not limited to, his proximity to the body—a fairminded jurist could conclude that his lawyer's allegedly bad strategic moves did not prejudice his defense. *Id*. Whether he was found standing on top of, a few feet from, or on the other side of the room as the body makes no difference: The proximity that matters to the analysis is that he was in a room with a dead body. Even accepting that Fields was not "next to" Horton in the sense of two people standing in a line, Fields still fails to point out a clear error of law. As such, he has failed to show how any alleged errors in the introduction permeated the Court's legal analysis.

***Errors in the fact section***. With the scene set, the Court went on to recount the facts more fully—normal stuff for judicial opinions. After his arrest, Fields was whisked to the hospital. While describing that trip, the Court mentioned that Fields confessed to an EMT. R. 68 at 7. Fields now alleges that he did not. R. 69 at 10. As he recalls, he merely said "that if the EMT had killed someone, then he would be covered in blood." *Id*. Although that self-summary is basically correct, it does not tell the whole story. The EMT testified that he had asked Fields "where the blood [on his pants] was coming from." R. 30-15 at 2112. To which Fields responded that "if [the EMT] had killed some lady that [the EMT] would have

blood on [him] as well." *Id.* Fields was not speaking in hypotheticals. If one is asked "why are you covered in paint?" and responds "if you had been painting a house, you would be covered in paint, too," the safe assumption is that one has just got done painting a house. Thus, it was not clearly erroneous to characterize Fields's talk with the EMT as confessional. Besides, the Court returned to that confession just once: again to show all the evidence that faced him and thus minimized the impact that his lawyer's alleged errors had on the case. R. 68 at 37, 85. But Fields had already confessed to the police twice before. One confession is powerful on its own. The second bolsters the first. The third is still relevant, but starts to seem repetitive. (The same goes for Burton's third alleged confession, as discussed above.) The Court's analysis therefore does not stand solely on the EMT confession. Even assuming that confession never occurred, the Court can find no legal error.

Fields also contests making two confessions to the police. R. 69 at 11. But that was the sworn trial testimony of his arresting officers, who testified to hearing two confessions. R. 30-14 at 2000; R. 30-13 at 1907. Indeed, as Fields himself admits, the officers were with him at different times and heard him use different words, implying distinct acts of contrition. *See* R. 69 at 11. Fields now argues that one of the officers was simply "mistaken." *Id.* at 12. But he offers no new evidence showing otherwise. And more importantly, he has waived any argument that the state court erroneously determined the facts. On AEDPA review, this Court is concerned only with what the state court did. Thus, Fields has identified no error, let alone one that impacts the Court's AEDPA analysis.

His remaining factual arguments all fall under the category of clarifications:

- Fields points out that, in one sentence, the Court got its names mixed up and called Minnie Burton "Minnie Horton."  R. 69 at 11 (quoting R. 68 at 110).  That is true—and a legitimate error.  But the Court "conflated" the two in name only.  *Id*.  As the rest of that sentence makes clear, the Court was discussing Minnie Burton and not implying that—sort of like the (spoiler alert) ending of *Fight Club*—Horton and Burton were actually one and the same.

- Fields then knocks the Court for writing that "[d]uring opening statements, the prosecutor remained silent to show the jury 'how long a minute can be.'"  R. 68 at 8; R. 69 at 11.  Indeed, the prosecutor ultimately remained silent for one full minute, as one does when trying to show "how long a minute can be."  But the other side's theatrics have nothing to do with Fields's own legal claims or this Court's analysis of those claims.

- The same goes for Fields's issue with the Court's listing of Elmer Pritchard as among his drinking companions the day of the murder, despite "the Kentucky Supreme Court ma[king] no such finding."  R. 69 at 10 (citing R. 68 at 2).  An appellate court, the Kentucky Supreme Court makes no factual "findings."  Regardless, Prichard's main role in this story is that he heard Fields break into Horton's house and called the police; whether he earlier accompanied Fields on a bender does not change that fact or impact any legal claims.

- Fields also says the Court improperly "reference[d] to the white paint on the 'twisty knife' as if it had something to do with [his] guilt."  R. 69 at 12 (citing R. 68 at 8).  Of course it did:  The paint was integral to the prosecutors' theory.

37

R. 30-13 at 1844, 1865–66.  The paint did not necessarily *prove* Fields's guilt: As the Court also noted, Fields's lawyer showed the jury that the paint on the knife differed from the paint on the window screws.  R. 68 at 83.  But to paint a balanced picture (no pun intended), the Court had to present both sides, including what the prosecution "had to do with" Fields's guilt and what Fields thought "had to do with" his innocence.  And that is all the Court did in its reference to the paint.

- Finally, Fields raises two timing issues that do not actually conflict with what the Court said.  He contends that the walk between his mother's apartment and Burton's takes a little bit long than five minutes; the Court called it "about a five-minute walk."  R. 68 at 3; R. 69 at 10.  And he says that Pritchard called the police "approximately two hours after midnight"; likewise, the Court said "sometime after midnight."  R. 68 at 4; R. 69 at 12.

There is a reason newspapers publish clarifications in a small section in the next day's paper, rather than run a whole new article.  The clarifications do not affect the substance.  Just so here.  Even adopting all of these clarifications, Fields points to no instance where an alleged error of fact caused the Court to conclude that a fairminded jurist could find that the Kentucky Supreme Court had acted in line with United States Supreme Court precedent, when in fact none could.  At the end of the day, that question was the only one that this Court had to answer.  And the Court itself cannot find an instance where one of these alleged errors caused it to answer that question incorrectly.  Most of these facts were irrelevant to Fields's

legal claims, so neither the state court nor this Court even mentioned them while analyzing those claims.  Thus, none of these alleged errors of fact reveal a clear error of law.

But Fields offers one last fact-based argument: that the Court failed to give "adequate deference" to the Kentucky Supreme Court's statement that the evidence of Fields's guilt "was not overwhelming."  *Fields v. Commonwealth*, 12 S.W.3d 275, 281 (Ky. 2000).  AEDPA does not require "deference" to such commentary.  After all, the Kentucky Supreme Court does not decide whether someone is guilty.  Juries do.  Fields's jury found him guilty.  By pointing again to all the evidence that seemed to point in his favor, Fields illustrates how difficult AEDPA makes it to overturn a jury's decision.  If the "standard is difficult to meet," however, "that is because it was meant to be."  *Harrington*, 562 U.S. at 102.  Because Fields does not meet the standard, his AEDPA argument fails.

### D.

Finally, Fields argues that the Court misapplied the AEDPA standard to one claim in particular:  His third claim, alleging that the state prosecutors violated *Brady v. Maryland*, 373 U.S. 83 (1963).  *See* R. 69 at 17.  If the government has evidence that favors the defense, whether because the evidence is "exculpatory" or "impeaching," *Brady* requires it to turn that evidence over to the defense.  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  Here, Fields alleged that the government suppressed the favorable testimony of James Berry, who apparently could have told the jury that Fields was intoxicated on the day of the murder.  *See* R. 6 at 30.  To prove the prosecution violated *Brady*, Fields must show that (1) the evidence was favorable to him, (2) the prosecution suppressed it, either willfully or inadvertently, and (3) the suppression prejudiced the defense, *i.e.*, made it more difficult for him to present his

case. *Strickler*, 527 U.S. at 281–82.  Moreover, the evidence must have been "known to the prosecution but unknown to the defense."  *United States v. Agurs*, 427 U.S. 97, 107 (1976).  Logically speaking, the government cannot suppress what the defense already knows.  And since this is still AEDPA review, Fields must show that no fairminded jurist could conclude, as the Kentucky Supreme Court did, that the government committed no *Brady* violation here.  *Harrington*, 562 U.S. at 102.

Fields does not disagree with how the Court stated the law, but he does disagree with how the Court applied it.  The Court first concluded that "a fairminded jurist could believe that the prosecutors here were not, in fact, aware that Berry was willing to testify that Fields was intoxicated."  R. 68 at 28.  This was so because the only person who said that Berry had even spoken with the prosecution was Berry himself.  *Id.*  He said so about ten years after the alleged conversation took place.  *Id.*  And he changed his story later, recalling that the state Attorney General's office had merely called him on the phone whereas earlier he has said that a representative from the office had visited him in person many times.  *Id.*  This was on top of the fact that Berry is a convicted felon who suffers from paranoid schizophrenia.  *Id.*  Given the holes in the story, the Court concluded that a fairminded jurist could agree that the prosecution was not on notice that Berry had any relevant information to give, let alone what the information might be.  R. 68 at 27–28.

Fields says "the notion that anyone suffering from schizophrenia is automatically deemed an incredible witness discriminates against the mentally ill."  R. 69 at 18.  Such a rule could be discriminatory, which is probably one reason why it does not exist.  The Court certainly did not invent it for this case.  Fields's argument misunderstands this Court's role.

Its role was not to "judge" whether Berry would have been a competent witness.  R. 69 at 18.  Its role was to determine whether a fairminded jurist could agree that the prosecution did not know he might serve as a witness at all.  To serve that role, the Court had to list the factors that made it reasonable for the Kentucky Supreme Court to think that the prosecution did not know about Berry.  And since it was reasonable to think that, it was of course reasonable for the court to think the government could not have suppressed Berry's testimony.  To conceal information, the government first must know it.

As Fields notes, the Court then went on to "conclude[] that [his] *Brady* claim had no merit because the defense knew about Berry."  *Id*.  He further notes that "the defense had another witness who 'suggested in her own testimony' that [Fields] was intoxicated [the] night [of the murder]."  *Id*. (quoting R. 68 at 29).  He contests neither conclusion.  *See id*.  And these conclusions alone are enough to doom his *Brady* claim.  Accepting them means accepting that Fields can prove neither suppression (since he already knew of the evidence), nor that suppression prejudiced his case (since he could get the same evidence elsewhere).  Because a fairminded jurist could also accept these conclusions, Fields is not entitled to relief on his *Brady* claim.

Though Fields does not contest that someone else—specifically, Minnie Burton— could have said that he was intoxicated, he does argue that the Court's references to Burton in its section on claim three render its entire opinion "internally inconsistent."  R. 69 at 19.  Inconsistency is not by itself a reason to vacate an opinion.  But it could conceivably show that the Court made a mistake:  If two parts of an opinion disagree with each other, one of them probably has to be wrong.  While analyzing Fields's *Brady* claim, the Court concluded

41

that a fairminded jurist could think that the alleged suppression of Berry did not prejudice the defense because Berry would have simply parroted Burton; thus, his testimony would have been mostly cumulative.  R. 68 at 30–31 & n.15.  Elsewhere, however, the Court noted that the defense did not quite get the testimony it wanted out of Burton:  She equivocated a bit.  *Id*. at 45.  Fields contends that Berry, by contrast, would have spoken clearly.  R. 69 at 19.  Thus, he says, Berry would not have been cumulative—and by saying otherwise, the Court contradicted itself.  *Id*.

This argument again confuses a habeas court for a trial court.  On AEDPA review, this Court's role was not to decide evidentiary issues.  And the Court did not.  The simple question before this Court was:  Was it reasonable to think what the state court thought?  Given that Fields could have elicited the same testimony from two people, it was reasonable for the state court to think that—if the government really did suppress the Berry evidence—the suppression was no setback.  Admittedly, this discussion is somewhat gratuitous, since Fields cannot satisfy any of the earlier *Brady* prongs and therefore has no *Brady* claim.  But even if Berry's testimony had landed right in the middle of the fairway, as Fields speculates it would have, a fairminded jurist could conclude that it would not do much for his case.

Granted, Fields ultimately did not get the testimony he wanted out of Minnie Burton.  That precipitated his lawyer's concession during closing arguments that "drugs may or may not have been ingested," which precipitated Fields's habeas allegation that his lawyer was constitutionally ineffective, which led this Court to analyze that claim and thus to create what Fields calls an internal inconsistency.  R. 68 at 45–47.  Inconsistency is tough to avoid in a long opinion dealing with thirty claims, and someone looking for inconsistency can always

create it by juxtaposing two sentences from totally different parts of the opinion.  But the Court does not see the inconsistency.  The Court was required to apply AEDPA to all claims. AEDPA required it to ask what a fairminded jurist would think as to a given claim.  As to the *Brady* claim, a fairminded jurist could think that Fields did not need two witnesses to do the job of one.  As to the other claim, a fairminded jurist could think that Fields's lawyer made a reasonable strategic move in admitting that the witness he chose to use did not come through. And a fairminded jurist could think both at once:  Burton just did not work out as expected. Regardless, what is reasonable to think about one claim does not change what is reasonable to think about the other.  Because Fields fails to show why a fairminded jurist would decide his *Brady* claim any differently than the Court thinks, he has shown no legal error.

Fields also makes one more attempt to resuscitate his claim that the Court improperly relied on a state-court decision written by the prosecution.  He argues the Court ruled on his *Brady* allegations "[w]ithout addressing that the Attorney General wrote the original opinion exonerating [the prosecution] of violating *Brady*."  R. 69 at 17.  But as discussed, Fields did not raise this point in any of his claims for relief.  Although he did raise it as a reason for the Court not to rely on the state court's findings, those finding are not per se corrupt because of the underlying procedure.  In any event, Fields points to no part of the *Brady* section where the Court relied on any faulty findings.  Actually, the Court based its conclusions exclusively on videotaped testimony and controlling precedents.  *See* R. 68 at 26–31.

Thus, Fields gives the Court no reason to reverse its ruling on his *Brady* claim.  And as a result, none of his arguments for reconsideration have merit.

43

IV.

This Order has covered a lot of different terrain.  But its conclusions can be summed up like this:  Fields has not proven his actual innocence.  Nor has he shown that having the government pay for expert witnesses would make his innocence arguments any more viable.  As such, the Court can neither allocate him any public funds with which to pay those experts nor allow him to assert his procedurally defaulted eighteenth habeas claim.  Fields also fails to give the Court a reason to change its decision to deny his other habeas claims.  As such, the Court sees no reason to change it.

Accordingly, it is **ORDERED** as follows:

(1)     Fields's motion to appoint experts, R. 62, is **DENIED**.

(2)     Fields's motion for reconsideration, R. 69, is **DENIED**.

(3)     After considering Fields's actual-innocence memorandum, R. 63, the Court does not change its decision to deny Fields's eighteenth habeas claim, R. 58.

This the 22nd day of December, 2016.

Signed By:

*Amul R. Thapar*

United States District Judge